John J. Bowers
Paul W. Kisslinger
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMISSION
100 F Street, NE
Washington, D.C. 20549
(202) 551-4645 (Bowers)
(202) 551-4427 (Kisslinger)

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **18-CV-5474** |
| - against - | **COMPLAINT** |
| **JOSEPH A. FIORE, BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC., and EAT AT JOE'S, LTD. n/k/a SPYR, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), for its

Complaint against defendants Joseph A. Fiore ("Fiore"), Berkshire Capital Management

Company, Inc. ("Berkshire"), and Eat at Joe's, Ltd. (n/k/a SPYR, Inc.) ("Eat at Joe's")

(collectively, "Defendants"), alleges as follows:

### SUMMARY

1.       Defendant Fiore orchestrated a fraudulent scheme to promote and otherwise

manipulate the market for the common stock of microcap company Plandai Biotechnology, Inc.

("Plandai").  Fiore engaged in a variety of deceptive conduct to affect the market for Plandai

stock, while concealing that he controlled a large number of Plandai shares and intended to sell

them.  Fiore generated more than $11.5 million in illegal proceeds through his undisclosed sales

of Plandai shares, through his own accounts and in accounts that he controlled in the names of Defendants Berkshire and Eat at Joe's.

2.      One facet of Fiore's scheme was scalping, the illegal and deceptive practice of recommending that investors purchase a security while failing to disclose an intent to sell the same security.  From at least April 2013 to March 2014 (the "Relevant Period"), Fiore, himself and acting through his company Berkshire, organized, financed and directed a steady stream of stock alerts and research reports that promoted the purchase of Plandai stock.  Fiore paid promoters directly to promote Plandai stock or, more commonly, paid third-party consultants to retain promoters to promote Plandai stock.

3.      These promotions recommended that investors buy Plandai stock, while failing to disclose, as required by law, that Fiore, the organizer and funder of the promotional campaign, beneficially owned shares of Plandai stock, intended to sell shares, and was actively selling his Plandai holdings into the public market.  During the course of his scalping campaign, Fiore sold nearly 12 million shares of Plandai common stock through accounts he controlled.

4.      Manipulative trading was another facet of Fiore's fraudulent scheme.  During the Relevant Period, Fiore, Berkshire, and Eat at Joe's knowingly engaged in manipulative trading practices in order to induce investors to purchase Plandai stock, by artificially supporting and increasing the share price and creating the false appearance of market activity in the stock.

5.      On at least fourteen separate occasions, from May 2013 to June 2013, Fiore engaged in "matched" or "wash" trades, meaning that he caused accounts he controlled to buy and sell exactly the same amount of Plandai stock, at exactly the same price, creating a false appearance of legitimate market activity with no change in beneficial ownership.  On at least seventeen other occasions from May 2013 to December 2013, Fiore bought and sold

substantially the same amount of Plandai stock, at nearly the same time and at nearly the same price, using accounts he controlled.

6.      Fiore also repeatedly engaged in a manipulative trading practice known as "marking the close," whereby he executed trades at or near the close of the market for the purpose of artificially inflating the end-of-day share price of Plandai stock and creating the appearance of active trading.  From May 2013 to September 2013, Fiore set the closing price for Plandai stock on at least eighteen trading days.

7.      Fiore also manipulated the market for Plandai stock using a deceptive trading technique known as "painting the tape," by submitting multiple buy offers for Plandai stock on the same day, often at gradually increasing prices and within a short period of time, for the purpose of artificially inflating the share price and creating the appearance of active trading.

8.      Fiore also furthered his scheme by knowingly or recklessly making materially false and misleading statements to at least two brokerage firms.  Fiore filled out and signed documents misrepresenting, variously, that (i) he was not engaged in any promotional efforts regarding Plandai; (ii) he would not sell any shares of Plandai stock through any other brokerage firms; (iii) he had not executed or made arrangements for buy orders of Plandai stock; and (iv) his proposed sales of Plandai stock were not part of a plan to violate the federal securities laws. Fiore made these misrepresentations so that the brokerage firms would allow him to deposit his shares into accounts at those firms and then reap the profits from his scheme by selling the shares into the public market.

9.      Finally, Fiore furthered his scheme by concealing from the investing public, including the recipients of the Plandai promotions that Fiore paid for, that he had a substantial ownership interest in the company.  Fiore beneficially owned more than five percent of the

outstanding shares of Plandai common stock at certain times during the Relevant Period, and thus was required by law to file a form with the Commission to publicly disclose his ownership. Fiore, however, never filed the required forms.

### JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)], and Sections 42 and 44 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-41 and 80a-43].

11.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

12.     Venue lies in the Southern District of New York under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the offers and sales of securities and certain of the transactions, acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred within this District. Plandai traded on OTC Link, the interdealer quotation system operated by OTC Markets Group, Inc. ("OTC Markets") which is headquartered in Manhattan.  In addition, Defendant Fiore inhabits, and Defendants Fiore and Berkshire transact business, in this District.  Specifically, Fiore resides in Bronxville, New York, and Fiore and Berkshire transact business in Scarsdale, New York.   Moreover, Defendants engaged in many of the deceptive acts described in this Complaint in those locations.

4

## DEFENDANTS

13.    **Joseph A. Fiore**, age 58, is a resident of Bronxville, New York.  Fiore owns and controls Berkshire and is the Chairman of the Board of Directors of SPYR, Inc., previously known as Eat at Joe's.  During the Relevant Period, Fiore maintained and controlled six brokerage accounts held in the name of Berkshire and six brokerage accounts held in the name of Eat at Joe's.  Fiore directed and controlled these accounts and used them, along with a brokerage account in his own name, to engage in the unlawful trading, as alleged herein.

14.    **Berkshire Capital Management Company, Inc.** is a New York corporation, owned and controlled by Fiore, with its principal place of business in Scarsdale, New York. Berkshire is a private equity firm that provides financing to penny stock companies.  During the Relevant Period, Fiore financed his illegal scalping campaign regarding Plandai and unlawfully traded shares of Plandai stock using accounts he opened and controlled in the name of Berkshire.

15.    **Eat at Joe's, Ltd. (n/k/a SPYR, Inc.)** is a Nevada corporation with its principal executive offices currently located in Denver, Colorado.  During the Relevant Period, Fiore effectively controlled Eat at Joe's – he was the company's chief executive officer, chief financial officer, chairman of the board, owned more than 50% of its common stock, and, with the approval of the company's board, opened brokerage accounts in Eat at Joe's name, and controlled trading in those accounts.  In early 2015, Eat at Joe's changed its name to SPYR, Inc. and also changed the focus of its business from "developing, owning, and operating theme restaurants" to "digital publishing and advertising and the development of mobile applications and games."  SPYR has a reporting obligation to the Commission under Section 15(d) of the Exchange Act and is quoted on OTC Link under the ticker symbol "SPYR."  Eat at Joe's filed, and SPYR continues to file, periodic reports, including annual reports on Form 10-K and

quarterly reports on Form 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

16.     As outlined below in paragraphs 91 to 100, although Eat at Joe's operated as an investment company pursuant to the Investment Company Act during the Relevant Period, the company failed to register as an investment company with the Commission, in violation of Section 7(a) of the Investment Company Act.

