Alex Spiro
Crystal Nix-Hines
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Fl.
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100

Marc S. Gottlieb
ORTOLI ROSENSTADT LLP
366 Madison Ave, 3rd Floor
New York, NY 10017
Tel: (212) 829-8943
Fax: (866) 294-0074

*Attorneys for Defendants Joseph A Fiore,*
*Berkshire Capital Management Company,*
*Inc., and Eat at Joe's, Ltd. n/k/a SPYR, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 7:18-cv-05474 |
| **JOSEPH A. FIORE, BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC., and EAT AT JOE'S, LTD. n/k/a SPYR, INC.**, | ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

I.  BACKGROUND .........................................................................................2

    A.  Fiore Meets with and Invests in the Growth of Plandai...............................2

    B.  The SEC Brings Suit ................................................................................3

II.  ARGUMENT .............................................................................................4

    A.  The SEC Fails to Adequately Plead Violations of §17(a) or §10(b)-5...................5

        1.  The SEC Fails to Adequately Plead Fiore Owed and Breached a Duty of Disclosure ................................................................6

        2.  No False or Misleading Information Was Disclosed..................................9

        3.  The SEC Fails to Sufficiently Allege Materiality in the Advertisement Disclosures ................................................................9

        4.  There Was No Causal Connection Between Fiore's Statements to Brokerages and Market Awareness ........................................10

        5.  The SEC Does Not Adequately Allege Scienter.......................................11

        6.  The SEC Fails to Sufficiently Plead Market Manipulation .....................15

    B.  The Complaint Fails to Adequately Allege Section 17(a), 10(b) or 20(b) Liability of Berkshire or EAJ................................................................18

    C.  The Section 7(A) Claim Against EAJ is Insufficient................................19

    D.  Dismissal of the SEC's Claim for Disgorgement is Warranted..........................22

    E.  Fiore's Reliance on Plandai's Public Filings Insulates Him from Section 13(d) Liability ................................................................24

    F.  The Statute of Limitations Bars the SEC's 17(a), 10(b) and Disgorgement Claims in Whole or in Part................................................................25

    G.  The SEC's Untimely Enforcement Action Violates the Purposes and Procedural Safeguards of Dodd Frank ................................................27

III.  CONCLUSION .........................................................................................30

i

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Aaron v. Sec. & Exch. Comm'n,*
   446 U.S. 680 (1980)..................................................................................................... 5

*Anschutz Corp. v. Merrill Lynch & Co.,*
   690 F.3d 98 (2d Cir. 2012)........................................................................................... 4

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)....................................................................................................... 4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007).......................................................................... 5, 13, 14, 15

*Avon Pension Fund v. GlaxoSmithKline PLC,*
   343 F. App'x 671 (2d Cir. 2009) ............................................................................... 12

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988)....................................................................................................... 8

*Baxter v. A.R. Baron & Co.,*
   No. 94-cv-3913(JGK), 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995)...................... 15

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)....................................................................................................... 4

*Birch Ranch & Oil Co. v. Hopkins,*
   128 Cal. App. 2d 730 (1954) ...................................................................................... 10

*In re China Organic Sec. Litig.,*
   No. 11 CIV. 8623 JMF, 2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) ................. 18

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,*
   480 F.2d 341 (2nd Cir. 1973)...................................................................................... 14

*CompuDyne Corp. v. Shane,*
   453 F. Supp. 2d 807 (S.D.N.Y. 2006)........................................................................ 15

*In re Comverse Tech., Inc. Sec. Litig.,*
   543 F. Supp. 2d 134 (E.D.N.Y. 2008) ....................................................................... 23

*Cortina v. Anavex Life Scis. Corp.,*
   No. 15-CV-10162(JMF), 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ............. 6, 7, 8, 12, 13

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009)..................................................................................... 4, 13

*Fezzani v. Bear, Stearns & Co.,*
   384 F. Supp. 2d 618 (S.D.N.Y. 2004)........................................................................ 21

*In re Galectin Therapeutics, Inc. Sec. Litig.,*
   157 F. Supp. 3d 1230 (N.D. Ga. 2015), *aff'd,* 843 F.3d 1257 (11th Cir. 2016) ..... 13

*In re Galena Biopharma, Inc. SEC Litig.,*

117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................... 7

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ...................................................................................... 5

*Garvey v. Arkoosh*,
354 F. Supp. 2d 73 (D. Mass. 2005) .......................................................................... 8

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
No. 06 CIV. 1202 LGS HBP, 2013 WL 3718071 (S.D.N.Y. July 15, 2013) ........................ 20

*Hogan v. Fischer*,
738 F.3d 509 (2d Cir. 2013) ...................................................................................... 4

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
309 F. Supp. 3d 100 (S.D.N.Y. 2018) ........................................................................ 15

*Johnson v. SEC*,
87 F.3d 484, 492 (D.C. Cir. 1996) ............................................................................. 22

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ...................................................................................... 12

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017) ............................................................................................. 23

*Montford & Co, Inc. v. SEC*,
No. 14-1126 (D.C. Cir. 2015) .................................................................................... 25

*Panama Ref. Co. v. Ryan*,
293 U.S. 388 (1935) ................................................................................................. 26

*S.E.C. v. Kelly*,
663 F. Supp. 2d 276 (S.D.N.Y. 2009) ........................................................................ 24

*S.E.C. v. National Presto Industries, Inc.*,
486 F.3d 305 (7th Cir. 2007) ............................................................................... 17, 19

*S.E.C. v. Wyly*,
71 F. Supp. 3d 399 (S.D.N.Y. 2014) .................................................................. 1, 20, 22

*Scherer v. Equitable Life Assurance Soc'y of U.S.*,
347 F.3d 394 (2d Cir. 2003) ...................................................................................... 25

*SEC v. Brown*,
740 F. Supp. 2d 148 (D.D.C. 2010) ........................................................................... 22

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ................................................................................. 20

*SEC v. Frohling*,
851 F.3d 132 (2d Cir. 2016) ...................................................................................... 5

*SEC v. Jones*,
476 F. Supp. 2d 374 (S.D.N.Y. 2007) .................................................................. 22, 23, 24

*SEC v. Lek Sec. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017) .......................................................................... 14

*SEC v. O'Meally*,
   No. 06 CIV. 6483 LTS RLE, 2008 WL 4090461 (S.D.N.Y. Sept. 3, 2008) ............................ 5

*SEC v. Patel*,
   61 F.3d 137 (2d Cir. 1995)......................................................................................... 21

*SEC v. Pentagon Capital Mgmt. PLC*,
   612 F. Supp. 2d 241 (S.D.N.Y. 2009)........................................................................... 5

*SEC v. Teo*,
   746 F.3d 90 (3d Cir. 2014)........................................................................................ 20

*SEC v. Thompson*,
   238 F. Supp. 3d 575 (S.D.N.Y. 2017)........................................................................... 8

*SEC v. Yorkville Advisors, LLC*,
   305 F. Supp. 3d 486 (S.D.N.Y. 2018)........................................................................... 5

*Sec. & Exch. Comm'n v. Aly*,
   No. 16 CIV. 3853(PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018)........................... 7, 10

*Stoll v. Ardizzone*,
   No. 07 Civ. 00608, 2007 WL 2982250 (S.D.N.Y. Oct. 9, 2007) ........................................ 23

*In the Matter of the Tonopah Mining Company of Nevada*,
   26 S.E.C. 426 (July 21, 1947) ............................................................................. 17, 26

*In re UBS Auction Rate Sec. Litig.*,
   No. 08 CIV. 2967(LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ................................ 2

*Union Cent. Life Ins. Co. v. Credit Suisse Sec.*,
   (USA), LLC,, 2013 WL 1342529 ................................................................................ 16

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)......................................................................................... 6

*Wilson v. Merrill Lynch & Co., Inc.*,
   671 F.3d 120 (2d Cir. 2011)............................................................................ 8, 14, 15

**Statutory Authorities**

15 U.S.C. § 77q(a) ............................................................................................................. 5

15 U.S.C. § 78d-5 .............................................................................................................. 24

15 U.S.C. § 78d-5(a)(1) ............................................................................................... 24, 25

15 U.S.C. § 78j(b) .............................................................................................................. 5