## OTHER RELEVANT ENTITIES

17.     **Plandai Biotechnology, Inc.** is a Nevada corporation with its principal executive offices currently located in London, England.  Plandai purports to be in the business of producing botanical extracts from live plant material, including from green tea leaves, tomatoes, and more recently, marijuana, for the nutriceutical and pharmaceutical industries.  At all relevant times, Plandai's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on OTC Link under the ticker symbol "PLPL."  Plandai filed periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder, including Forms 10-K and 10-Q.  On January 31, 2017, Plandai filed a Form 15 with the Commission deregistering securities that had been registered pursuant to Section 12(g) of the Exchange Act.

18.     Plandai's stock was a "penny stock," as defined by the Exchange Act.  At all times relevant to this Complaint, Plandai's stock traded at less than $5.00 per share.  During the same time period, Plandai's stock did not meet any of the exceptions to penny stock classification set forth in Section 3a51-1 of the Exchange Act.

## FACTS

### A.   Fiore and Berkshire Engaged in a Fraudulent Scheme to Promote and Otherwise Manipulate the Market for Plandai Stock.

19.    In early 2011, Fiore's business associate introduced Fiore to Plandai's Chief Executive Officer (CEO).  Fiore then developed a business relationship with Plandai, which eventually led to Fiore's efforts to illegally promote and manipulate Plandai stocks.

20.    In order to engage in and profit from his manipulative activities, Fiore first had to acquire a large supply of Plandai shares, which he did in several different transactions.  In February 2012, Fiore, through Berkshire and Eat at Joe's, beneficially acquired 5.5 million shares of Plandai stock, purportedly as part of the merger transactions between Plandai's predecessor, Diamond Ranch Ltd. ("Diamond Ranch") and Plandai.  Pursuant to a stock transfer agreement, the parties purportedly converted approximately $2.6 million in debt that Diamond Ranch purportedly owed to Berkshire, Eat at Joe's, and certain of Fiore's close associates (including his sister and employees of Berkshire, Eat at Joe's, and the Red Rooster restaurant that Fiore owned) into 14 million shares of Plandai common stock.  Of the 14 million Plandai shares distributed in these transactions, Berkshire received 2 million; Eat at Joe's received 3.5 million; and Fiore's associates received 8.5 million.

21.    As set forth below at paragraph 58, Fiore later purchased 4.5 million of these shares from his associates at below market prices, and soon thereafter, sold 3.5 million of them into the market for a large profit.

### 1.   Fiore Used Third-Parties to Engage in a Fraudulent Promotional Campaign

22.    In March 2013, Fiore met in New York City with Plandai's CEO.  During their meeting, Fiore agreed to promote Plandai stock.  Following their meeting, Fiore orchestrated a

fraudulent scheme to promote, scalp, and otherwise manipulate the market for Plandai stock. From at least April 2013 through March 2014, Fiore and others, including Berkshire and Eat at Joe's, successfully implemented and executed Fiore's fraudulent scalping and manipulation scheme, resulting in substantial ill-gotten gains.

23.     As part of the scheme, beginning in April 2013, Fiore organized and funded a campaign promoting Plandai stock.  Fiore was deeply involved in almost every aspect of the Plandai promotional campaign, including, most significantly, paying for the campaign with funds that he funneled through Berkshire.  Fiore directly paid at least five promoters to promote Plandai stock.  He also indirectly paid at least twenty other promoters to promote Plandai stock through two intermediary consulting companies he retained.  In turn, the promoters that Fiore funded often used multiple stock promotion entities, including websites and email subscription services that they owned and controlled to promote Plandai stock.

24.     Between April 2013 and March 2014, Fiore paid the promoters at least $2,137,000 to promote penny stocks, including Plandai, with approximately $675,000 going to the two intermediary consulting companies, who then retained third parties to promote Plandai stock.  Fiore personally selected the promoters, including the promoters that the consulting companies located and later retained on his behalf.  He also paid the promoters for each promotional publication that they disseminated, and controlled the timing of their promotions.

25.     At the direction of Fiore, and with his funding, the promoters promoted Plandai stock by making explicit recommendations to potential investors buy Plandai stock in stock alerts and research reports.

26.     Many of the promoters operated email subscription services and websites that provided stock buying tips and recommendations to their subscribers.  The promoters primarily

disseminated their promotional materials through bulk emails to their subscribers and in posts on

their websites.  The promotional materials typically targeted retail investors and encouraged

them to buy Plandai stock.  The names of the promoters' websites and email domains included,

"Epic Stock Picks," "Awesome Stock Picks," "Fast Money Alerts," "Penny Stock Prophet,"

"Penny Pick Finders," "the Stock Scout," "Penny Stock Gainers," and "Moving Pennies."  The

promotional materials were also frequently titled as "Trading Alerts" or "Stock Alerts" and

addressed directly to "Traders."

27.     Throughout the promotional campaign, Fiore suggested topics for certain

promotions and routinely provided the promoters with information about Plandai for use in their

promotional materials.  Fiore also frequently coordinated the dissemination of the promotional

materials to coincide with Plandai's issuance of press releases, in order to generate additional

positive news about Plandai.

28.     On multiple occasions, Fiore received copies of Plandai press releases directly

from Plandai before they had been publicly disseminated, and then forwarded the releases to

third-party promoters for use in their promotional materials.

29.     For example, in an October 4, 2013 email to a promoter whom Fiore paid directly

to promote Plandai stock, Fiore attached a copy of an as yet unissued Plandai press release and

told the promoter to "write your stories around this topic."  In the same email, Fiore also wrote

that the promoter should "set the release up for distribution … and I will let you know the date

and time we will put it out."

30.     Similarly, in a December 6, 2013 email to the owner of one of the consulting

companies that Fiore used to hire stock promoters, Fiore attached six draft Plandai press releases,

which he directed the consulting company to forward to third-party promoters that it had retained

on behalf of Fiore to promote Plandai stock.

31.     Fiore also reviewed certain Plandai promotional materials that had been created by promoters before they were disseminated by the promoters, and he subscribed to several of the promoters' email services to ensure that the promoters earned the fees that he was paying to them.  After reviewing the promotional materials disseminated by a promoter that one of the consulting companies had hired to promote Plandai stock, Fiore emailed the owner of the company to complain that "the guy who went out today owes us a full credit, he did absolutely nothing."