15 U.S.C. § 78t(b) .............................................................................................................. 16

15 U.S.C. § 80a-3(a)(1)(A)-(B) ........................................................................................... 17

15 U.S.C. § 80a-3(b)(1) ...................................................................................................... 17

15 U.S.C. § 80a-7(a) .......................................................................................................... 16

18 U.S.C. §§ 3161(b), 3162(a).......................................................................................... 26

28 U.S.C. § 2462................................................................................................... 22, 23

Exchange Act, 15 U.S.C. § 78m(d) ........................................................... 21

**Rules and Regulations**

17 C.F.R. § 200.66 .................................................................................. 26

17 C.F.R. § 202.5(c) ................................................................................ 24

17 C.F.R. § 240.10b-5 ............................................................................... 5

Fed. R. Civ. P. 9(b) .................................................................................. 4

Fed. R. Civ. P. 12(b)(6) ............................................................................ 4

Fed. R. Evid. 201 .................................................................................... 3

Fed. R.Civ.P. 12(b) ................................................................................ 25

**Treatises**

Div. of Enf't, *SEC, Enforcement Manual*  § 2.4 (2017) ............................ 24

**Additional Authorities**

*http://www.sec.gov/news/speech/2009/spch031909tap.htm.* ....................... 26

*https://ir.spyr.com/all-sec-filings/content/0001262463-13-000160/joes10k.htm*  (last
   visited Oct. 17, 2018) ......................................................................... 18

*https://ir.spyr.com/all-sec-filings/content/0001262463-14-000312/joes201310k.htm*  (last
   visited Oct. 17, 2018) .................................................................... 18, 19

*Penny Stock Rules* https://www.sec.gov/fast-answers/answerspennyhtml.html  (last
   visited Oct. 4, 2018) ............................................................................ 2

*The Barre-Montpelier Times Argus*, https://www.timesargus.com/news/sec-should-
   tighten-procedures-gao-report-says/article_6975a72c-a105-55d4-ab4e-
   87f7570e1e6e.html (Sept. 18, 2007) ................................................... 26

*The New York Times*, B. Keller, "How to Legalize Pot," (May 19, 2013) .................. 11

## PRELIMINARY STATEMENT

More than four years after it began its investigation against Defendants, and over 14 months following the issuance of its *Wells* notice letters, the Securities and Exchange Commission ("SEC" or "Plaintiff") filed this lawsuit against Defendants Joe Fiore ("Fiore"), his corporation Berkshire Capital Management Company ("Berkshire"), and Eat at Joe's, Ltd. ("EAJ") (now known as SPYR, Inc.), a publicly traded, microcap company for which Fiore was its CEO, President and majority shareholder (collectively "Defendants"). The SEC's principal theories of liability center on an alleged scheme by Fiore to manipulate the share price of Plandai Biotechnology, Inc. ("Plandai")—a microcap company that creates biochemical extracts—by orchestrating and funding a purportedly fraudulent promotional campaign and engaging in allegedly manipulative trading activities. Complaint ("Compl.") ¶ 1. Notwithstanding the five-year statute of limitations period, the SEC erroneously claims that these activities generated more than $11.5 million in proceeds between April 2013 and March 2014 (the "Relevant Period"). *Id.* ¶¶ 1-2.

Specifically, the Complaint alleges violations of Sections 17(a) of the Securities Act, Sections 9(a)(1), 9(a)(2), 10(b), 13(d) and 20(b) of the Exchange Act, and Rules 10b-5 and 13d-1 thereunder. *Id.* ¶¶ 101-123. The SEC also asserts a separate cause of action against EAJ on the ground that it failed to register as an Investment Company in violation of Section 7(a) of the Investment Company Act of 1940.[1] *Id.* ¶¶ 124-129. These claims are unavailing. In addition to suffering from fatal jurisdictional and statute of limitations defects, the Complaint is based purely on conclusory and erroneous allegations and fundamental errors of law. Further, it does not come

---

[1] The SEC also presents a "disgorgement" claim against EAJ, Compl. ¶¶ 130-132, but this "claim" is actually an equitable remedy. *See S.E.C. v. Wyly*, 71 F. Supp. 3d 399, 404 (S.D.N.Y. 2014) ("[D]isgorgement is an equitable remedy.").

even close to satisfying the heightened pleading requirement for claims sounding in fraud. Accordingly, the Complaint should be dismissed in its entirety.

## I.    BACKGROUND

Fiore owns and operates Berkshire, a private equity firm that provides support and financing to small public companies in the penny stock market.[2] Compl. ¶ 14. He also ran EAJ, which, since 1997, had as its mission, developing theme restaurants, and thereunder, operated a Philadelphia-based cheesesteak restaurant. *Id*. ¶¶ 15, 92. In 2015, Fiore changed the company's focus to the development of mobile applications and games, *id*. ¶ 15, and changed its name to SPYR, Inc. ("SPYR"). *Id*. ¶¶ 99, 100.

### A.    Fiore Meets with and Invests in the Growth of Plandai

In 2011, Fiore met the CEO of Plandai, which produces botanical extracts from live plant material for the nutraceutical and pharmaceutical industries. *Id*. ¶¶ 17, 19. To support the company's mission, Fiore decided to fund Plandai's growth and publicity. *Id*. ¶¶ 20, 21. In February 2012, through Berkshire and EAJ, Fiore beneficially acquired 5.5 million shares of stock in exchange for investing in Diamond Ranch—a predecessor company that would later merge with Plandai. *Id*. ¶ 20. Diamond Ranch settled $2.6 million of its debt in exchange for 14 million shares of its newly merged company, Plandai. From these shares, Berkshire received 2 million, EAJ received 3.5 million, and several Berkshire consultants received 8.5 million. *Id*.

After investing in Plandai, from April 2013 to March 2014, Fiore funded a promotional campaign designed to bring investor awareness to Plandai, specifically to highlight the company's offerings and growth potential. *Id*. ¶¶ 23–51. While Fiore funded this campaign, he had absolutely

---

[2] "The term 'penny stock' generally refers to a security issued by a very small company that trades at less than $5 per share." *Penny Stock Rules*, https://www.sec.gov/fast-answers/answerspennyhtm.html (last visited Oct. 4, 2018). Defendants ask the Court take judicial notice of this website. *See In re UBS Auction Rate Sec. Litig.*, No. 08 CIV. 2967 (LMM), 2010 WL 2541166, at *13 (S.D.N.Y. June 10, 2010) (Judicial notice taken of SEC website).

no authority or control over the promotional content. *Id.* The SEC even admits that Fiore's role was limited; in addition to reviewing the promotional content, he "suggested" article topics, "coordinated the dissemination of promotional materials," and "gave input into the content of the promotions." *Id.* ¶¶ 27, 31, 35.

Undaunted by positive or negative coverage of Plandai, Fiore supported Plandai's growth through "multiple purchases of Plandai shares." *Id.* ¶ 53. Even after Fiore learned in June of 2013 that the *Seattle Times* intended to publish an article critical of Plandai, he continued to invest. *Id.* ¶¶ 53–54. Then, after Plandai announced its entry into the soon-to-be lucrative medical marijuana industry in December 2013, just before the "highly anticipated legalization of marijuana in Colorado and Washington," *id.* ¶ 57, Fiore "bought more Plandai stock than he sold." *Id.*

**B.     The SEC Brings Suit**

On June 18, 2018, more than five years after Fiore invested in Plandai, ignoring the factual and legal arguments set forth in Defendants' *Wells* submissions, the SEC brought suit against Fiore, EAJ and Berkshire, alleging a variety of purportedly manipulative trading activities, including matched and washed trades, "marking the close," "painting the tape," and scalping. *See* Compl. ¶¶ 5–7. Despite the detailed *Wells* submission Defendants submitted,[3] the SEC persisted in its lawsuit. Moreover, while the SEC brought suit against all of the Defendants, the vast majority of its allegations are against Fiore, with very few direct claims against Berkshire or EAJ. *See infra*, Part II.B.