32.     The promotional campaign that Fiore organized and funded played up the purported investment merits of Plandai stock and often included specific recommendations to buy Plandai stock, without disclosing that Fiore himself was actively selling.  For example:

a.      On April 29, 2013, a third-party promoter that Fiore paid directly to promote Plandai stock issued an eighteen-page "research report" that included a positive review of the company and its prospects and was accompanied by a "Speculative BUY" rating.  On Monday, April 29, 2013, and Tuesday, April 30, 2013, Fiore directed the sale of at least 55,629 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's.

b.      On October 4, 2013, a third-party promoter that one of the consulting firms had retained on behalf of Fiore to promote Plandai stock disseminated a "Street Alert" on Plandai.  The alert stated:  "Put everything we've told you together and you have a money making opportunity with PLPL like no other – and when it starts to run it's going to run fast, so get in while you can.  Go with the experts.  Buy PLPL now!"  The alert continued: "Keep a very close eye on this fast innovative play today.  PLPL

could tear up the charts once again.  PLPL looks ready to lock and load!!  Be prepared for an exciting trading session.  This is an opportunity that you will not want to miss!"  On Friday, October 4, 2013, and Monday, October 7, 2013, Fiore directed the sale of at least 70,633 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's.

   c. On January 23, 2014, a third-party promoter paid directly by Fiore to promote Plandai stock issued a research report that included positive reports about the company and its prospects, as well as a "Speculative BUY" rating.  On Thursday, January 23, 2014, and Friday, January 24, 2014, Fiore directed the sale of at least 227,200 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's.

   d. On February 12, 2014, a third-party promoter that a consulting firm had retained on behalf of Fiore to promote Plandai stock disseminated a "Stock Alert" on Plandai.  The alert stated:  "PLPL is still a huge stock for our penny-pinching standards, but I think this suggests we have one more chance to play around this $1.40 to $1.45 area…. If $3 a share was too rich for you (it was for me!), the recent down swing provides another chance to create a position at a deep, deep discount!  PLPL is a huge proven winner for us in the past and it was arguably the breakout company of the entire junior markets in early 2014."  The stock alert continued:  "Keep a very close eye on this fast innovative play today.  PLPL could tear up the charts once again.  PLPL looks ready to lock and load!!  Be prepared for an exciting trading session.  This is an opportunity that you will not want to miss!"  On Wednesday, February 12, 2014, and Thursday,

February 13, 2014, Fiore directed the sale of at least 1,148,078 shares of Plandai

common stock from accounts held by Berkshire and Eat at Joe's.

33.     The Plandai promotional materials disseminated by the promoters encouraged

potential investors to buy Plandai stock, while failing to disclose that Fiore, the organizer and

funder of the promotional campaign, beneficially owned shares of Plandai stock that he intended

to sell, and was selling, into the public market.

34.     Fewer than half of the promotions contained generic disclaimers indicating that

the promoter had been compensated for promoting the stock, and that Berkshire, or the unnamed

entity paying for the promotions, "may own," or "may sell" Plandai stock.  But these disclaimers

were incomplete, misleading, and materially inaccurate because Fiore and Berkshire were

actively selling throughout the Relevant Period.  Moreover, many promotions contained no such

disclaimer, and none of the promotions disclosed the true state of affairs:  that Berkshire and

Fiore beneficially owned, intended to sell and were actively selling shares of Plandai stock.

35.     Fiore controlled the promotional campaign through Berkshire.  He hired the

promoters, paid for the promotional campaign, gave input into the content of the promotions,

monitored the campaign, and had ample opportunities to correct any incomplete or misleading

statements, including the incomplete, inaccurate, and misleading disclaimers.  Despite having the

numerous opportunities and the economic power to insist that the promoters include in the

promotional materials complete and accurate disclosures about his funding of the campaign and

Fiore's and Berkshire's intent to sell, Fiore failed to do so, in further concealment of his role in

both the scalping and the overall fraudulent scheme.

36.     For example, Fiore knew at least as early as April 2013 that certain Plandai

promotional materials that he paid for through Berkshire, including an April 29, 2013 research

report with a "buy" recommendation for Plandai, failed to disclose his beneficial ownership of Plandai stock and that he intended to sell, and was selling, the stock at the time that the paid promotions were being published.

37.     Fiore knew that the promoters could not make accurate disclosures regarding his intention to sell Plandai stock because he never told any of the promoters or intermediary consulting companies that he owned Plandai stock that he intended to sell, and was, in fact, actively selling while the promotional campaign was ongoing.  Accordingly, investors were never informed that Fiore beneficially owned, intended to sell, and was selling Plandai stock at the same time that the stock promotions Fiore funded were encouraging investors to purchase Plandai stock.

38.     In addition, as described in paragraphs 85 to 90 below, Fiore beneficially owned more than five percent of the outstanding shares of Plandai common stock at various times during the Relevant Period, but never filed the required Schedule 13D with the Commission that would have publicly disclosed his ownership.  By failing to file the required forms, Fiore further concealed his accumulation of and interest in Plandai stock from the investing public.

39.     Notwithstanding the favorable statements regarding Plandai stock that Fiore's promoters made in the promotional materials that Fiore paid for and directed to be distributed to prospective investors, Fiore intended to, and did, sell large amounts of Plandai stock throughout the course of the promotional campaign.

40.     The promotional campaign was designed to create liquidity and market demand, to increase the share price, and to offset downward pressure on the stock price caused by Fiore's sales.

41.     Fiore clearly intended to sell throughout the Relevant Period.  At least two of the brokerage accounts from which Fiore sold Plandai stock specifically identified "liquidation" among the objectives for the accounts.  From April 2013 through March 2014, Fiore sold a total of 4,805,359 shares of Plandai stock from these two accounts.  Fiore sold shares of Plandai stock from at least one of these accounts during every month of the Plandai promotional campaign.

42.     During the course of his scheme, Fiore also completed and signed at least five documents that were sent to brokerage firms where Berkshire and Eat at Joe's maintained accounts that held Plandai stock, disclosing his intent to sell Plandai stock from those accounts.

43.     For example, on November 8, 2013, in connection with his deposit and intended sale of 1.25 million shares of Plandai stock owned by Eat at Joe's, Fiore signed and submitted a representation letter to his brokerage firm in which he certified, "I have sold, or am in the process of selling, the above referenced [Plandai] shares."  From November 2013 through January 2014, Fiore did, in fact, sell all of the shares he referred to in his November 8, 2013 letter.

44.     Although Fiore spent millions to finance the Plandai promotional campaign, along with his promotion of other penny stock companies, neither Fiore, Berkshire, nor Eat at Joe's purportedly received any compensation from Plandai or anyone else for promoting Plandai or Plandai stock.  Fiore's incentive for financing the Plandai promotional campaign was to facilitate his profitable sales of Plandai stock.

45.     Fiore's intent to sell Plandai stock throughout the Relevant Period manifested itself in his actual and consistent selling of Plandai stock through his own account and the accounts that he maintained and controlled in the names of Berkshire and Eat at Joe's.

46.     Fiore executed trades through accounts at six brokerage firms that were held in the names of Fiore, Berkshire, and Eat at Joe's.  Fiore controlled and exercised exclusive trading authority over each of the accounts.