---

[3] The suit was filed on **June 18, 2018** after Fiore, Berkshire Capital, and EAJ submitted responses to the SEC's *Wells* Notices in **May 2017**. *See* Alex Spiro Decl. ("Spiro Decl.") Ex. A (Fiore and Berkshire Capital *Wells* Submission); Ex. B (EAJ/ SPYR *Wells* Submission). Defendants request judicial notice of the dates Defendants submitted their responses. *See B & R Supermarket, Inc. v. MasterCard Int'l Inc.*, No. 17CV02738MKBJO, 2018 WL 4445150, at *9 (E.D.N.Y. Sept. 18, 2018) (a court may take judicial notice of records to establish the date and fact of the record); *Piccolo v. New York City Campaign Fin. Bd.*, No. 05 CV 7040 GBDMHD, 2007 WL 2844939, at *2 (S.D.N.Y. Sept. 28, 2007) (a court may take judicial notice of the fact that advertisements were published on certain dates).

In particular, the SEC alleges that between April 2013 and March 2014, Fiore "matched and washed" trades on approximately 30 days, *id.* ¶¶ 67–69, "marked the close" of the market on approximately 18 days, *id.* ¶¶ 70–72, "painted the tape" on two days, *id.* ¶¶ 73–77, and engaged in "scalping" activity throughout the Relevant Period, *id.* ¶¶ 14, 22, 35, 90. The Complaint also alleges that Fiore made materially misleading statements to two investment brokerages, *id.* ¶ 8, and that he allegedly concealed from investors and the advertisers that he funded his financial stake in Plandai, *id.* ¶ 9. Finally, the Complaint alleges that by the end of 2013 and 2014, EAJ operated as an "unregistered investment company," insofar as more than forty percent of its total assets consisted of investment securities. *Id.* ¶¶ 91–100. For the reasons set forth below, the SEC's Complaint is deficient and should be dismissed.

## II.    ARGUMENT

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 566 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Moreover, "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rule of Civil Procedure by stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Accordingly, a plaintiff generally "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal citation omitted). Where, as here, a complaint failed to meet these standards, dismissal has been granted. *See id.* (granting motion to dismiss where defendant's disclosure that it "may routinely place one or more bids in an auction . . . to prevent an auction failure" undermined a finding of fraud).

### A.     The SEC Fails to Adequately Plead Violations of §17(a) or §10(b)-5

From the outset, it is clear that the SEC cannot establish its core claim of misconduct—that Defendants engaged in a "fraud or deceit" in violation of Section 17(a) of the Securities Act or Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. Whether cast as an omission or a misrepresentation of a material fact, or as a market manipulation, the Complaint lacks the requisite specificity necessary to survive a motion to dismiss.

Section 10(b) claims may be based on either material misstatements or omissions or on market manipulation. A misstatement or omission theory requires a plaintiff to adequately allege that a defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quotations and citations omitted); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. "Market manipulation requires  . . . [allegations of] (1) manipulative acts;  . . . [2] scienter;  . . . [3] in connection with the purchase or sale of securities;  . . . [4] furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commun., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).

Similarly, Section 17(a) contains three subsections that forbid: "(1) the direct or indirect use of any device, scheme, or artifice to defraud; (2) obtaining money or property through misstatements or omissions of material facts; and (3) any transaction or course of business that operates as a fraud or deceit upon a purchaser of securities." *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (citing 15 U.S.C. §§ 77q(a)). The first subsection requires

proof of scienter, while the other two sections require only proof of negligence. *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 697 (1980) ("[T]he language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)."). Because the SEC's actions center on "fraud or deceit" *see* Compl. ¶¶ 102–103, 106–107, and not negligence, the evidentiary burdens for the mental state elements of Sections 17(a) and 10(b) claims are indistinguishable. Accordingly, Plaintiff must meet the heightened pleading requirements of Rule 9 for its Sections 10(b) and 17(a) claims. *See SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 257–58 (S.D.N.Y. 2009) (where "an action alleging violation of section 10(b) or 17(a)(1) sounds in fraud, the [complaint] 'must state with particularity the circumstances constituting fraud or mistake.'"). Plaintiff has not met, and cannot meet, this burden.

The SEC also failed to adequately plead that Defendants acted with the requisite scienter. A plaintiff sufficiently alleges scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. O'Meally*, No. 06 CIV. 6483 LTS RLE, 2008 WL 4090461, at *1 (S.D.N.Y. Sept. 3, 2008) (*quoting, Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000). Again, the Complaint comes up short.

1. <u>**The SEC Fails to Adequately Plead Fiore Owed and Breached a Duty of Disclosure**</u>

The SEC erroneously alleges that in promotional articles funded by Fiore, but written by independent advertisers, Fiore misled the investing public by concealing his beneficial ownership of more than 5% of Plandai stock, Compl. ¶¶ 38, 85; that advertisers had been paid for promoting the stock, *id.* ¶¶ 34, 35, or that he intended to sell Plandai shares during the promotional period, *id.* ¶¶ 3, 32-37. These allegations are insufficient because they rest on the false premise that underwriting the cost of a promotion is *ipso facto* synonymous with controlling the content of what

is contained therein. The allegations in the Complaint do not support, and, in fact, contradict, this premise.

It is axiomatic that a "pure omission . . . is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) (quotation and citation omitted). In *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *1 (S.D.N.Y. Dec. 29, 2016), the plaintiff brought securities fraud claims based on the defendants' purported duty to disclose that they had paid for stock promotions. *Id.* at *5. In dismissing the 10b-5 claim, the court held that the plaintiffs had "fail[ed] to identify any duty that Defendants . . . owed to disclose," as the securities laws place the burden of disclosure on a paid promotion's publisher, not the payor. *Id.* The allegations that Fiore funded dissemination of the promotional materials, and "had ample opportunities to correct any incomplete or misleading statements, including the incomplete, inaccurate, and misleading disclaimers," Compl. ¶ 35, are irrelevant because Fiore's ability to provide feedback on, and fund the content of, independent advertisers has no bearing on *his* legal liability to disclose. As the Supreme Court recognized in *Janus Capital Group v. First Derivative Traders*:

> [T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. . . . This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

564 U.S. 135, 143–43 (2011).

Notably, the SEC did not allege, nor could it, that Fiore was the "maker" of the promotional articles. It claims only that Fiore organized and financed the promotional campaign and provided input into the promotional materials. *See supra*, Part I.A. But these allegations do not equate to

*editorial control*. To be sure, a funder of promotional materials may face liability for the publishers' statements if it maintains tight control over what is published. *See In re Galena Biopharma, Inc. SEC Litig.*, 117 F. Supp. 3d 1145, 1165 (D. Or. 2015) (company approved every article). But here, since Fiore did not make the statements, or write or edit the content, he cannot be held liable, particularly when the Complaint is devoid of *any* allegations that the advertisers lacked independence to publish what they saw fit. *See Cortina*, 2016 WL 7480415, at *4 (dismissing fraud claim where plaintiffs merely alleged "superficial accusations that Defendants 'caused, directed, and authorized' a paid promotional scheme.").

The SEC attempts to portray Fiore as the *de facto* publisher, alleging that after reading one article, "Fiore emailed the owner of the company to complain that the guy who went out today owes us a full credit, he did absolutely nothing." Compl. ¶ 31. Fiore's frustration hardly demonstrated his control over the promotional content. More to the point, the Complaint fails to sufficiently allege any an "intent to deceive, manipulate or defraud" or "knowing misconduct." *Sec. & Exch. Comm'n v. Aly*, No. 16 CIV. 3853 (PGG), 2018 WL 1581986, at *19 (S.D.N.Y. Mar. 27, 2018). If anything, his dissatisfaction only *confirmed* the advertisers' independence to write what they chose. Perhaps recognizing this, the SEC attempts to bolster its pleading by asserting that Fiore had "the economic power" to insist on certain disclaimers but failed to do so. Compl. at ¶ 35. But absent allegations of control over the final content, no liability attaches to those who merely fund and comment on the content that is ultimately disseminated, even if that individual had "the economic power" to insist on the inclusion of certain disclaimers. If merely having "economic power" were enough to create liability for failing to include a proper disclaimer, any party paying for an article would suddenly become liable for all disclaimers. This is contrary to the law.