47.     Between April 2013 and March 2014, Fiore sold 11,961,898 shares of Plandai stock from these accounts, often selling on the same day and/or the day after promotions that he paid for had been disseminated to potential investors.   Collectively, Fiore, Berkshire, and Eat at Joe's received proceeds totaling approximately $11,521,778 from their sale of Plandai stock. Fiore personally directed and controlled all of the Plandai stock sales from his own account and the accounts held by Berkshire and Eat at Joe's.

48.     On at least ninety occasions over the course of the scheme, Fiore sold Plandai stock within a week or less of the publication of a promotion that he had paid for, including seventy-three occasions when he sold on the same day.

49.     Fiore sold nearly ten times more shares of Plandai stock than he bought on the public market during the Relevant Period.  During ten of the twelve months of the scheme, he sold substantially more shares than he bought.  Moreover, as set forth in paragraphs 52 to 62 below, during the two periods in which Fiore bought more shares of Plandai stock than he sold – late June to early July 2013 and December 2013 – Fiore's purchases were consistent with his fraudulent scheme.

50.     Between April 2013 and March 2014, Fiore sold Plandai stock on at least 176 of the 252 trading days, and his trading often comprised a significant portion of the daily market volume in Plandai stock.  In contrast, during the three months preceding the start of the Plandai promotional campaign, January through March 2013, Fiore did not sell any shares of Plandai stock in the public market.

51.     During the Relevant Period, Fiore and Berkshire knowingly or recklessly organized, implemented, and funded the promotional campaign without making required disclosures.  Further, by means of the third-party promoters that they hired and paid for, Fiore and Berkshire knowingly or recklessly promoted and recommended that investors purchase Plandai stock without disclosing that Fiore owned, intended to sell, and did sell Plandai stock during the same period.  This was deceptive conduct in furtherance of Fiore's fraudulent scheme.

### 2.     Fiore Purchased Plandai Stock to Support the Price

52.     Fiore also engaged in targeted purchases of Plandai stock for the purpose of artificially increasing the market activity and stock price of Plandai, in furtherance of the fraudulent scheme.

53.     For example, in late June to early July 2013, Fiore made multiple purchases of Plandai shares in anticipation of and to offset the potential market impact of the publication of a July 6, 2013, *Seattle Times* article, "Green Tea Firm Raises Red Flags," which was highly critical of Plandai and its senior management and raised concerns about claims made by the company in public filings and press releases.  The article specifically noted the dramatic increase in the price of Plandai stock, which had "ballooned tenfold since March, thanks to a publicity campaign."

54.     Fiore first learned on or about June 25, 2013 that the *Seattle Times* was preparing an article suggesting that Plandai was a fraud.  He began buying Plandai stock immediately thereafter for the purpose of manipulatively supporting the stock price and conditioning the market in advance of the publication of the negative article.

55.     On the eighteen trading days from June 25, 2013 to July 22, 2013, Fiore not only bought more Plandai shares than he sold, but his purchasing accounted for a significant portion

of the market volume in Plandai stock.  As discussed in paragraphs 63 to 77 below, Fiore's
purchases during this period were manipulative.  Fiore's trades set the closing price for Plandai
stock on eleven of these eighteen trading days.  On seven of those days, Fiore had also been
responsible for the prior trade execution reported in the market, further indicating that his trades
were an attempt to artificially inflate the stock price.

56.     To further amplify the impact of his trading activity during the June to July 2013
period (as well as at other times during the scheme), Fiore paid for Plandai promotional materials
that drew attention to the active trading in Plandai stock, a significant part of which was
attributable to Fiore's own trading.

57.     In December 2013, the month prior to the highly anticipated legalization of
marijuana in Colorado and Washington, and shortly after Plandai had announced its entry into
the medical marijuana industry, Fiore again bought more Plandai stock than he sold, as a surge in
the stock prices of marijuana-related companies appeared imminent.

58.     In February 2014, Fiore purchased a total of 4.5 million shares of Plandai shares
for $1.35 million from his sister, a director of Eat at Joe's, and employees of Berkshire and the
Red Rooster restaurant that Fiore owned.  He then quickly sold 3.5 million of these shares in the
public market for proceeds of approximately $5.65 million.

59.     Fiore's buying efforts, coupled with his promotional campaign, were deceptive
actions, designed to create the false perception of liquidity and market demand and to offset
downward pressure on the stock price caused by negative press, and his own undisclosed selling
of Plandai shares in the accounts he controlled.

60.     Both market demand for, and the share price of, Plandai stock increased
significantly over the Relevant Period.  In March 2013, the month before Fiore began his

17

scheme, Plandai's common stock traded between $0.06 and $0.14 per share, with an average daily trading volume of 15,040 shares.

61.    On eight days in March 2013, there was no trading at all in Plandai common stock.  During the time of the Plandai promotional campaign, the price of Plandai common stock jumped significantly, starting at a low of $0.13 per share on April 1, 2013 and reaching a high of $3.12 per share on February 3, 2014.  Similarly, the average daily trading volume of Plandai common stock rose sharply to 420,126 shares, to a high of 10,609,100 shares traded on February 3, 2014.

62.    By the end of June 2014, two months after Fiore had ended the promotional campaign, Plandai stock closed at $0.31 per share.

### 3.    Fiore, Berkshire, and Eat at Joe's Manipulated the Market for Plandai Stock

63.    During the Relevant Period, Fiore, acting individually and through Berkshire and Eat at Joe's, also engaged in deceptive conduct in furtherance of the fraudulent scheme by engaging in manipulative trading to artificially inflate the value and appearance of trading volume for Plandai stock.

64.    Fiore used three well-known methods for manipulating the market for Plandai stock:  wash and matched trades, marking the close, and painting the tape.  These trades did not have legitimate business or economic purposes.  Instead, they were executed for the purpose of giving investors the false and misleading impression that Plandai's share price and trading volume were the legitimate result of active market supply and demand and to induce investors to purchase shares of Plandai.

65.    Fiore conducted the manipulative trading through accounts that he maintained and controlled at three brokerage firms, Broker A, Broker B, and Broker C.  These accounts were

held in Fiore's name as well as in the names of Berkshire and Eat at Joe's.  Fiore exercised exclusive trading authority over all of these accounts.

66.     From April 2013 through December 2013, Fiore held approximately two million shares of Plandai stock in brokerage accounts that he maintained and controlled.  He also beneficially owned an additional 1.45 million to 5.7 million shares of Plandai stock in certificate form that he had not deposited into any brokerage account.

**Matched and Wash Trades**

67.     From May 2013 to December 2013, Fiore executed matched and wash trades, which artificially created the appearance of market activity and interest in Plandai stock.

68.     On at least fourteen occasions from May 2013 to June 2013, Fiore bought and sold exactly the same amount of Plandai stock at exactly the same price with no change in beneficial ownership, through accounts he controlled in the name of himself, Berkshire, and Eat at Joe's.