### 2. No False or Misleading Information Was Disclosed

Putting aside the absence of any legal duty of disclosure, the SEC's claims fail for the additional reason that no material information was omitted from Plandai promotional materials that misled the investing public. Compl. ¶¶ 33–35, 37, 51. The SEC's alleged omissions include the failure to disclose that the advertisers were compensated "and that Berkshire, or the unnamed entity paying for the promotions, 'may own' or 'may sell' Plandai stock." *Id.* at ¶ 34. However, again, since Defendants did not control the content of these materials, they had no legal duty to provide any "disclaimer" about that relationship. *See, e.g., Cortina*, 2016 WL 7480415, at *5 (dismissing securities fraud claim where "Plaintiffs fail to identify any duty that Defendants [who were not promoters] would have owed to disclose even if they had played role in a paid-promotional scheme."). This fact alone is fatal to the SEC's claim.

While the SEC trumpets the "may own" or "may sell" language in the disclaimers, these references were neither false nor misleading. While "may sell" language has been held to be misleading where plaintiff plausibly alleged it was always defendant's intent to sell shares, *see SEC v. Thompson*, 238 F. Supp. 3d 575, 598–99 (S.D.N.Y. 2017), that is not the case here because Fiore was both a purchaser and a seller of Plandai shares throughout the Relevant Period. *See* Compl. ¶¶ 52–62. This fact undermines any inference that it had always been Fiore's intent to sell Plandai shares. In any event, disclaimers stating that a party "may" sell shares are appropriate when, as here, the party harbors an uncertain intent. *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 129–30 (2d Cir. 2011) (A "critical distinction [exists] between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur.") (internal quotations omitted).

### 3. The SEC Fails to Sufficiently Allege Materiality in the Advertisement Disclosures

The SEC also fails to adequately plead that the alleged omissions would have been material

to a reasonable investor. An omission is only material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). That is not the case here because it is widely assumed that promotional campaigns have been funded by someone; and knowledge of the practice is incorporated into the market price. *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("It may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation."). In any case, the disclosures at issue here were more than sufficient to place a reasonable investor in microcap stocks such as Plandai on notice that "Berkshire and Fiore beneficially owned, intended to sell and were actively selling shares of Plandai stock." Compl. ¶ 34.

### 4.     There Was No Causal Connection Between Fiore's Statements to Brokerages and Market Awareness

The SEC also alleges that Fiore made material misstatements to Broker B and Broker C, and that these misstatements enabled him to deposit and sell more than 3 million of his Plandai shares in and from accounts "in the name[s] of Berkshire and [EAJ]" *Id.* ¶ 78. It further alleges that Fiore gave to Broker B misleading "Customer Stock Deposit Representations ("Stock Deposit Rep.")" regarding EAJ's deposit of 2,000,000 shares of Plandai stock in a brokerage account. *Id.* ¶ 79. However, the statements that the SEC claims were false were contained in boilerplate account documents; that were never disseminated to or known by the investing public. These statements included the following:

> (i) While any of Customer's Stock at [Broker B] remains unsold, Customer will not sell additional shares of the same Stock through any other broker-dealer unless Customer advises [Broker B] in advance; . . .

> (ii) Customer has not made, and will not make any payment to any other person in connection with the proposed sale of the Stock or engage in any special or enhanced selling or promotional efforts [regarding the Issuer]; . . .

> (iii) Customer's proposed sale of the Stock is not part of a plan to violate or evade the registration provisions of the Securities Act or any other federal or state law or regulation; . . . [and]
>
> (iv) Customer is not using any device, scheme, or artifice to defraud, and is not misstating a material fact or omitting to state a material fact required to be made in order to make the statements made not misleading, in connection with the sale of the Stock.

Compl. ¶ 80. None of these statements give rise to an actionable securities claim. The first representation related to "Stock," as in, the *same* Stock that Fiore deposited into the pertinent brokerage account. Fiore did not double-sell or transfer any of the Plandai shares he deposited during the Relevant Period, and the SEC does not claim otherwise. The second representation similarly contained a promise that Fiore was not aiding in a breach of fiduciary duty by the issuer by selling shares for more than their fair value. *See Birch Ranch & Oil Co. v. Hopkins*, 128 Cal. App. 2d 730, 736 (1954) (discussing breach of fiduciary duty by "enhanced selling"). No such breach of duty was even alleged here. The final two representations merely reiterated the requirements of the Securities and Exchange Act's antifraud provisions. They therefore, at most, merely duplicated the SEC's other claims.

Taken together, these statements reflect Fiore's accurate representations that he had not sold and would not sell the shares he deposited; that he had not entered into a subscription agreement or other scheme that might impinge upon Broker B's legal right to sell the shares; and that he had not violated any provisions of the Securities or Exchange Acts or their state equivalents. Nothing in the Complaint could plausibly challenge the plain reading of these statements. Because Defendants' statements were accurate, they cannot form the basis for an actionable claim.

### 5. <u>The SEC Does Not Adequately Allege Scienter</u>

The Complaint also fails to allege the requisite scienter; that "the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." *Aly*, 2018 WL 1581986, at \*19 (internal citation omitted). In an effort to plead market manipulation, the SEC points to the

11

same alleged interactions Fiore had with the advertisers he funded; allegations that cannot sufficiently allege material misrepresentations or omissions. *See supra*, Part I.A (discussing Fiore's interactions with funded advertisers). Even if Fiore met with or suggested topics to advertisers, coordinated the timing or article releases, provided information on Plandai to advertisers or funded their employment, Compl. ¶¶ 23–32, none of this conduct, alone or together, evinces an intent to commit securities fraud. In fact, as shown above, *see supra*, Part II.A.3, such actions are common in the industry, are used to highlight particular companies, and are not actionable.

The SEC liberally utilizes such terms as Fiore's "fail[ure] to disclose," *id.* at ¶¶ 2, 3, "deceptive" actions and conduct, *id.* at ¶¶ 59, 63, "manipulative trading," "manipulative activities," and "manipulate the market," *id. at ¶¶* 4, 6, 19, 20, 55, 63, 65, 76, 77*,* "artificially inflate," *id.* at ¶¶ 55, 73, and "illegally promote" "Plandai stocks," *id.* at ¶ 19, as if these terms alone sufficiently allege wrongful conduct. The same is true with the SEC's use of the phrase "knowingly or recklessly," as if adding these two inflammatory words to routine occurrences somehow makes legitimate conduct nefarious. For instance, the SEC alleges that "[d]uring the Relevant Period, Fiore and Berkshire *knowingly or recklessly* organized, implemented, and funded the promotional campaign without making the required disclosures." (emphasis added) (*Id.* at ¶ 51). Again, there is nothing improper about "organizing, implementing and funding" a stock promotional campaign. Defendants have already shown that Fiore had no disclosure obligations. Simply labeling Defendants' actions as "fraudulent" or "manipulative" fails to satisfy Rule 9's heightened pleading burden.

As to claims that Defendants engaged in a "pump and dump" scheme, the SEC pointed to a limited number of Plandai stock transactions during the "Relevant Period without articulating

how these transactions, profitable as they may seem (there is no mention of how much Fiore paid

for these shares), were manipulative. There is nothing illegal about selling securities during a

promotional campaign, even one "organized, financed and directed" by the seller. *See supra*, Part

II.A.3. Because Fiore had no control over the content of these promotions, the SEC is forced to

trumpet the number of Plandai shares Fiore sold during the promotional period and the proceeds

he received from these sales. However, the SEC never articulates how these perfectly legitimate

transactions were illegal. Nor does the SEC establish any direct correlation between the promotion

of Plandai and the price and/or volume of Plandai shares during the promotional period. The fact

that the price and volume of Plandai stock increased during the promotional period does not

support an allegation of market manipulation, particularly given other market forces, including the

highly publicized, game-changing legalization of marijuana in Colorado and Washington.[4] *See*

*supra*, Part I.A.

     Similarly, selling shares during a price increase similarly does not equate to wrongdoing.