Following are examples of these trades:

| Date | Time | Fiore Controlled Account | Price | Quant Bought | Quant Sold |
|---|---|---|---|---|---|
| 05/08/13 | 11:04:50 | Berkshire | $0.36 | 5,000 | |
| 05/08/13 | 11:05:08 | EAJ | $0.36 | | 5,000 |
| | | | | | |
| 05/16/13 | 14:09:13 | Berkshire | $0.46 | 2,500 | |
| 05/16/13 | 14:09:50 | EAJ | $0.46 | | 2,500 |
| | | | | | |
| 05/28/13 | 13:57:54 | Berkshire | $0.49 | 3,480 | |
| 05/28/13 | 13:58:26 | EAJ | $0.49 | | 3,480 |
| | | | | | |
| 05/29/13 | 13:22:48 | Berkshire | $0.51 | 1,500 | |
| 05/29/13 | 13:23:10 | EAJ | $0.51 | | 1,500 |
| | | | | | |
| 06/04/13 | 11:47:19 | Berkshire | $0.54 | 800 | |
| 06/04/13 | 11:49:04 | EAJ | $0.54 | | 800 |
| | | | | | |
| 06/14/13 | 10:12:02 | Berkshire | $0.52 | 1,000 | |
| 06/14/13 | 10:12:31 | EAJ | $0.52 | | 1,000 |
| | | | | | |
| 06/14/13 | 10:34:11 | Berkshire | $0.52 | 1,000 | |
| 06/14/13 | 10:34:34 | EAJ | $0.52 | | 1,000 |
| | | | | | |
| 06/17/13 | 10:08:13 | Berkshire | $0.53 | 2,500 | |
| 06/17/13 | 10:09:08 | EAJ | $0.53 | | 2,500 |
| | | | | | |
| 06/21/13 | 15:10:34 | Berkshire | $0.49 | 300 | |
| 06/21/13 | 15:10:51 | EAJ | $0.49 | | 300 |
| | | | | | |
| 06/26/13 | 11:51:29 | Fiore | $0.52 | 2,000 | |
| 06/26/13 | 11:51:55 | EAJ | $0.52 | | 2,000 |
| | | | | | |
| 06/26/13 | 11:52:14 | Fiore | $0.52 | 500 | |

| 06/26/13 | 11:52:50 | EAJ | $0.52 | | 500 |
|---|---|---|---|---|---|
| | | | | | |
| 06/26/13 | 11:56:14 | Fiore | $0.52 | 2,500 | |
| 06/26/13 | 11:56:41 | EAJ | $0.52 | | 2,500 |
| | | | | | |
| 06/27/13 | 10:44:18 | Fiore | $0.52 | 2,500 | |
| 06/27/13 | 10:44:42 | EAJ | $0.52 | | 2,500 |
| | | | | | |
| 06/28/13 | 12:05:12 | Fiore | $0.53 | 2,500 | |
| 06/28/13 | 12:05:44 | EAJ | $0.53 | | 2,500 |

69.     On at least sixteen other occasions from May 2013 to December 2013, Fiore
bought and sold substantially the same amounts of Plandai stock at nearly the same times and
prices, through accounts he controlled in the name of himself, Berkshire, and Eat at Joe's.
Following are examples of these trades:

| Date | Time | Fiore Controlled Account | Price | Quant Bought | Quant Sold |
|---|---|---|---|---|---|
| 05/13/13 | 15:52:27 | EAJ | $0.53 | | 1,300 |
| 05/13/13 | 15:57:57 | Berkshire | $0.56 | 1,000 | |
| | | | | | |
| 05/16/13 | 14:07:19 | Berkshire | $0.46 | 2,500 | |
| 05/16/13 | 14:10:02 | EAJ | $0.43 | | 2,750 |
| | | | | | |
| 05/21/13 | 14:34:24 | Berkshire | $0.51 | | 1,000 |
| 05/21/13 | 14:36:42 | Berkshire | $0.51 | 1,500 | |
| | | | | | |
| 06/14/13 | 10:33:55 | Berkshire | $0.52 | 1,500 | |
| 06/14/13 | 10:34:34 | EAJ | $0.52 | | 1,000 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 06/14/13 | 11:56:52 | Berkshire | $0.51 | | 1,000 |
| 06/14/13 | 11:57:48 | Berkshire | $0.53 | 1,000 | |
| | | | | | |
| 06/21/13 | 15:07:40 | EAJ | $0.45 | | 2,500 |
| 06/21/13 | 15:08:31 | Fiore | $0.47 | 2,500 | |
| | | | | | |
| 06/21/13 | 15:08:42 | EAJ | $0.47 | | 2,500 |
| 06/21/13 | 15:10:02 | Fiore | $0.48 | 2,500 | |
| | | | | | |
| 06/21/13 | 15:10:08 | Fiore | $0.48 | 3,800 | |
| 06/21/13 | 15:10:17 | EAJ | $0.48 | | 2,500 |

**Marking the Close**

70.     From May 2013 to September 2013, Fiore repeatedly marked the close, *i.e.,* executed trades at or near the close of the market to attempt to raise the closing price of Plandai stock and create the false and misleading appearance that it was the result of legitimate market demand.

71.     Fiore set the closing price of Plandai stock on at least eighteen trading days during this time period.  On seven of those days, Fiore had also been responsible for the previous reported execution (examples of painting the tape, as set forth in paragraphs 73-77).

72.     Following are examples of Fiore's marking the close in accounts that he controlled:

| Date | Time | Fiore Controlled Account | Original Order Qty | Limit or Mkt Order | Execution Qty | Execution Price | Closing Price |
|---|---|---|---|---|---|---|---|
| 05/03/13 | 15:52:34 | Berkshire | 500 | 0.325 | | | |
| 05/03/13 | 15:52:41 | Berkshire | | | 500 | 0.325 | 0.325 |
| 05/31/13 | 15:49:00 | Fiore | 500 | Mkt | | | |
| 05/31/13 | 15:49:01 | Fiore | | | 500 | 0.54 | 0.54 |
| 06/14/13 | 15:37:29 | Berkshire | 500 | Mkt | | | |
| 06/14/13 | 15:37:32 | Berkshire | | | 500 | 0.525 | |
| 06/25/13 | 15:56:14 | Berkshire | 500 | Mkt | | | |
| 06/25/13 | 15:56:29 | Berkshire | | | 500 | 0.515 | 0.515 |
| 06/27/13 | 15:30:41 | Fiore | 2,500 | 0.49 | | | |
| 06/27/13 | 15:59:16 | Fiore | | | 100 | 0.49 | 0.49 |
| 07/02/13 | 15:43:26 | Fiore | 500 | Mkt | | | |
| 07/02/13 | 15:43:29 | Fiore | | | 500 | 0.5095 | 0.5095 |
| 07/09/13 | 15:54:08 | Fiore | 500 | Mkt | | | |
| 07/09/13 | 15:54:10 | Fiore | | | 500 | 0.49 | 0.49 |
| 07/10/13 | 15:58:48 | Berkshire | 500 | Mkt | | | |
| 07/10/13 | 15:58:51 | Berkshire | | | 500 | 0.48 | 0.48 |

**Painting the Tape**

73.     From May 2013 to September 2013, Fiore repeatedly painted the tape, *i.e.*,
initiated multiple offers to purchase Plandai stock on the same day, and within the same short
period of time, often at increasing purchase prices to artificially inflate the stock price and create
the false and misleading appearance that the increase was the result of legitimate market demand.