The SEC acknowledges that "in late June to early July 2013, Fiore made multiple purchases of

Plandai shares," Compl. ¶ 53 – an admission that he was not simply a seller but also a buyer of

Plandai stock. The SEC then asserts a nefarious intent by alleging that Fiore bought these shares

---

[4] From discussions in the Federal Government, *see* Spiro Decl. Ex. J (Cole Memorandum), to extensive media reports, *see, e.g.*, Spiro Decl. Ex. K ("Colorado Recreational Pot Sales"); Spiro Decl. Ex. L ("How to Legalize Pot"); Spiro Decl. Ex. M ("Going the Distance; On and Off the Road with Barack Obama"); Spiro Decl. Ex. N ("Why I changed my mind on weed"), the movement toward legalization of marijuana was information of which any reasonable investor considering investments related to medical marijuana would have had notice. Defendants request judicial notice of the articles for the general proposition that marijuana legalization was a significantly discussed topic during the Relevant Period. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("It is unremarkable that courts consider the extent of media coverage in deciding when inquiry notice for securities fraud claims was triggered."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (court referenced the "widely-publicized collapse of the junk bond market" to explain "an example" of why a stock's low opening price did not illustrate scienter on defendant's part).

"in anticipation of and to offset the potential market impact of the publication of a July 6, 2013, *Seattle Times* article, "Green Tea Firm Raises Red Flags," which was highly critical of Plandai and the claims it made in public filings and press releases. *Id.* But a reasonable shareholder with advance knowledge of a damaging article about a company would not buy *more* shares of its stock. Fiore did exactly that. And the fact that his purchases "accounted for a significant portion of the market volume in Plandai stock," *id.* at ¶ 55, only undermines the SEC's "pump and dump" scheme. In similar circumstances, courts have found that share purchases during a time when the market price is supposedly inflated negate any inference of scienter. *E.g.*, *Cortina*, 2016 WL 7480415, at *8 n.3 (noting that the fact defendants "purchased additional shares during the [Relevant] . . . Period . . . serves to further undermine any plausible allegation of scienter.") (citing *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (acquisition of shares during relevant period helped to negate any finding of scienter)). The same conclusion is compelled here.

At a minimum, the SEC's allegations merely show that the price and volume of a given stock was materially impacted by positive or negative news. For instance, the SEC notes that a surge in the price of Plandai stock appeared imminent in December 2013, "shortly after Plandai had announced its entry into the medical marijuana industry" and ahead of the "anticipated legalization of marijuana in Colorado and Washington." Compl. ¶ 57. This undermines the SEC's claim that Fiore's so-called manipulative trading activity and advertising was the reason for Plandai's sudden jump in price and volume in mid-late January 2014. The fact that Fiore bought more Plandai shares than he sold during a time marijuana legalization was highly publicized, *supra*, note 4, made him a smart investor, not a market manipulator.

Alleging a generalized profit motive similarly will not suffice to show scienter. *See, e.g.*,

*Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("generalized desires do not establish scienter"). Nor are the SEC's allegations that Fiore had the *hypothetical* ability to control articles prior to publication sufficient. *See* Compl. ¶ 35 (alleging that Fiore and Berkshire had "*economic power to insist* that the promoters include in the promotional materials complete and accurate disclosures"). Courts have routinely rejected these theories. *See*, *e.g.*, *In re Galectin Therapeutics, Inc. Sec. Litig.*, 157 F. Supp. 3d 1230, 1238 (N.D. Ga. 2015), *aff'd,* 843 F.3d 1257 (11th Cir. 2016) (holding that scienter had not been sufficiently alleged where "[p]laintiff merely alleges that [Defendants] used stock promoters to increase the price of its stock and . . . did not disclose this arrangement to investors."); *Cortina*, 2016 WL 7480415, at *7 (holding that scienter was not supported by an allegation that the company "paid millions of dollars for 'investor relations' and 'consultant' services").

Aside from intent, the SEC claims that Defendants' alleged recklessness showed the requisite mental state for securities fraud. Reckless behavior encapsulates conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009). But here too, the SEC's allegations are insufficient. Once again, it is not uncommon to work in conjunction with stock promoters to promote one's stock, and the Supreme Court has explicitly foreclosed a securities fraud claim where plaintiffs fail to allege a defendant had "authority over the content of the statement" giving rise to the fraud claims. *Janus*, 564 U.S. at 144. In light of the foregoing, Fiore's conduct clearly was not reckless, and Plaintiff's attempt to allege otherwise is inadequate.

### 6.    The SEC Fails to Sufficiently Plead Market Manipulation

The SEC also fails to allege with particularity facts sufficient to show market manipulation.

To sustain such a claim, the SEC must show that "manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–102 (2d Cir. 2007). Pleading market manipulation requires "a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *Wilson*, 671 F.3d at 130 (citation omitted). As the Second Circuit explained, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* (citation omitted). And "[i]n determining whether activity falls outside the natural interplay of supply and demand, courts generally consider whether it sends 'a false pricing signal to the market.'" *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) (quoting *Wilson*, 671 F.3d at 130).

Notably, the SEC's Complaint focuses only on a small fraction of the trading days during the Relevant Period. Moreover, the SEC does not even attempt to allege that the trading activity *actually* impacted the market. Nor does it allege *any* facts beyond the trading activity itself that even suggest that Defendants traded with fraudulent intent. The SEC points to a series of isolated transactions spread out over the Relevant Period to assert that Defendants manipulated the price of Plandai stock through such purported tactics as wash trades, Compl. ¶¶ 5, 67; scalping, *id.* ¶¶ 3, 69); marking the close, *id.* ¶¶ 6, 70, 71, and painting the tape, *id.* ¶¶ 7, 73. Noticeably absent is any allegation of market impact. Under the securities laws, it has never been sufficient to merely allege that there were, for example, matched trades by independent brokers with independent instructions; rather, there must be alleged intent to impact the market price with these trades. *See, e.g.*, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2nd Cir. 1973) ("So

16

long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established."). The SEC's Complaint is devoid of any such factual assertions.

The SEC's allegations of marking the close and painting the tape fail to allege with specificity "what effect the scheme had on the market for the securities at issue," an omission fatal to allegations of scheme liability. *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 116 (S.D.N.Y. 2018) (dismissing market manipulation claims for failure to allege scienter and manipulative conduct) (citing *Baxter v. A.R. Baron & Co.*, No. 94-cv-3913 (JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)). Were the SEC's broad construction of market manipulation accepted, it would effectively gut the requirements for pleading market manipulation pursuant to U.S.C. § 78i(a)(1)(A) and contravene the requirement for a separate showing of *scienter*, which cannot rest on "speculative inferences[.]" *ATSI*, 493 F.3d at 103.

The SEC cannot plausibly analogize this dispute to cases where a market manipulation theory has withstood a motion to dismiss. Such cases, if they are not based on direct evidence of *scienter*, typically draw at least some connection between the alleged manipulative acts and changes in the market price for a security. *See Wilson*, 671 F.3d at 130 (in "identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market."); *cf. CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006) (finding market manipulation claim adequate where complaint alleged scheme to manipulate the stock price during period of shorting and covering the shorts). It is particularly important to follow such precedents in enforcement actions since the SEC can use its subpoena power to find matching market data and then claim, based on coincidence alone, there was a conspiracy to manipulate the market.

**B.      The Complaint Fails to Adequately Allege Section 17(a), 10(b) or 20(b) Liability of Berkshire or EAJ**

Not only are the SEC's allegations against Fiore deficient, but the SEC also fails to plead

the necessary elements for a Section 17(a) or 10(b) claim against the two corporate Defendants,

Berkshire and EAJ. The SEC's introduction essentially admitted as much, accusing Fiore of

masterminding an unlawful scheme more than 20 times, while mentioning Berkshire and EAJ less

than five times *combined*. In fact, there are *no* direct allegations of wrongdoing against either

corporate Defendant other than that Fiore is alleged to have acted through Berkshire and EAJ. *See*

*generally* Compl. On this basis, alone, the allegations against these Defendants should be

dismissed.

The SEC's allegations that the Defendants violated Section 20(b) of the Exchange Act are

similarly deficient. The claim is set forth in one paragraph of the 132-paragraph Complaint:

> By knowingly or recklessly using third-party promoters to promote Plandai stock
> without disclosing Fiore's and Berkshire's beneficial ownership, intent to sell,
> and/or sales of the stock, Fiore and Berkshire, directly or indirectly, violated
> Section 20(b) of the Exchange Act.