74.     For example, on May 3, 2013, Fiore submitted the following limit orders -
meaning that the trades could only be executed at the specified price or higher - beginning at
$.32 per share, ending at $.36 per share (a 12.5 percent increase in four minutes):

| Date | Time | Account | Market or Limit Price | Buy Order Quantity |
|------|------|---------|----------------------|--------------------|
| 05/03/13 | 14:15:20 | Berkshire | $   0.32 | 3,700 |
| 05/03/13 | 14:16:22 | Berkshire | $   0.32 | 2,500 |
| 05/03/13 | 14:17:33 | Berkshire | $   0.36 | 1,000 |
| 05/03/13 | 14:19:16 | Berkshire | $   0.36 | 1,000 |

75.     On July 9, 2013, Fiore initiated the following limit orders from 3:32 to 3:49 p.m. -
beginning at $.425, ending at $.475 per share (an 11.8 percent increase in seven minutes):

| Date | Time | Account | Market or Limit Price | Buy Order Quantity |
|------|------|---------|----------------------|--------------------|
| 07/09/13 | 15:32:40 | Fiore | $   0.425 | 10,000 |
| 07/09/13 | 15:43:56 | Fiore | $   0.45 | 5,000 |
| 07/09/13 | 15:44:30 | Fiore | $   0.46 | 2,500 |
| 07/09/13 | 15:45:30 | Berkshire | Mkt | 200 |
| 07/09/13 | 15:47:58 | Fiore | $   0.475 | 10,000 |
| 07/09/13 | 15:48:40 | Berkshire | Mkt | 300 |
| 07/09/13 | 15:49:58 | Fiore | $   0.475 | 12,000 |

76.     The above-described manipulative transactions had no legitimate market-based or
economic purpose.  Fiore entered into these trades the purpose of creating a false or misleading
appearance of active trading in Plandai stock, to artificially increase the share price and trading
volume of the stock, and to induce investors to purchase it.

77.     As alleged above in paragraphs 22 to 51, to further amplify the impact of his
manipulative trading, Fiore funded promotions that explicitly referenced the increased trading
activity in Plandai stock, some of which was as a result of Fiore's own trading on multiple
occasions, including between June 25, 2013 and July 22, 2013.

24

**C.      Fiore Made False and Misleading Statements to Brokerage**
         **Firms to Further His Fraudulent Scheme.**

78.      During the Relevant Period, and in furtherance of his fraudulent scheme, Fiore made materially false and misleading statements to Broker B and Broker C in connection with the sale of Plandai securities held in accounts in the name of Berkshire and Eat at Joe's that he controlled.  Fiore's misrepresentations enabled him to deposit his Plandai shares in those accounts and then sell more than 3,000,000 of those shares.

79.      For example, on January 27, 2014, Fiore signed and submitted to Broker B a document titled Customer Stock Deposit Representations ("Stock Deposit Rep.") in connection with Eat at Joe's deposit of 2,000,000 shares of Plandai stock in a brokerage account.  The heading of the Stock Deposit Rep. stated:  "This is a legally binding document that will be relied on for compliance with the securities laws."

80.      In the Stock Deposit Rep., Fiore made the following false representations to Broker B concerning the sale and promotion of Plandai stock:

a.       "While any of Customer's Stock at [Broker B] remains unsold, Customer will not sell additional shares of the same Stock through any other broker-dealer unless Customer advises [Broker B] in advance."  This was a false statement.  While shares at Broker B remained unsold, on the day of, and within days after signing the Stock Deposit Rep., Fiore sold more than 80,000 shares of Plandai through broker-dealers other than Broker B.  Fiore never corrected this misrepresentation to Broker B.

b.       "Customer has not made, and will not make any payment to any other person in connection with the proposed sale of the Stock or engage in any special or enhanced selling or promotional efforts."  This representation was false.  Fiore engaged in extensive promotional efforts for Plandai and its stock throughout the Relevant Period,

including the period covered by the Stock Deposit Rep., as described above in paragraphs 22 to 51.  Fiore never corrected this misrepresentation to Broker B.

      c.      "Customer's proposed sale of the Stock is not part of a plan to violate or evade the registration provisions of the Securities Act or any other federal or state law or regulation."  This representation was false.  Fiore's sale of Plandai shares throughout the Relevant Period, including shares covered by the Stock Deposit Rep., was an essential component of his fraudulent scheme, as alleged herein.  Fiore never corrected this misrepresentation to Broker B.

      d.      "Customer is not using any device, scheme, or artifice to defraud, and is not misstating a material fact or omitting to state a material fact required to be made in order to make the statements made not misleading, in connection with the sale of the Stock."  This representation was false.  Fiore's sale of Plandai shares throughout the Relevant Period, including shares covered by the Stock Deposit Rep., was an essential component of his fraudulent scheme, as alleged herein.  Fiore never corrected this misrepresentation to Broker B.

81.    On November 8, 2013 and January 27, 2014, Fiore signed and submitted two Shareholder Representation Letters ("Shareholder Rep. Letters") to Broker C, both in connection with sales of 1,250,000 shares of Plandai stock, in which Fiore made multiple misrepresentations, including the following:

      a.      "Neither I nor any Related Person has made, or will make, any payment in connection with the offer or sale of the Restricted Security to any person other than the usual and customary broker's fee or commissions."  These were false statements.  As part of his promotional campaign set forth in paragraphs 22 to 51 Fiore made substantial

payments to consultants and promoters in connection with the offer and sale of Plandai stock throughout the Relevant Period, which included the sale of the stock covered by the Shareholder Rep. Letters.  Fiore never corrected these misrepresentations to Broker C.

       b.      "Neither I nor any Related Person has buy or sell orders open in any security of the Company with any other broker, dealer, or bank or will place any such order pending completion of the sale of the Restricted Securities."  These were false statements.  On the day of, and within days of signing each of the Shareholder Rep. Letters, while sell orders authorized by the Shareholder Rep. Letters were pending, Fiore, Berkshire, and Eat at Joe's placed buy and sell orders for hundreds of thousands of Plandai securities with other brokers.  For example, between November 8 and November 15, 2013, Fiore sold more than 45,000 shares of Plandai stock through brokers other than Broker C; between January 29 and January 30, 2014, Fiore sold more than 700,000 shares of stock through brokers other than Broker C.  Fiore never corrected these false statements to Broker C.