Compl. ¶ 117. Section 20(b) of the Exchange Act makes it "unlawful for any person, directly, or

indirectly, to do any act or thing which it would be unlawful for such person to do under the

provisions of this chapter or any rule or regulation thereunder through or by means of any other

person." 15 U.S.C. § 78t(b). The SEC's claim fails because it has not alleged an independent

unlawful act by any Defendant. *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, No.

11 CIV. 2327 GBD, 2013 WL 1342529, at *9 (S.D.N.Y. Mar. 29, 2013) (dismissing Section 20(b)

claims where "Plaintiffs fail[ed] to state … any unlawful act under 20(b)"). The gravamen of the

SEC's allegations is that Fiore and Berkshire had a duty to disclose their respective beneficial

ownership interests in Plandai and intent to sell shares, but that Fiore, for himself and Berkshire,

failed to do so. This claim is built on a false premise—that Defendants owed such a duty. As set

forth above, they did not. Because one cannot breach a duty one does not owe, the SEC's Fifth

Count cannot be sustained.

### C.      The Section 7(A) Claim Against EAJ is Insufficient

The SEC's Seventh Count alleges that EAJ violated Section 7(a) of the Investment

Company Act ("ICA") by failing to register as an investment company. Compl. ¶ 128. Section 7(a)

of the ICA prohibits an investment company from, among other things, purchasing or selling

securities without first registering as an investment company with the SEC. *See* 15 U.S.C. § 80a-

7(a). The Statute defines an investment company as any issuer which

> (A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;
> (B) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or
> (C) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.

15 U.S.C. § 80a-3(a)(1)(A)-(B). The SEC alleges that during the Relevant Period, EAJ was an

investment company as defined by Section 3(a)(1)(C) of the ICA, asserting that the company was,

at that time, "engaged in the business of investing and trading in securities, and it owned

investment securities having a value exceeding 40 percent of the value of its total assets on an

unconsolidated basis." Compl. ¶ 127. There is no dispute that EAJ never registered as an

investment company. But contrary to the SEC's assertion, EAJ was never required to register as

such because it fell within the definition of companies exempt from being classifed as an

investment company, and thus exempt from the registration requirement.

The ICA contains a number of exemptions from the foregoing provisions. They include

"[a]ny issuer primarily engaged … in a business or businesses *other than* that of investing,

reinvesting, owning, holding, or trading in securities." 15 U.S.C. § 80a-3(b)(1) (emphasis added).

During the Relevant Period, EAJ fell squarely within this statutory exemption. The issue of whether a particular issuer was primarily engaged in a business other than that of investing, was addressed *In the Matter of the Tonopah Mining Company of Nevada*, 26 S.E.C. 426, at *1 (July 21, 1947). The court articulated five factors it found relevant to the determination of whether a company is "primarily engaged in a business other than that of investing," namely: 1) the company's historical development; 2) its public representations of policy; 3) the activities of its officers and directors; 4) the nature of its present assets; and 5) the sources of its present income. *Id.* Although more than 40% of EAJ's total assets allegedly consisted of investment securities in 2013 and 2014, EAJ was nonetheless exempt from the ICA's registration requirements based upon the *Tonopah* factors, including the fact that the company was primarily engaged in a business other than investing. *See S.E.C. v. National Presto Industries, Inc.*, 486 F.3d 305, 315 (7th Cir. 2007) (Presto was not an investment company where "[r]easonable investors would treat Presto as an [military products] operating company rather than a competitor with a closed-end mutual fund.").

As the SEC alleges, "[b]etween 1997 and 2014, Eat at Joe's claimed to "develop, own and operate theme restarants called 'Eat at Joe's.'" Compl. at ¶ 92. And while the company reduced the number of its restaurants by 2013–2014, the SEC nevertheless acknowledges that during the Relevant Period, EAJ continued to operate at least one restaurant — "a cheesesteak stand in the Philadelphia airport." *Id*. The lease in the Philadelphia Airport where the EAJ restaurant was located did not expire until April 2017. *Id.* ¶ 100. The SEC further acknowledges that after the Relevant Period, in early 2015, EAJ changed the focus of its business to "digitial publishing and advertising and the development of mobile applications and games." *Id.* at ¶ 15. By the SEC's own admission, the primary focus of EAJ (and SPYR) was and remains business pursuits having nothing whatsoever to do with investing in securities. Indeed, noticeably absent from the SEC's

Complaint is an allegation that EAJ's *primary* business was "investing, reinvesting, owning, holding, or trading in securities." In fact, documents judicially noticeable prove that this has never been EAJ's primary business – its public filings make clear that EAJ's focus was and continues to be on businesses other than "investing, reinvesting, owning, holding or trading in securities."

From EAJ's 2013 10-K filings, for example, the SEC was on notice that EAJ's business was to "develop, own and operate theme restaurants called "Eat at Joe's (R)," the theme for the restaurants was an "American diner," and the business model replicated the "classic American grill." *See* Spiro Decl.Ex. D (EAJ 2013 Form 10-K). In EAJ's 2014 10-K filings, the SEC was on notice that EAJ's functioned to create an atmosphere catering to "local working" class people, where "families can eat wholesome, home-cooked food" *See* Spiro Decl. Ex. E (EAJ 2014 Form 10-K).[5] EAJ's primary business is in creating American Diner themed restaurants, not investing.

The Seventh Circuit's decision in *Nat'l Presto Indus., Inc.*, 486 F.3d at 315 is instructive. There, the SEC sued National Presto Industries, a seller of consumer goods and munitions because, as "the SEC concluded," "Presto was well past the 40% trigger." *Id.* at 307. More specifically, National Presto "used to make everything it sold," but by 1994, "[f]inancial instruments were 86% of its total assets . . . and 92% in 1998." *Id.* Even in 2003, "financial instruments still represented 62% of its physical and financial assets." *Id.* Much as it contended here, the SEC argued that, because National Presto exceeded the 40% threshold, it must register as an investment company or be in violation of Section 7(a). *Id.* The Seventh Circuit rejected that argument, holding that,

---

[5] Defendants request judicial notice of all form 10-K public filings referenced herein. *See DoubleLine Capital LP v. Odebrecht Fin.*, Ltd., 323 F. Supp. 3d 393, 434 (S.D.N.Y. 2018) (In resolving a motion to dismiss under Rule 12(b)(6), "courts may consider . . . legally required public disclosure documents filed with the SEC"); *In re China Organic Sec. Litig.*, No. 11 CIV. 8623 JMF, 2013 WL 5434637, at *1 (S.D.N.Y. Sept. 30, 2013) (taking judicial notice of defendant's form 8-K in securities fraud case).

because "[National] Presto presents itself to the public (and to investors) as an operating company [not investment company] [and] [t]hat's how its web site, its annual reports, and its publicity all depict it," *Id.* at 313, it was not subject to Section 7 of the ICA. *Id.* at 313; *see also id.* at 312 (noting "[a] visitor to its web site for consumers . . . will find sales promotions, warranty information, and instruction manuals for pizza ovens and coffee makers but nary a hint that someone would want to buy Presto's stock as a means to own a derivative interest in refunded municipal bonds or variable-rate demand notes."). The same is true here.

Further, like *National Presto*, which shifted its business "from a manufacturer to a firm that was (principally) a designer and marketer of products assembled by others," *id.* at 313, it was irrelevant that Eat at Joe's/SPYR shifted its business focus from restaurants to mobile games because such shifts do not necessarily make a company "[any] less an operating enterprise." *National Presto,* 486 F.3d at 313 (noting that Apple shifted its business similarly but "without being thought to have evolved into mutual funds"). EAJ was and has always been an operating company, not an investment company under the ICA. As such, EAJ was exempt from, and did not violate, the registration requirements of Section 7. For these reasons, Count VII of the Complaint warrants dismissal.

### D.    Dismissal of the SEC's Claim for Disgorgement is Warranted

Count VIII of the SEC's Complaint seeks disgorgement by EAJ, a "Relief Defendant." Compl. ¶¶ 130–132. The SEC alleges that EAJ was the recipient of unlawful proceeds arising from the various acts purportedly committed by Fiore and Berkshire. *Id.* at ¶ 131. As such, EAJ, now SPYR, should be "compelled to return any unlawful proceeds received by it as a result of" these alleged violations. *Id.* ¶¶ 131–32. Based on these allegations, the SEC brings a claim against EAJ styled as a claim for "Disgorgement By Relief Defendant" *Id.* p. 37.