82.     On or about November 8, 2013 and January 27, 2014, Fiore made the same misrepresentations to his counsel that he made in the Shareholder Rep. Letters.  Fiore's counsel incorporated these misrepresentations into two attorney opinion letters, dated November 8, 2013 and January 27, 2014, that Fiore's counsel then forwarded to Broker C, along with the Shareholder Rep. Letters, to enable Fiore to deposit and sell the shares.  Fiore never corrected these false statements made to his counsel and Broker C.

83.     Fiore's misrepresentations to his counsel and Brokers B and C were material. Representatives of the brokerage firms would not have accepted the Plandai stock for deposit, or

subsequently permitted Fiore to sell the shares, if they had known that any or all of the above statements made by Fiore or his counsel were or had become untrue.

84.     Fiore knew or was reckless in not knowing that each statement was false at the time that he executed the documents in question, or had become untrue prior to some or all of the sales of Plandai stock from the respective accounts he controlled, based on his ongoing promotional campaign he orchestrated through Berkshire and his trading of Plandai stock in other accounts.

**D.      Fiore Failed to Publicly Disclose His Beneficial Ownership of More Than
         Five Percent of the Outstanding Shares of Plandai Stock.**

85.     At various times during the course of his fraudulent scheme, Fiore beneficially owned more than five percent of the outstanding shares of Plandai stock in his own name and in accounts he controlled in names of Berkshire and Eat at Joe's.

86.     As of February 20, 2012, Fiore beneficially owned at least 7,704,500 shares of Plandai stock, which constituted approximately 6.97 percent of the outstanding shares of Plandai stock.

87.     Fiore's beneficial ownership of Plandai stock remained over five percent through January 16, 2014, when it fell to approximately 4.81 percent.

88.     On February 19, 2014, Fiore acquired beneficial ownership of an additional 5,000,000 shares of Plandai stock, resulting in Fiore beneficially owning approximately 6.69 percent of the outstanding shares of Plandai stock.  He continued to own more than five percent until on or about March 13, 2014, after which his ownership fell below five percent.

89.     As a five percent shareholder in Plandai, Fiore was required to file a Schedule 13D with the Commission in order to publicly disclose his holdings of Plandai stock.  Fiore never filed any Schedules 13D with the Commission, as required by law, disclosing his

beneficial ownership of Plandai stock, including at any point during the course of his fraudulent

scheme.  As a result, Fiore violated Section 13(d) of the Exchange Act and Rules 13d-1

thereunder.

90.     Moreover, by failing to make the required Schedule 13D filings, Fiore further

concealed his ownership and sales of Plandai stock from the investing public during the course

of his scalping, in furtherance of his fraudulent scheme.  In this regard, Fiore's failure to file

Schedules 13D was deceptive conduct in which he engaged knowingly or recklessly.

**E.     Eat at Joe's Operated as an Unregistered Investment Company.**

91.     According to periodic filings with the Commission, Eat at Joe's was originally

incorporated in Delaware in 1988 as Conceptualistics, Inc.  After a series of changes in corporate

structure and control, in January 1997 the company's shareholders adopted a plan of

reorganization and merger with E.A.J. Holding Corp., Inc., making E.A.J. Holding Corp. a

wholly owned subsidiary of the company.  The company changed its name to Eat at Joe's, Ltd.

and initiated its plan to open theme restaurants.

92.     Between 1997 and 2014, Eat at Joe's claimed to "develop, own and operate theme

restaurants called 'Eat at Joe's.'"  Eat at Joe's, however, operated only one restaurant, a

cheesesteak stand in the Philadelphia airport that reported recurring losses from operations.

93.     In reality, at least in 2013 and 2014, Eat at Joe's acted primarily as an investment

company engaged in the business of investing in securities.

94.     Fiore frequently used Eat at Joe's as a vehicle to buy and sell shares of OTC

issuers, including Plandai and other penny stocks, that Eat at Joe's acquired from Berkshire

pursuant to a 2003 related party agreement.  According to its filings with the Commission, as of

May 21, 2013, Eat at Joe's had acquired approximately 30,000,000 shares of penny stock

companies from Berkshire, with a stated face value of over $7.5 million.

95.     This total includes approximately 3.5 million shares of Plandai, with a stated face

value of over $1.5 million.  Eat at Joe's also purchased numerous shares of Plandai and other

issuers on the open market and in private transactions.  As a result of its acquisitions of shares of

penny stocks, at various times a significant portion of Eat at Joe's total assets consisted of

holdings of investment securities.

96.     Specifically, as of December 31, 2013, investment securities constituted

approximately 52 percent to 65 percent of the value of Eat at Joe's total assets on an

unconsolidated basis, and as of December 31, 2014, between 62 percent and 80 percent, of the

value of Eat at Joe's total assets on an unconsolidated basis.

97.     Because investment assets exceeded forty percent of Eat at Joe's total assets as of

December 31, 2013 and December 31, 2014, Eat at Joe's was thus operating as an unregistered

investment company within the meaning of the Investment Company Act of 1940, in violation of

Section 7(a) of the Investment Company Act.

98.     Fiore and Eat at Joe's knew or should have known that Eat at Joe's was operating

as an unregistered investment company in violation of Section 7(a) of the Investment Company

Act.

99.     In February 2015, Eat at Joe's changed its name to SPYR, Inc., and adopted a

new ticker symbol "SPYR."

100.     In April 2017, Eat at Joe's lease in the Philadelphia airport expired and the

cheesesteak stand closed.  In its most recent SEC filings, the company has stated that it plans to

focus its efforts on the digital media industry, specifically the development of mobile games and applications.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

**(Against Fiore, Berkshire, and Eat at Joe's)**

101.    Paragraphs 1-9 and 13-90 are re-alleged and incorporated by reference as if fully set forth herein.

102.    Defendants Fiore and Berkshire, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce, knowingly or recklessly have:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

103.    Defendant Eat at Joe's directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce, knowingly or recklessly has employed devices, schemes, or artifices to defraud; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

104.    By reason of the foregoing, Defendants Fiore, Berkshire, and Eat at Joe's directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

### (Against Fiore, Berkshire, and Eat at Joe's)

105.     Paragraphs 1-9 and 13-90 are re-alleged and incorporated by reference as if fully set forth herein.

106.     Defendants Fiore and Berkshire directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

107.     Defendant Eat at Joe's, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has employed devices, schemes, or artifices to defraud; and engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

108.     By reason of the foregoing, Defendants Fiore, Berkshire, and Eat at Joe's, each violated, and unless restrained and enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Section 9(a)(1) of the Exchange Act

**(Against Fiore, Berkshire, and Eat at Joe's)**

109.    Paragraphs 1, 4-7, 13-18, and 63-77 are re-alleged and incorporated by reference as if fully set forth herein.

110.    Defendants Fiore, Berkshire, and Eat at Joe's directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose of creating a false or misleading appearance of active trading in Plandai stock, or a false or misleading appearance with respect to the market for Plandai stock:  (a) have effected transactions in Plandai stock which involved no change in the beneficial ownership thereof; (b) have entered orders for the purchase of Plandai stock with the knowledge that the orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; and/or (c) have entered orders for the sale of Plandai stock with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of any such securities had been or would be entered by or for themselves or different parties.