This claim is fatally deficient on several independently sufficient grounds. To begin with,

disgorgement is not an independent claim, but rather an equitable remedy that requires a defendant to return funds it would not have acquired "but for" fraud. *Wyly*, 71 F. Supp. 3d at 406. On this basis alone, the SEC's disgorgement claim is improperly pleaded and should be dismissed. *See Gurvey v. Cowan, Liebowitz & Latman, P.C.*, No. 06 CIV. 1202 LGS HBP, 2013 WL 3718071, at *10 (S.D.N.Y. July 15, 2013) ("[P]laintiff's new 'claim' for 'disgorgement of expanded retainers,' to the extent it is even comprehensible, appears to be in the nature of a remedy, not a separate claim.").

Moreover, the SEC has not alleged sufficient facts to render plausible that EAJ owes disgorgement. As demonstrated above, the SEC has not alleged facts sufficient to sustain its claims that EAJ, Fiore or Berkshire engaged in any fraud, *supra*, Parts II.A.5, II.A.6, let alone adequately pled that any Defendant was unjustly enriched. *Wyly*, 71 F. Supp. 3d. at 406; *accord*, *e.g.*, *SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property that is causally related to the wrongdoing.")). In fact, the SEC has failed to allege that EAJ profited at all, let alone that its supposed profits were the result of any illegal conduct on its or anyone's part. Throughout its Complaint, the SEC references the "proceeds" generated from the offending transactions. Compl. ¶¶ 1, 47, 58, 131–132. The word "profit" was not mentioned. The entirety of the SEC's Eighth Claim consisted of two paragraphs in which the SEC alleged that EAJ received unlawful proceeds arising from the alleged violations, *id.* ¶ 131, and that EAJ should be compelled to return any unlawful proceeds it received. *Id.* at ¶ 132.

Finally, the SEC made it clear that all three Defendants were the recipients of unlawful proceeds, asserting unambiguously:

Between April 2013 and March 2014, Fiore sold 11,961,898 shares of Plandai stock from these accounts, often selling on the same day and/or the day after promotions that he paid for had been disseminated to potential investors. Collectively, Fiore, Berkshire, and Eat at Joe's received proceeds totaling approximately $11,521,778 from their sale of Plandai stock.

Compl. ¶ 47. The SEC conveniently lumps all three Defendants together, utilizing the word "[c]ollectively" relative to the total proceeds the parties are alleged to have generated. *Id.* Clearly, this allegation "suffer[s] from the defect of group pleading." *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 643 (S.D.N.Y. 2004)).

Because the SEC fails to adequately allege that EAJ profited, let alone profited from any identifiable illegal conduct attributed to it, and because disgorgement is a remedy rather than a cause of action, Plaintiff's Eighth Count should be dismissed. *See SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (noting disgorgement remedy must identify defendant's actual profits attributable to fraud).

### E.   Fiore's Reliance on Plandai's Public Filings Insulates Him from Section 13(d) Liability

The SEC's Sixth Claim is predicated on Fiore's failure to file a Schedule 13D as required under Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R.§ 240.13d-1]. *See Compl.,* ¶¶ 120–123. Under this statute, any person who has acquired beneficial ownership of more than five percent of the stock of a Section 12 reporting company, such as Plandai, must file a Schedule 13D with the Commission within ten days of the acquiring the stock and crossing the five percent threshold. From at least February 2012 until January 16, 2014, and from February 19, 2014 until approximately March 13, 2014, Fiore beneficially owned more than five percent of the outstanding shares of Plandai stock. *Id.* ¶ 121. However, his failure to file was based entirely on Plandai's public filings at that time in which it erroneously concluded that it was not a Section 12 reporting company. Based upon Plandai's filings, Fiore had no way of ascertaining that he was subject to this statutory filing requirement. Fiore should not be held

accountable for Plandai's mistake.

In its 2011 through 2014 Form 10-Ks, of which this Court may take judicial notice, Plandai repeatedly stated that it was not subject to the beneficial ownership reporting requirements by officers, directors, persons owning more than 10%, etc. under 16(a) of the Securities Exchange Act of 1934 because Plandai did not have a class of securities registered under Section 12. *See* Spiro Decl. Ex. F at 32 (Plandai 2011 Form 10-K ); Ex. G at 24 (Plandai 2012 Form 10-K ); Ex. H at 26 (Plandai 2013 Form 10-K ); Ex. I at 34 (Plandai 2014 Form 10-K). Plandai 's Form 10-Ks reports have been filed annually since 2005 and have been regularly reviewed by the SEC as part of its two-year mandatory review. Notwithstanding this review, the SEC failed to correct this erroneous conclusion until well-after Fiore's alleged unintended violation occurred. The SEC's failure to do its job should not be visited upon Fiore who reasonably relied upon the accuracy of Plandai's public filings.

F.    **The Statute of Limitations Bars the SEC's 17(a), 10(b) and Disgorgement Claims in Whole or in Part**

Because the relevant provisions of the Exchange Act contain no statute of limitations, the catch-all five-year limitations period of 28 U.S.C. § 2462 applies "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. Section 2462 indisputably applies to the SEC's claims for civil monetary penalties. *See SEC v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007) (holding that "[t]he SEC's claim for civil monetary penalties against Defendants is unquestionably a penalty and, as such, is subject to the five-year limitations period of § 2462"); *see also Johnson v. SEC*, 87 F.3d 484, 486, 492 (D.C. Cir. 1996) (barring the SEC's claim for a civil monetary penalty because the five-year period set forth in § 2462 had expired); *Wyly*, 788 F. Supp. 2d at 102 (§ 2462 "governs punitive relief sought by the SEC" under the Exchange Act); *SEC v. Brown*, 740 F. Supp. 2d 148, 157-58 (D.D.C. 2010) (noting no dispute between the parties regarding the application to civil money penalties). It also bars the other

remedies sought by the SEC, which, although nominally equitable, can only be sought on the facts alleged here to punish the Defendants, and are therefore also subject to § 2462. *See, e.g., Jones*, 476 F. Supp. 2d at 380-81 (holding that § 2462 applied to the SEC's claims for civil money penalties and a permanent injunction prohibiting future violations because they were "penalties"); *Johnson*, 87 F.3d at 488 (applying § 2642 to the SEC's administrative sanctions of a censure and disciplinary suspension because the statute applies whenever the remedy sought is "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's action").

"[W]hether the Commission's action for a permanent injunction is subject to the five-year limitations period in § 2462 depends on whether the injunction is a penalty or a remedial measure." *Jones*, 476 F. Supp. 2d at 383, 385 (dismissing as untimely the SEC's request for a statutory injunction because it could "only be characterized as a penalty" and was, therefore, subject to Section 2462's five-year statute of limitations. The Supreme Court recently made this point clear in *Kokesh v. SEC*, holding that "any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued." 137 S. Ct. 1635, 1645 (2017) (citing and applying 28 U.S.C. § 2462).

The Relevant Period began in April 2013 and ended in March 2014. The SEC filed its Complaint on June 18, 2018. Thus, claims accruing before June 18, 2013 are time-barred. *See id.* While some of the Relevant Period falls within the five-year statutory period, due to the high level of generality in which the SEC pled its claims, it is impossible to separate those claims that are timely from those that are not, requiring dismissal of the entirety of the SEC's claims in order to prevent the very real risk that the already generous five-year limitations period provided by Section 2462 will be encroached. Accordingly, any of the SEC's Section 17(a) and Section 10(b) claims,

26

and its request for disgorgement, should be dismissed with prejudice.

The SEC may attempt to argue that the offending conduct involved an on-going scheme that began in April 2013, but did not end until March 2014, at which time the statute of limitations began to run. However, this "continuing violations" theory has not been adopted in the Second Circuit, and most courts in this circuit have been skeptical of its application to securities violations. *See, e.g.*, *In re Converse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (noting that "[t]he weight of authority in this circuit is skeptical of the application of the continuing violations doctrine in securities fraud cases" but deferring the issue until the facts could be further developed); *see, e.g., Stoll v. Ardizzone*, No. 07 Civ. 00608, 2007 WL 2982250, at *2 (S.D.N.Y. Oct. 9, 2007) ("[T]here is no 'continuing violations' exception to the absolute bar of the statutory limitations period."); *Jones*, 2006 WL 1084276 at *5 (refusing to apply the continuing violations theory to overcome the SEC's failure to file a complaint alleging securities violations within the five year statute of limitations and noting that "courts in [the Second Circuit] have questioned the applicability of the continuing violation doctrine to securities fraud actions").

In the rare case where it has been applied, the facts are entirely distinct from the allegations here. *See S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 287-88 (S.D.N.Y. 2009) (finding that the SEC had properly pled "a continuous, integrated scheme that [was] operated by the same group of people" and therefore the statute of limitations period began on the date of the last affirmative misstatement). For the reasons stated herein, Plaintiff's claims sounding in fraud, including its claim for disgorgement, should be dismissed as untimely.

### G.   The SEC's Untimely Enforcement Action Violates the Purposes and Procedural Safeguards of Dodd Frank

The Commission's untimely suit against Defendants violates the purposes and safeguards established by Dodd Frank, providing further support for dismissal. In 2010, Congress passed legislation creating a "deadline for completing examinations, inspections and enforcement

actions." 15 U.S.C. § 78d-5. This statute provides:

> Not later than 180 days after the date on which Commission staff provide[s] a written *Wells* notification to any person, the Commission staff shall either file an action against such person or provide notice to the Director of the Division of Enforcement of its intent to not file an action.

15 U.S.C. § 78d-5(a)(1).[6] The statutory language used to set a firm deadline is unambiguous: to the extent the Commission intends to file an enforcement action, it "shall" do so "[n]ot later than 180 days" after issuing a *Wells* notification. *Id*. An exception to this deadline allowing for additional 180-day periods may be granted but only under certain circumstances inapplicable here, including if the "enforcement investigation is sufficiently complex such that a determination regarding the filing of an action against a person cannot be completed within the deadline." *Id*. § 78d-5(a)(2). Under this circumstance, the Director of the Division of Enforcement of the Commission or the Director's designee, may, after providing notice to the Chairman of the Commission, extend such deadline as needed for one additional 180-day period. *Id*. This is yet another condition that must be satisfied prior to extending the 180-day deadline. Similarly, subsequent 180-day extensions require this additional safeguard; i.e., the "approval of the Commission." *Id*.

Regardless of whether the SEC went through the motions of technical compliance with the statutory provision, it is clear that the excessive delays in filing its enforcement action contravene the central purposes of Dodd Frank. Not only did the SEC fail to commence its action within either the first or second 180-day period, but it waited more than *427 days* following its issuance of its

---

[6] A *Wells* notice informs the subject of an investigation that the Enforcement Division may (or will) recommend action against that subject, describes the basis for the potential violations at issue, and invites the subject to submit arguments or evidence regarding the allegations. *See* 17 C.F.R. § 202.5(c); Div. of Enf't, *SEC, Enforcement Manual* § 2.4 (2017), available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf (last visited Oct. 18, 2018).

*Wells* notifications, and *1,587 days* after obtaining its formal order of investigation, *see* Gottlieb Decl. Exs. 1, 2, 3, 4 to file the instant lawsuit.[7] Given the enormity of the consequences of the investigation and lawsuit, there is no rational justification for this delay, particularly since the Commission has autonomy to decide when to issue (and start the clock on) a *Wells* notification. The delay is even more unjustified with respect to the Investment Act claim because no additional information was sought after Defendants made their *Wells* submission in May 2017.[8]

The procedural protections set forth in § 78d-5(a) were a congressional response to years of reports detailing how the Division's refusal to close investigations jeopardized the Division's enforcement mission and harmed people who were no longer suspected of wrongdoing. For instance, in response to a 2007 report by the Government Accountability Office, Senator Grassley observed that the Division's failure to promptly close matters is "not fair to those under investigation" and "misleads the public by implying that the SEC is more active than it really is."[9] Indeed, as the Commission's own regulations recognize, "[t]he power to investigate carries with

---

[7] The court is allowed to assess the declaration on this jurisdictional issue, even on a motion to dismiss. *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 401 (2d Cir. 2003).

[8] Only two cases have considered the issue, neither of which is dispositive or controlling in this jurisdiction. In *Montford & Co, Inc. v. SEC*, No. 14-1126 (D.C. Cir. 2015), the delay at issue was only 187 days after issuance of the SEC's *Wells* notification—just seven days longer than the initial 180-day period, *see id*. at 9, —rather than the excessive 427-day delay here. Moreover, the Defendants in *Montford* and in *SEC v. The NIR Group, LLC.*, No. 11-04723, slip op. (E.D.N.Y. Mar. 24, 2013), sought to construe the 180-day rule as tantamount to a fixed statute of limitations. *See Montford*, slip. op. at 11-13; *NIR Group*, slip. op. at 6-9. Here, in contrast, Defendants make an entirely different argument, contending that because the case is not sufficiently complex, there is no legitimate basis to override the central purposes of the Dodd Frank Act, which protect against unnecessary governmental delays in deciding to prosecute or refrain from prosecuting a defendant.

[9] *SEC should tighten procedures, GAO report says*, The Barre-Montpelier Times Argus, (Sept. 18, 2007),https://www.timesargus.com/news/sec-should-tighten-procedures-gao-report-says/article_6975a72c-a105-55d4-ab4e-87f7570e1e6e.html; s*ee also* SEC Commissioner Troy A. Paredes's remarks at the 2009 Southern Securities Conference, (Mar. 19, 2009), http://www.sec.gov/news/speech/2009/spch031909tap.htm(pointing out that lingering investigations can "wre[a]k havoc on people and their families").

it the power to defame and destroy." 17 C.F.R. § 200.66; *see also* Comm. on Fed. Regulations of Sec.*, Report of the Task Force on SEC Rules Relating to Investigations*, 42 Bus. Law. 789, 790 (1987) ("[T]he investigative process can be devastating to business entities or individuals under scrutiny.").[10] Unlike many aspects of an investigation, known only to the Division's staff, the *Wells* notice generally denotes when the staff's investigation is close to complete and provides the first opportunity for an investigation target to present potential defenses to the Division. Congress clearly felt the *Wells* notice was a sufficiently significant event as to trigger § 78d-5's clock.

Clearly, if it was determined that the SEC did not seek an extension of time or make the requisite complexity determination, its extension would be invalid, and the lawsuit should be dismissed. *See Panama Ref. Co. v. Ryan*, 293 U.S. 388, 431 (1935) (if a statute creates "prerequisites" to executive action, the executive must "comply with those conditions and . . . show that compliance . . ."). However, even if the proper procedural conditions were satisfied, the SEC cannot demonstrate that the case is of such complexity as to warrant more than a four-year delay in bringing suit. As is evidenced by the *Wells* notices, by April 2017, the SEC had already reached its principal conclusions. Yet, it waited an additional 427 days before commencing this lawsuit. Moreover, the causes of action asserted in the Complaint are fairly routine and involve commonly raised allegations under the securities laws. The SEC's disregard of the purposes embodied in § 78d-5(a)(2) thus lends further support for dismissal of this action.

### III.   CONCLUSION

For the reasons stated, the SEC's Complaint should be dismissed.

---

[10] The deadline for commencing a proceeding after issuance of a *Wells* notice, § 78d-5, is analogous to the Speedy Trial Act, which provides that an "information or indictment … shall be filed within thirty days from the date on which [the defendant] was arrested or served with a summons," and requires dismissal for noncompliance. *See* 18 U.S.C. §§ 3161(b), 3162(a).

DATED:   New York, New York
            November 2, 2018

By: /s/*Alexander Spiro*
    Alexander Spiro
        alexspiro@quinnemanuel.com
    Crystal Nix-Hines
        crystalnixhines@quinnemanuel.com
    Marc S. Gottlieb
        msg@orllp.legal

*Attorneys for Defendants Joe Fiore, Berkshire Capital Management Company, and Eat at Joe's, Ltd. n/k/a SPYR, Inc.*

## **CERTIFICATE OF SERVICE**

A copy of the foregoing motion was served on all counsel of record for the parties via ECF on November 2, 2018

/s/ *Alexander Spiro*
Alexander Spiro