111.    By reason of the foregoing, Defendants Fiore, Berkshire, and Eat at Joe's have violated, and unless restrained and enjoined will again violate, Exchange Act Section 9(a)(1) [15 U.S.C. § 78i(a)(1)].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act

**(Against Fiore, Berkshire, and Eat at Joe's)**

112.    Paragraphs 1, 4-7, 13-18, and 63-77 are re-alleged and incorporated by reference as if fully set forth herein.

113.    Defendants Fiore, Berkshire, and Eat at Joe's directly or indirectly, singly and in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, effected a series of transactions in Plandai stock, that created actual or apparent active trading in the stock, and raised the price of the stock, for the purpose of inducing the purchase or sale of such security by others.

114.    By reason of the foregoing, Defendants Fiore, Berkshire, and Eat at Joe's have violated, and unless restrained and enjoined will again violate, Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 20(b) of the Exchange Act

**(Against Fiore and Berkshire)**

115.    Paragraphs 1-9 and 13-90 are re-alleged and incorporated by reference as if fully set forth herein.

116.    Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] precludes any person, directly or indirectly, from doing any act which would be unlawful under the Exchange Act for such person to do, through or by means of any other person.

117.    By knowingly or recklessly using third-party promoters to promote Plandai stock without disclosing Fiore's and Berkshire's beneficial ownership, intent to sell, and/or sales of the stock, Fiore and Berkshire, directly or indirectly, violated Section 20(b) of the Exchange Act.

These acts, done through and by means of the third-party promoters violated Section 10b of the Exchange Act and Rule 10b-5 thereunder.

118.     By reason of the foregoing, Defendants Fiore and Berkshire directly or indirectly, singly or in concert, have violated, and unless restrained and enjoined will continue to violate Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder**

**(Against Fiore)**

119.     Paragraphs 1, 9, 13-18, 38, and 85-90 are re-alleged and incorporated by reference as if fully set forth herein.

120.     Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R.§ 240.13d-1] require any person who has acquired beneficial ownership of more than five percent of the stock of a Section 12 reporting company, such as Plandai, to file a Schedule 13D with the Commission within ten days of the acquisition.  .

121.     From at least February 2012 until January 16, 2014, and from February 19, 2014 until approximately March 13, 2014, Fiore beneficially owned more than five percent of the outstanding shares of Plandai stock.

122.     Fiore never filed a Schedule 13D as required.

123.     By reason of the foregoing, Defendant Fiore violated, and unless restrained and enjoined will again violate, Exchange Act Section 13(d) [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

**SEVENTH CLAIM FOR RELIEF**
**Violations of Section 7(a) of the Investment Company Act**

**(Against Eat at Joe's)**

124.    Paragraphs 13-18 and 91-100 are re-alleged and incorporated by reference as if fully set forth herein.

125.    Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)] prohibits an investment company with a board of directors, such as Eat at Joe's, from, among other things, buying or selling securities unless it is registered with the Commission pursuant to Section 8 of the Investment Company Act [15 U.S.C. § 80a-8].

126.    Section 3(a)(1)(C) of the Investment Company Act [15 U.S.C. § 80a-3(a)(1)(C)] defines an investment company as an issuer which (1) is engaged, or proposes to engage, in the business of investing, reinvesting or trading in securities, and (2) owns or proposes to acquire investment securities having a value exceeding 40 percent of the issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.

127.    During the Relevant Period, Defendant Eat at Joe's was an investment company, as defined by Section 3(a)(1)(C).  Eat at Joe's was engaged in the business of investing and trading in securities, and it owned investment securities having a value exceeding 40 percent of the value of its total assets on an unconsolidated basis.

128.    Eat at Joe's was never registered with the Commission as an Investment Company under the Investment Company Act Section 8(a) [15 U.S.C. § 80a-8(a)].  By failing to register or otherwise qualify for any exemption or exclusion from registration, Eat at Joe's violated Section 7(a) of the Investment Company Act.

129.    By reason of the foregoing, Defendant Eat at Joe's, directly or indirectly, singly or in concert, has violated, and unless restrained and enjoined will again violate, Investment Company Act Section 7(a) [15 U.S.C. § 80a-7(a)].

## EIGHTH CLAIM FOR RELIEF

### Disgorgement By Relief Defendant

### (Against Eat at Joe's)

130.    Paragraphs 1-9 and 13-90 are re-alleged and incorporated by reference as if fully set forth herein.

131.    Defendant Eat at Joe's received unlawful proceeds arising from the violations alleged herein by defendants Fiore and Berkshire.

132.    Eat at Joe's should be compelled to return any unlawful proceeds received by it as a result of the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently enjoining Fiore, Berkshire, and Eat at Joe's and their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them who receive actual notice of the final judgment by personal service or otherwise  from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5], Section

9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)], and Section 9(a)(2) of the Exchange Act [15

U.S.C. § 78i(a)(2)];

Permanently enjoining Fiore and Berkshire and their agents, servants, employees, and

attorneys, and all persons in active concert or participation with any of them who receive actual

notice of the final judgment by personal service or otherwise  from future violations of Section

20(b) of the Exchange Act [15 U.S.C. § 78t(b)];

Permanently enjoining Fiore and his agents, servants, employees, and attorneys, and all

persons in active concert or participation with him who receive actual notice of the final

judgment by personal service or otherwise from future violations of Section 13(d) of the

Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R.§ 240.13d-1];

Permanently enjoining Eat at Joe's and its agents, servants, employees, and attorneys, and

all persons in active concert or participation with it who receive actual notice of the final

judgment by personal service or otherwise  from future violations of Section 7(a) of the

Investment Company Act [15 U.S.C. § 80a-7(a)];

### III.

Ordering Defendants Fiore and Berkshire to disgorge all ill-gotten gains they received,

directly or indirectly, with prejudgment interest thereon, as a result of the violations alleged in

this Complaint.

Ordering Eat at Joe's to disgorge all ill-gotten gains it received, directly or indirectly,

with prejudgment interest thereon, as a result of the violations alleged in this Complaint, or in the

alternative, as a relief defendant, to disgorge all proceeds it received as a result of the fraud.

**IV.**

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)];

**V.**

Permanently barring Fiore and Berkshire from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Securities Act Section 20(g)(1) [15 U.S.C. § 77t(g)(1)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

**VI.**

Permanently prohibiting, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],  Fiore from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

**VII.**

Granting any other and further relief this Court deems appropriate.

Dated: June 18, 2018

/s/ Paul W. Kisslinger
John J. Bowers
Paul W. Kisslinger
100 F Street, N.E.
Washington, DC 20549-4473
Telephone: 202-551-4645 (Bowers)
            202-551-4427 (Kisslinger)
email:  *bowersj@sec.gov*
        *kisslingerp@sec.gov*

COUNSEL FOR PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION