# EXHIBIT A

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE &
BERKSHIRE CAPITAL MANAGEMENT CO., INC.

BEFORE THE UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

In the Matter of Plandai Biotechnology,
Inc.

SEC File No. HO-12349

## SUBMISSION ON BEHALF OF JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

MORVILLO, ABRAMOWITZ, GRAND,
 IASON, & ANELLO, P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

May 19, 2017

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# **TABLE OF CONTENTS**

<div align="right">**Page**</div>

PRELIMINARY STATEMENT .............................................................................................1

RELEVANT FACTS .........................................................................................................7

MR. FIORE AND BERKSHIRE ENGAGED IN A LONG-TERM EFFORT TO HELP
DEVELOP PLANDAI'S BUSINESS, INCLUDING COORDINATING A MARKET
AWARENESS CAMPAIGN THAT PROPERLY WAS DISCLOSED ......................................7

   A.  Joseph Fiore is a Self-Made Entrepreneur Who Built Many Successful Companies .......7

   B.  Berkshire Helps Develop Emerging Small Cap Companies through Investments of
      Time, Energy, and Money ................................................................................9

   C.  Mr. Fiore and Berkshire's Long History of Involvement with Plandai Demonstrate
      Their Commitment to Helping Plandai Succeed and Confidence in Its Prospects ............10

        1.  Mr. Fiore Invests in Plandai After Diligently Researching its Technology ...........10

        2.  After Merging with Diamond Ranch, Plandai Emerges as a Public Company ......11

   D.  Mr. Fiore Retained Publishers to Help Raise Awareness of Plandai's Business...............12

   E.  Mr. Fiore Did Not Control the Content of the Articles .......................................13

        1.  The Writers Published Truthful, Independent Articles.............................14

        2.  Mr. Fiore Hired Independent Publishers To Write Articles About Plandai ...........17

   F.  Mr. Fiore Legitimately Bought and Sold Stock During the Market Awareness
      Campaign ..................................................................................................19

   G.  2014 Increase in Plandai Share Price is Replicated Throughout the Related Industry.......20

   H.  The Staff's Position............................................................................................22

DISCUSSION ...................................................................................................................24

BECAUSE THE PUBLISHERS KNEW MR. FIORE HELD AND MAY TRADE
PLANDAI SHARES AND BECAUSE MR. FIORE HAD NO OBLIGATION TO
ENSURE THAT THE INDEPENDENT PUBLISHERS INCLUDED ADDITIONAL
INFORMATION IN THEIR ALREADY ROBUST DISCLAIMERS, A "SCALPING"
ACTION SHOULD NOT BE AUTHORIZED .........................................................................24

   A.  Hiring Publishers to Generate Market Awareness is Appropriate and Legal ....................25

<div align="center">i</div>

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

B. No Material Omission Occurred in Mr. Fiore's Disclosures to the Publishers
Because They Knew that Mr. Fiore was a Shareholder and that He Might Sell Shares.....26

C. Mr. Fiore Had No Duty to Disclose His Holdings or Intent to Sell (If He Even
Had Such Intent, Which He Did Not) to The Public ........................................................27

    1. Congress Imposed the Obligation for Disclaimer on the Publisher.........................28

    2. Mr. Fiore Had No Disclosure Obligation Insofar as Any Lack of Disclosure
of His Shareholder Status or Supposed Intent to Sell was Not Misleading.............29

    3. Mr. Fiore Did Not Control the Content of the Publishers' Articles and
Therefore Had No Duty to Oversee Their Disclaimers ............................................31

    4. Disclaimers Stating that Mr. Fiore "May" Sell Shares Accurately Reflected
Mr. Fiore's Uncertain Intent ...................................................................................35

DISGORGEMENT IS NOT AVAILABLE BECAUSE THE STAFF CANNOT ALLEGE
ANY PROFITS DUE TO THE ALLEGED INSUFFICIENCY OF THE DISCLAIMERS........38

CONCLUSION.....................................................................................................................40

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

## PRELIMINARY STATEMENT

This Wells is submitted on behalf of Mr. Joseph Fiore and Berkshire Capital Management, Inc. ("Berkshire").[1]  Mr. Fiore is the founder and chairman of Berkshire.  The staff's proposed proceeding is predicated on a novel and improper application of the law.  At its core, it is a non-transparent attempt to use the enforcement process to unfairly expand the securities laws and regulations.  The staff's theory also is inconsistent with the factual record, some of which, despite several offers, the staff declined to review.

Mr. Fiore is a hard-working, self-made entrepreneur who has attempted, with the aid of counsel, to navigate the morass of laws and regulations applicable to the small cap enterprises he champions.  He spent years building successful restaurant businesses, starting with his family snack stands in a regional shopping center shortly after graduating college, then developing and growing his own restaurant concept, Eat at Joe's®.  In 1996, after successfully building and financing a number of companies from the ground up, Mr. Fiore founded Berkshire to use his business expertise to help other entrepreneurs develop and expand their companies.  To this day, Berkshire assists small companies, using the talents and energy of Mr. Fiore and Berkshire's staff to develop them into successful companies.

In recent conversations, the staff stated its belief that Mr. Fiore and Berkshire engaged in an impermissible "scalping" scheme in violation of Section 17(a) of the Securities Act, Sections 10(b) and 20(b) of the Exchange Act, and Rule 10b-5.  The staff proffers that Mr. Fiore and Berkshire funded a promotional campaign for Plandai Biotechnology, Inc. ("Plandai") in an effort to bolster its stock price, supposedly without disclosing to the publishers retained, or to the

---

[1] This submission addresses the April 5, 2017 Wells letters to Joseph A. Fiore and Berkshire.  By letter dated April 5, 2017, the staff also indicated that it is considering recommending charges against SPYR, Inc., formerly known as Eat at Joe's, Ltd., for violating Section 7(a) of the Investment Company Act of 1940.  That allegation is addressed in a separate submission prepared on behalf of SPYR, Inc.

1

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

market, that they were shareholders and would be selling shares during the year-long period in which they engaged writers to publish what the staff concedes were truthful articles.

The following facts disprove the staff's case:

- Trading records show that during the relevant period Berkshire both bought and sold shares, including purchasing over 1,285,000 Plandai shares. Thus, no basis exists to conclude that Mr. Fiore and Berkshire intended consistently to sell shares of Plandai when they hired writers to publish articles.

- Neither Mr. Fiore nor Berkshire withheld any material information from the writers or publishers, all of whom wrote their own materials and have confirmed in affidavits that they knew Mr. Fiore/Berkshire were shareholders and thus likely sellers. These affidavits are attached as Exhibits here.[2]

- Mr. Fiore had no role in the content of the publications or the disclaimer language, and the staff cites no case law (because none exists) that paying for advertising, without more, is sufficient to support an enforcement action.

- The promotional materials contained no misstatements about Plandai and disclosed that the publishers were compensated for their work.[3]

Thus, as explained in more detail below, scalping claims against Mr. Fiore or Berkshire cannot be maintained and should not be authorized.

*First,* Mr. Fiore followed all legal requirements placed upon third parties who hire publishers. "Scalping" occurs when a publisher recommends a security for purchase to obtain a short-term increase in share price on which he then capitalizes by immediately selling shares at a higher price. Here, Mr. Fiore—a long time investor—hired publishers to research and write truthful articles. Separately, he bought and sold shares based on market conditions. A shareholder hiring writers to create market awareness is not only legal, but is encouraged.[4] For small cap companies, which often have less institutional research and media coverage, getting a company's message out to the market is especially important. Hiring writers to help a company tell its story is one way to make the company known to potential business partners and investors,

---

[2] *See* Exhibits ("Ex.") A–E.
[3] On April 26, 2017, the staff confirmed that their proposed case did not involve any substantive misrepresentations in the materials funded by Berkshire.
[4] *See* Final Report of the Advisory Committee on Smaller Public Companies to the United States Securities and Exchange Commission, Apr. 23, 2006, hereinafter "Advisory Committee Report."

2

which can lead to important financing opportunities, mergers, or other strategic business alliances. Here, the writers engaged by Mr. Fiore did independent research on Plandai and its technology, which included reviewing public filings and even traveling to South Africa to view Plandai's factory, in order to include accurate information in their publications.

*Second,* over the years, through loans and other financings, Berkshire invested over $7 million in Plandai to help develop its operations. Although Mr. Fiore and Berkshire were Plandai stockholders, contrary to the staff's assertions, they had not decided to sell shares when they retained the publishers. After the paid publications began in April 2013, Mr. Fiore and Berkshire *bought* over 1,285,000 shares in six different months between April 2013 and December 2013.[5] As Mr. Fiore explained in his testimony, his trading in Plandai was based upon market conditions at the time—buying when he saw an opportunity and selling when the stock was at an attractive price.[6] The trading activity substantiates his assertion. In fact, Mr. Fiore and Berkshire were net *buyers* of Plandai during July 2013 and December 2013, months central to the market awareness campaign. Mr. Fiore continued to purchase shares because he believed in the company and its prospects. Moreover, nothing refutes Mr. Fiore's testimony that the goal of the market awareness campaign was not to obtain a quick increase in share price, but, instead, to increase investor awareness about Plandai and further its future prospects.[7]

Equally important is that the bulk of Mr. Fiore's sales during the relevant period occurred in the first quarter of 2014 and cannot be attributed to a predetermined plan to cash in on the market awareness campaign launched in April 2013. Rather, the sales unarguably were related

---

[5] Mr. Fiore made the trading decisions on behalf of Berkshire and Eat at Joe's. *See* April 6, 2016 Testimony of Joseph A.Fiore at 23:2-21 (hereinafter "Fiore Test.").
[6] Fiore Test. at 152:13-23 ("I have criteria about how I sell stock . . . [I] look and see if I feel the stock is fairly priced based on what I believe the fundamentals of the company are.")
[7] Fiore Test. 39:17-40:3 ("The initial goal . . . is to expand the knowledge of the story of what the company's products, services, and technology are.").

<center>3</center>

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

to significant and surprising market news and fueled by unanticipated announcements made by the Obama administration.  In February 2013, Plandai formed a wholly-owned subsidiary to develop and test whether its extraction technology could be used to create a non-psychoactive cannabis extract.  Almost a year later, in January 2014, after Colorado and Washington started implementing their marijuana legalization, media stories hinted that the federal government may loosen its enforcement of marijuana laws, and President Obama publicly stated that marijuana was not more dangerous than alcohol.[8]  At around the same time, the U.S. Attorney General proposed banking rules for legal marijuana-related businesses.[9]  As a result, in mid-January, Plandai and other cannabis-related stocks experienced an almost identical increase in share price and trading volume, lasting through March 2014.  As shown in the attached trading charts, this increase in price almost immediately was followed by short sellers scrambling to close and cover their positions, which pushed stock prices even higher.[10]  Mr. Fiore could not have predicted these outside events.  His trading activity was motivated by the same developments that fueled a trading pattern in other similarly-situated stocks throughout the market.

        *Third,* also contrary to the staff's assertions, the writers were aware of all information about the stock holdings and potential trading activity of Mr. Fiore that the staff suggests was material.  Each of the publishers and list brokers retained has provided an affidavit stating they were aware Mr. Fiore and/or Berkshire were Plandai shareholders.  The staff was informed of these affidavits, but declined to review them prior to issuing a Wells notice.  Moreover, the staff's contention that Mr. Fiore should have informed the writers that he would be selling shares is not supported by the facts or the law.  Mr. Fiore was not a definite seller, as his purchases of

---

[8] David Remnick, *Going the Distance:  On and off the road with Barack Obama*, New Yorker, Jan. 27, 2014.
[9] David Ingram, *U.S. to adjust rules to let banks handle marijuana money – Holder*, Reuters, Jan. 23, 2014, *available at* http://www.reuters.com/article/usa-marijuana-banking-idUSL2N0KY03D20140124.
[10] *See* Ex. J (comparison of trading in Plandai and five other companies listed on marijuana index).

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

over 1,285,000 shares confirm.  Each of the writers and brokers, however, noted in their affidavits that they understood shareholders such as Mr. Fiore might be selling shares.

*Fourth,* the staff's contention that Mr. Fiore controlled the content of the disclaimers— written statements included in the articles or on the publishers' websites stating that the writer was paid to publish the article—also is contradicted by the facts.  The three writers engaged by Berkshire have confirmed that they had full control over the content of their publications; Joe Fiore had no power to veto or review their articles or disclaimers.  The brokers who assisted Berkshire in retaining newsletter writers also confirmed that the writers did not interact with Mr. Fiore, demonstrating that he did not control the newsletters' content or disclaimers.  The staff's claim that Mr. Fiore *should* or *could* have changed the disclaimers is contrary to the unequivocal market practice described in the publishers' affidavits, and to Section 17(b)'s requirement that the *publisher* bears the burden of providing the disclaimer.  "As the plain language of Section 17(b) makes clear, the burden to disclose rests on the person who *publishes* the analyst's report." *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005).  The staff's attempt to expand Section 17(b) to create a "shadow" 17(b) requirement on those who pay the publisher should be rejected.  A third party is not liable for statements made by a newsletter publisher unless, unlike here, he retains control over the statements.  *See Cortina v. Anavex Life Sciences Corp.*, No. 15-cv-10162 (JMF), 2016 WL 7480415, at *4 (S.D.N.Y. Dec. 29, 2016) (Plaintiffs failed to allege that third party had control over the included statements or the power to review or approve).  In light of the writers' confirmation that they wrote and published their articles without Mr. Fiore's consultation or review, he was not required to supervise their disclaimers.  We also have not found, and the staff has not cited, any legal basis for the proposition that a shareholder is obligated to oversee the content of a disclaimer prepared by independent publishers.

5

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Even if the staff had some basis to hold Mr. Fiore responsible for language in the disclaimers, the language typically stated that the third party who paid for the publication may trade shares.  Given that Mr. Fiore, Berkshire, and Eat at Joes, Ltd.[11] were buying and selling shares, this language is accurate and a disclaimer suggesting that Mr. Fiore/Berkshire would be "only" sellers would have been false.[12]  Many recent "scalping" cases filed by the Commission are predicated on the publisher's failure to disclose that he was paid for writing the article.[13]  The articles here contained disclaimers stating the publishers were paid by a third party and almost always indicated the specific amount of compensation received.  We are unaware of any case holding a shareholder liable because the publisher he paid failed to include facts that were not required by law to be included in their disclaimers, such as Mr. Fiore's supposed intent to sell.  The staff's proposed action by "enforcement fiat"[14] would undermine development and awareness of small businesses and expand liability beyond current law.

The staff continues its unprecedented expansion in asserting its proposed relief.  Even if the staff's "scalping" allegations were correct, its assertion that disgorgement of all profits from sales of stock between April 2013 and April 2014 is authorized, regardless of causation, is contrary to the law.  The staff "must distinguish between the legally and illegally derived profits."  *S.E.C. v. Wyly,* 56 F. Supp. 3d 260, 265 (S.D.N.Y. 2014).  Given the lack of evidence of any causal link between the publication of articles and the price of Plandai stock, and the

---

[11] Eat at Joe's owns and operates restaurants developed by Mr. Fiore.  Largely in exchange for use of its products and work it performed on behalf of Plandai's predecessor company, Diamond Ranch, it became a holder of substantial shares.  During the relevant period, Mr. Fiore was a large Eat at Joe's shareholder.

[12] *See S.E.C. v. Thompson,* No. 14-cv-9126 (KBF), 2017 WL 874973, at *15 (S.D.N.Y. Mar. 2, 2017) (noting "may" sell disclosure is appropriate in situations where the party has "uncertain intent.")

[13] *See, e.g. S.E.C. v. Galena Biopharma, Inc.*, Admin. Proc. 3-17911 (Apr. 10, 2017).

[14] In a 2013 speech, former interim acting S.E.C. Chairman Michael Piwowar emphasized that enforcement should be solely focused on evidence of wrongdoing, namely, lying, cheating, and stealing, and further stated that the S.E.C. must concern itself only with "the facts known to them and the reasonable inferences from those facts."  He further recognized that "the mere existence of an investigation—even without taking any subsequent enforcement action— carries with it power to defame and destroy."  Comm'r Michael S. Piwowar, Remarks to the L.A. Cty. Bar Assoc. Sec. Reg. Seminar, Nov. 22, 2013, *available at* https://www.sec.gov/news/speech/2013-spch112113msp.

6

evidence that market-wide increases in cannabis-related stocks caused most of the increase in

Plandai's price, no "illegally derived profits" were caused by the market awareness campaign.

An enforcement action is not warranted.[15]

## RELEVANT FACTS

### MR. FIORE AND BERKSHIRE ENGAGED IN A LONG-TERM EFFORT TO HELP DEVELOP PLANDAI'S BUSINESS, INCLUDING COORDINATING A MARKET AWARENESS CAMPAIGN THAT PROPERLY WAS DISCLOSED

#### A.  Joseph Fiore is a Self-Made Entrepreneur Who Built Many Successful Companies

From a young age, Mr. Fiore demonstrated his impressive work ethic and entrepreneurial

spirit.  He grew up in Yonkers, New York, and at the age of 12, began working as a bus boy in

his father's diner in New York.  He steadily worked his way up to the position of short order

cook and later, waiter.  At 16, his family lost its lease on the restaurant, so Joe's father bought

two snack stands at an outdoor shopping center in Yonkers.  Throughout high school Joe helped

his father manage the stands.  Joe attended college at Fordham University, from which he

graduated in three years while continuing to help his father run the family business.

When Joe was 20, before he graduated college, he bought his first business, Quick &

Natural, a counter-service food court restaurant in the Galleria Mall in White Plains, N.Y.  Joe

made the $35,000 down payment using money he saved from his years of working, covering the

remaining $220,000 with a note obtained from the sellers.  When he took over Quick & Natural

it had been experiencing an operating loss.  Through ingenuity and hard work, Joe turned the

---

[15] In several conversations with counsel, the staff set out different, and inconsistent, theories regarding its view that, on several occasions, Mr. Fiore was a beneficial owner of more than 5% of the total number of outstanding shares of Plandai stock, and failed to file a Schedule 13D.  Review of the relevant documents, including several Forms 10-KSB suggests, however, that confusion exists regarding the registration status of Diamond Ranch and/or Plandai's common stock under 12(g), and whether it necessitated the filing of a Schedule 13D.  Mr. Fiore attempted to clear up this ambiguity by seeking advice on the matter, but it appears that previous counsel may have misunderstood the company's filings.  Certainly, however, Mr. Fiore's good faith reliance on such contemporaneous advice refutes any argument that the failure to file a Schedule 13D was intentional or an effort to mislead potential investors.  Given the nature of the 13(d) obligation, however, counsel already has indicated to the staff that Mr. Fiore is willing to discuss resolution of the 13(d) matter on acceptable terms.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

restaurant around, making it the highest grossing food court unit per square foot within his first year of ownership.  The business remained profitable, and Joe paid off the note in three years.

Seeing the success of Joe's first restaurant, shopping center and real estate developers approached him to open additional restaurants.  When he was 22, he opened a second food court location at Herald Center in New York City.  He named this location "Eat at Joe's®" and operated it as a 50's style diner concept with a menu he developed himself.  By the time Joe was 24, he opened and developed two additional Eat at Joe's® restaurants.  Recognizing that he could not continue operating all the locations himself, he decided to franchise the Eat at Joe's® concept.[16]  Joe approached business professionals to learn how to establish limited partnerships to expand Eat at Joe's®, which ultimately resulted in a total of eight franchised locations.  In 1993, Mr. Fiore also purchased a 50's style drive-in restaurant in Putnam County, New York, which he still owns and operates as the Red Rooster Drive-In.

As Mr. Fiore began opening new Eat at Joe's® locations, he realized that the cost of using a general contractor to build out his stores was a costly addition to his initial capital outlay.  To reduce this expense, he taught himself the building trade and began acting as his own general contractor.  Another substantial cost he recognized was the large markup restaurant equipment suppliers added to the wholesale price of the equipment necessary to outfit restaurants.  To reduce this expense, he started his own restaurant equipment and supply company.

Seeing the quality of Mr. Fiore's work, other entrepreneurs began asking him to build their restaurants.  Joe seized on the profit potential and acted as a general contractor, eventually constructing and supplying approximately thirty locations.  After years of work developing and operating Eat at Joe's®, Mr. Fiore decided to revamp the concept to focus on larger, sit-down

---

[16] The development of Eat at Joe's is further described in the Wells submission submitted on behalf of SPYR, Inc.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

restaurants.  He began evaluating how to take Eat at Joe's® public, which would allow him to gain access to the capital markets.  Again, he taught himself the process, and learned he could purchase a publicly traded but non-operating company and take Eat at Joe's® public by merging it into such a company.  His new public entity raised funds for a new series of restaurants under the Eat at Joe's® name.  Through his hard work, Eat at Joe's® grew to a peak of eleven locations.

## B.  Berkshire Helps Develop Emerging Small Cap Companies through Investments of Time, Energy, and Money

From operating his own companies, Mr. Fiore understood how to build a business from scratch, operate a business day-to-day, and raise capital through both private placements and public offerings.  Given this expertise, Mr. Fiore began receiving requests to work with emerging companies that hoped to tap into his multi-faceted expertise.  In 1996, he formed Berkshire, a venture capital firm that focuses on applying the principles used to build his own companies— assisting with concepts, daily operations, and financial matters such as raising funds.

Mr. Fiore serves as Berkshire's Chairman, President, and CEO.  Berkshire typically chooses to work with companies that specialize in areas in which its employees "have a unique knowledge," including the food industry, nutraceuticals (such as Plandai), biotech, and alternative energy.[17]  The mission of Berkshire is to help grow companies through hands-on consulting and investments, including helping them inform the public about their products, technology, or services.  In addition to advice about operations and brick and mortar-type development, Berkshire's business model involves making long-term investments in companies. Berkshire's relationship with a company typically lasts between three and five years, though many last longer, during which time Berkshire helps the company achieve the objectives outlined in its business plan.  This commitment to helping develop companies, rather than merely turning

---

[17] Fiore Test. at 29:19-22, 35:6-25.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

a quick profit, is evidenced through the funding mechanisms used: Berkshire typically puts its

own capital at risk either by taking an equity position or by debt funding. The goal is to lead

companies into a joint venture, an acquisition, or onto a more senior listed exchange.

### C. Mr. Fiore and Berkshire's Long History of Involvement with Plandai Demonstrate Their Commitment to Helping Plandai Succeed and Confidence in Its Prospects

The relationship that led Mr. Fiore to Plandai began around 2003, when Mr. Fiore was

introduced to Plandai's predecessor company (Diamond Ranch). Phil Serlin was a principal in

Diamond Ranch, a wholesale meat distribution company, and was also a customer of the Red

Rooster Drive-In. As their relationship developed, Mr. Fiore and Mr. Serlin worked together to

create custom-blended burgers for the Red Rooster and Eat at Joe's. The burger they developed

was successful and later Mr. Fiore entered into an agreement with Mr. Serlin to sell the custom

burger to other Diamond Ranch customers under the "Eat at Joe's" trademarked brand name.

Berkshire began investing in Diamond Ranch the following year. In 2004, Mr. Fiore

helped take Diamond Ranch public. In subsequent years, Berkshire invested over $2.6 million in

Diamond Ranch's operations and growth and helped it establish new supply routes, expand into

additional products, and collect its accounts receivable. Berkshire also helped Diamond Ranch

acquire two companies and integrate them into its operations. In return for these services,

Berkshire received Diamond Ranch shares.[18]

### 1. Mr. Fiore Invests in Plandai After Diligently Researching its Technology

Around 2010, a long-time business associate told Mr. Fiore about a company that was

trying to develop a "live" plant extraction technology that allowed for a greater amount of the

plant's nutrients to be realized. In 2011, Mr. Fiore had an introductory call with Roger Duffield,

the CEO of Plandai, to learn about the company and its technology. Mr. Fiore learned that

---

[18] Eat at Joe's also received shares as compensation for the use of its proprietary burger and consultant services.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Plandai's goal was to create a more bio-available green tea extract, with greater absorption into the bloodstream to accentuate green tea's positive health effects.  Mr. Duffield also introduced Mr. Fiore to Plandai's manufacturing plans and explained that Plandai had signed a long-term lease (49 years with an option for 49 further years) for the Senteeko Tea Estate in South Africa.

After speaking with Mr. Duffield, Mr. Fiore reviewed additional data about Plandai's technology and did research into green tea extracts.  He also reviewed documentation regarding the $13 million loan Plandai received from the South African Land Bank for use in rehabilitating the green tea estate and developing a state-of-the-art manufacturing plant.  Around this time, Plandai also received verification of the bio-availability qualities of the extract from a South African university.  After his extensive due diligence, Mr. Fiore was satisfied that Plandai was a company with valuable technology and plans to develop a useful and marketable product.

### 2.    After Merging with Diamond Ranch, Plandai Emerges as a Public Company

As Mr. Fiore was conducting his due diligence, Phil Serlin and Roger Duffield discussed the possibility of a merger between Plandai and Diamond Ranch so they could work together to develop natural, antibiotic-free, and steroid-free meat and poultry products.  In the midst of these discussions, in approximately July 2011, Diamond Ranch began experiencing issues with its factor, meaning that its customers had less time to pay off their accounts receivable.  Berkshire attempted to help Diamond Ranch obtain a new factor or set up an alternative financing mechanism, but its efforts were unsuccessful.  Without operating capital, Diamond Ranch had difficulty meeting its financial obligations and could not continue developing its products.

Nevertheless, the companies continued with their planned merger—albeit in a different form.  Because they were no longer viable for a public company, the Diamond Ranch operations were spun off as a private entity.  Plandai was left as the surviving public company.  As part of

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

resolving its outstanding obligations, Diamond Ranch gave Berkshire stock as repayment for its previous loans.  Following the merger, this stock became Plandai shares.

Because he was supportive of Plandai's technology, Mr. Fiore, through Berkshire, began investing in Plandai.  In 2012, Berkshire provided a line of credit, and throughout 2012 and 2013 it invested approximately $900,000 to help Plandai cover its operational expenses, including building the South African factory.  In December 2013, Plandai and Berkshire agreed to convert the earlier $900,000 loan into five million shares of restricted stock, which Berkshire received on February 19, 2014.  Berkshire continued investing in Plandai, including a 2014 investment of approximately $7 million to assist with the completion of the factory and preparations for production of the green tea extract.  Mr. Fiore also assisted Plandai in obtaining a factor, which would allow Plandai to monetize its accounts receivable for future shipments, and introduced Plandai to an institutional lender in an effort to obtain an additional line of credit for Plandai.[19]

## D.  Mr. Fiore Retained Publishers to Help Raise Awareness of Plandai's Business

In March 2013, Mr. Fiore and Roger Duffield discussed ways to increase market and investor awareness of Plandai and its technology.[20]  As Mr. Fiore testified, he believed that funding a market awareness campaign was "consistent with Berkshire's mission statement of fundamentally helping the company grow, and part of that fundamental growth is to . . . tell the public what the products, technology, services, and in Plandai's case, what the science was."[21]  Additionally, Berkshire funding the market awareness campaign would allow Plandai to use its funds to build production facilities and develop its technology.  The goal of the campaign was to expand "knowledge of the story of . . . the company's products, services, and technology. . . .[22]

---

[19] Fiore Test. at 254:22-255:12, 256:21-257:5.
[20] Fiore Test. at 99:12-19.
[21] Fiore Test. at 101:19-102:3.
[22] Fiore Test. at 39:7-24

12

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Mr. Fiore was known in the small cap publishing community, and previously had dealt with parties who conduct market awareness.  Mr. Fiore explained that the purpose of a market awareness campaign is to get a company's message out to the market, which can have many beneficial effects: "[m]any times when you advertise a company, more people hear about it. They become interested in the products or services . . . .  Joint ventures open up . . . . Partnerships open up.  . . . [T]here's a multitude of benefits . . . ."[23]  Contrary to the staff's unsupported assertion, the primary goal of hiring publishers was not to increase the share price. Rather, as a result of getting out a company's story it "could get increased liquidity because more people could find out about it. . . . But the ***initial goal is not [to increase share price].***"[24]  For several companies with which Berkshire has worked, the end result of the advertising was obtaining a new distributor or becoming part of a joint venture.

## E.  Mr. Fiore Did Not Control the Content of the Articles

Berkshire retained five individuals to coordinate the market awareness campaign.  As explained in the affidavits from Kenn Kerr, Rob Goldman, Matthew Chipman, Steve Sandifer, and Alex Kon, each was retained, through their companies, to prepare or facilitate the preparation of factually accurate articles that discussed Plandai and its technology.  They understood Berkshire's goal "was to get the word out about [Plandai], generate interest in the company, and potentially attract investors or an acquirer."  (Ex. B, Goldman Aff. ¶ 4).[25]

Over the course of the market awareness campaign, Mr. Fiore worked with two types of publishers:  1) writers he retained (Kenn Kerr, Rob Goldman**,** and Matt Chipman), often on longer-term assignments, to write articles, profiles, and reports about Plandai and its technology

---

[23] Fiore Test. 39:1-6.
[24] Fiore Test. 39: 25-40:3 (emphasis supplied).
[25] *See also* Ex. A, Kerr Aff. ¶ 4 ("Mr. Fiore told me that he was looking for someone who could clearly and concisely tell Plandai's story.")

13

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

for distribution through newswires or their own newsletters; and 2) independent newsletter publishers engaged via publisher brokers (Steven Sandifer and Alex Kon) to write and distribute articles based upon publicly available information. The newsletter publishers distributed their truthful articles to their lists of double opt-in subscribers.

### 1. The Writers Published Truthful, Independent Articles

Kenn Kerr is a journalist and founder of Stock Market Media Group ("SMMG"), which was engaged to "clearly and concisely tell Plandai's story." (Ex. A, Kerr Aff. ¶ 4). Mr. Kerr knew that Mr. Fiore held Plandai shares and that he "may be trading stock." (*Id.*). Before publishing any materials, Mr. Kerr performed in-depth research and due diligence into Plandai, including speaking to Mr. Duffield and others at Plandai to better "understand the [company's] technology" so he could "accurately report on it." (*Id.* ¶ 5). Mr. Kerr's research also included "travel[ing] to South Africa, where Plandai was based, so that [he] could get a better understanding of the facilities." (*Id.*). After compiling his research, Mr. Kerr published a full overview research report, providing a detailed description of the company and its technology, and subsequently published a series of "information articles," which focused on informing the market about Plandai's developments.

Mr. Goldman is the founder and President of Goldman Small Cap Research, which specializes in sponsored research and preparing investment newsletters. (Ex. B, Goldman Aff. ¶ 2). After Mr. Goldman learned that Berkshire wanted to retain him, he too did his own due diligence, including a review of Plandai's SEC filings. He also did diligence on Berkshire, from which he "learned that it was a shareholder of Plandai" (*Id.* ¶ 5), and that it "may or may not have been buying or selling stock." (*Id.* ¶ 7). He too was retained for a long-term assignment writing articles that contained accurate information.

14

Mr. Chipman was retained early in the market awareness campaign, in May 2013, to provide a company profile on Plandai.  (Ex. C, Chipman Aff. ¶ 4).  Mr. Chipman's company published "The Green Baron Report," a newsletter distributed to subscribers of a double opt-in email list.[26]  Mr. Chipman began his research by gathering public materials on Plandai, including SEC filings, company press releases, and information from Plandai's website, which he used to prepare a company profile.  Mr. Chipman knew when he "put together this profile" that "Berkshire and/or Mr. Fiore [were] Plandai shareholder[s]," and recalled that "Berkshire/Mr. Fiore was a long-term shareholder [whose] ownership dated back to Plandai's predecessor company [Diamond Ranch]."  (*Id*. ¶ 6).  He also understood that parties who paid for his services "were authorized to make trades in the stocks that . . . were advertised."  (*Id*. ¶ 10).

Before distribution of these articles, Mr. Fiore asked Mr. Kerr and Mr. Goldman to have their articles reviewed by Plandai management to ensure they were accurate.  Consistent with his "general practice," Mr. Goldman would send "all materials to Plandai to review for factual accuracy" before publication.  (Ex. B ¶ 6).  Similarly, aside from Mr. Fiore's cursory review of Mr. Kerr's first publication (a Corporate Overview), he too worked directly with Plandai for fact-checking, without Mr. Fiore "in the middle."[27]  The writers retained sole control over the content of their articles and did not seek or receive Mr. Fiore's approval before publishing.  Mr. Kerr explains that "[e]very piece I wrote regarding Plandai was my own work," and "no one tried to influence the content of my articles."  (Ex. A ¶ 6).[28]

---

[26] A "double opt-in" email list requires that recipients have twice confirmed their desire to receive the publication. Mr. Sandifer confirmed that the standard and preferred industry practice was for newsletter publishers hired through a broker to require subscribers be "double opt-in" to access the newsletter's full content.  (Sandifer Aff. ¶ 5).
[27] Fiore Test. 46:20-47:5.
[28] *See* Ex. B, Goldman Aff. ¶ 8 ("I made it clear . . . that I would be the sole writer of any materials relating to Plandai."); Ex. C, Chipman Aff. ¶ 7 ("At no time did Joe Fiore or Berkshire give me any input regarding the content of my publication.")

15

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

In virtually all cases, each writer included disclaimers in their articles or on their websites that he had been compensated to write and the amount of compensation.[29]  Mr. Kerr explained that the writers drafted the disclosures, and "Mr. Fiore did not determine the language [the writers] used in [their] disclaimer[s]." (Ex. A ¶ 7).[30]  A typical disclaimer from Mr. Kerr comes from the original Plandai company profile:

> . . . Stock Market Media Group was compensated two-thousand five hundred dollars for the research, writing, production, and release of our Report on PLPL by a third-party via bank wire. . . . third parties that might have compensated Stock Market Media Group **may hold free-trading shares of the company** being profiled and **could very well be selling shares** of the company's stock at the same time the profile is being disseminated to potential investors. . . .[31]

The disclaimer used by Mr. Chipman on the company profile he prepared for Plandai similarly identified the amount of compensation he received for the publication:

> Evergreen Marketing, Inc. has received compensation of $3,000 for services that includes coverage of Plandai Biotechnology (PLPL) as a 'Trading Alert'[32]

Similarly, Mr. Goldman's disclaimer identified that he had received $4,000 and directed readers to his website, which provided similar information regarding receipt of compensation:

> Goldman Small Cap Research is compensated by the subject companies, related parties, or third parties for the Opportunity Research reports found on this website. The Firm does not accept any equity compensation, and all compensation is disclosed on each report.[33]

---

[29] Although it is difficult to perfectly reconstruct the disclaimers included on the publishers' articles and websites, in virtually all cases the publishers' disclaimers included language stating that the publishers were compensated for preparing the article and the amount of compensation received.

[30] *See also* Ex. B, Goldman Aff ¶ 7 ("Berkshire and Joe Fiore had no control over the language of my disclaimer."); Ex. C, Chipman Aff. ¶ 10 ("Neither Joe Fiore nor Berkshire had control over the language of our disclosure or disclaimers.")

[31] Disclaimer, Stock Market Media Group Company Profile, April 2014 (emphasis supplied).

[32] Disclaimer, Green Baron, April 29, 2013.

[33] Disclaimer, Goldman Small Cap Research, July 2013.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Additionally, the writers were aware that Berkshire may sell shares during the market awareness campaign.  As Mr. Kerr explained, he understood that "most clients who paid for promotional services were shareholders and thus likely to be buyers, sellers, or holders of the stock," and he "understood [the same] regarding Mr. Fiore and . . . Berkshire."  (Ex. A ¶ 7).  According to Mr. Goldman, "the fact that Berkshire was a Plandai shareholder who had paid Goldman for its services, and may or may not have been buying or selling stock, did not necessitate . . . [any] change [in] my standard disclaimer language." (Ex. B ¶ 7).

### 2.  Mr. Fiore Hired Independent Publishers To Write Articles About Plandai

Mr. Fiore also retained publisher brokers, who hired newsletter publishers to write and distribute articles to their respective subscribers.  Steve Sandifer (Cream Consulting Group) and Alex Kon (007 Stock Chat) were "[paid] a fee to obtain independent newsletters to publish information about the company."  (Ex. D, Sandifer Aff. ¶ 5).  The chosen newsletter writer would prepare and send articles about Plandai to his database of double "opt-in" email subscribers. (*Id.*)  This allowed Berkshire to circulate information about Plandai's business and technology to many subscribers who had shown interest in receiving such information.

Mr. Sandifer and Mr. Kon also were aware that Mr. Fiore held shares.  Mr. Kon explained that "[w]hen [he] was hired by Berkshire, [he] understood that it and Joe Fiore were shareholders . . . interested in getting Plandai's message out to a broader audience."  (Ex. E, Kon Aff. ¶ 4).  The brokers further were aware that Mr. Fiore and Berkshire may be selling their Plandai stock.  As Mr. Sandifer describes, "it is commonly known that shareholders and companies like Berkshire/Fiore, are likely to be engaging in the purchase and sale of their stock in the companies for which they hire me to provide list brokerage services." (Ex. D ¶ 4).

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Mr. Fiore did not speak to the individual newsletter publishers.  The broker coordinated with the newsletter publisher, who wrote articles based on publicly available information.[34]  The writers "authored their own content."  Mr. Fiore "never edited or reviewed."  (Ex. E, Kon Aff. ¶ 6).  Mr. Fiore periodically forwarded publicly available information, but did not expect that the writers hired would publish articles based on that information.

The publishers drafted their own disclaimers, indicating the amount they had been compensated.  "[E]very independent newsletter publisher [retained by the] list broker[s] ha[d] their own disclaimer," which was written by the newsletter publisher.  (Ex. E, Kon Aff. ¶ 7).  Often, "[t]he only things that change [in the disclaimer] are the amount paid and who is paying," because typically, "[a publisher's] disclaimer remains the same whether or not the paying third party intends on selling stock."  (*Id.*).  Although the disclaimers varied, they generally included that the writer was compensated by a third party and the amount paid, in addition to other information.  One newsletter obtained through Steve Sandifer (Cream Consulting) stated:

> . . . The Street Alert has received a total of $15,000 from a non affiliate third party Lakegroup Media for distribution of PLPL material.  This compensation received should be viewed as a definitive conflict of interest.  The third party that might have compensated TheStreetAlert.com may hold free-trading shares of the company being profiled and ***could very well be selling shares of the [company's] stock at the same time the profile is being disseminated to potential investors; this should be viewed as a definite conflict of interest*** and as such, the reader should take this into consideration.[35]

At the request of counsel, Messrs. Kerr, Goldman, Chipman, Sandifer and Kon provided affidavits explaining their understanding of Mr. Fiore's shareholder status and potential trading, and their independence as it related to content of the articles and the disclaimers.  In a pre-Wells meeting on February 17, 2017, counsel informed the staff that it had obtained statements from

---

[34] Fiore Test. 51:8-15 (writers would often "send out the most current news … the company had that was available").
[35] Street Alert Disclaimer (emphasis supplied).

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

the writers that were inconsistent with the staff's assertions that the publishers were unaware that Mr. Fiore and/or Berkshire were shareholders who may sell shares during the market awareness campaign.[36]  The staff did not ask to review them.  Instead, the staff stated that it would not be issuing a Wells Notice and would speak to counsel again prior to taking any such step.[37]

On April 5, 2017, the staff contacted counsel and informed them that a Wells Notice would be issued to Mr. Fiore and Berkshire, without any opportunity for further discussion. Counsel again told the staff that he had sworn statements from the writers and asked if the staff would review them prior to issuing a Wells.  The staff declined, stating that the affidavits could be sent but the Wells Notice was being issued immediately regardless.

## F.  Mr. Fiore Legitimately Bought and Sold Stock During the Market Awareness Campaign

From April 2013 to April 2014, during the time of the market awareness campaign, Mr. Fiore both bought and sold Plandai shares.  He was a regular buyer of Plandai shares during 2013.  At the start of the campaign, he both bought and sold stocks in five consecutive months, from May 2013 through September 2013, ultimately purchasing over 1,285,000 shares of Plandai stock during 2013.  In July 2013 and December 2013, Mr. Fiore was a net *buyer* of stock.  The chart attached as Exhibit F tracks the amount that Mr. Fiore, Berkshire, and Eat at Joe's bought and sold in each month of 2013.  He both bought and sold shares during the majority of 2013.

The attached Exhibit G tracks weekly trading by Mr. Fiore, Berkshire, and Eat at Joe's with the average weekly price of Plandai shares.  As demonstrated, Mr. Fiore's trading activity generally followed the market, with Mr. Fiore buying Plandai shares when prices were low and

---

[36] In a January 25, 2017 call, the staff said it was basing its case in part on Mr. Fiore's testimony that he did not discuss his share ownership with the publishers at the time he paid them, yet, after being informed during the pre-Wells meeting that the publishers had provided affidavits on Mr. Fiore's behalf, the staff now labels Mr. Fiore's same testimony as "irrelevant" because it no longer supports its theory.

[37] The attorney for the five individuals also informed the staff that his clients would be willing to testify about their knowledge and communications with Mr. Fiore.

19

selling shares when prices rose.  The fact that Mr. Fiore both bought and sold shares shows that the staff's position that Mr. Fiore intended to be a seller when hiring the article writers is incorrect.  Rather, it is consistent with Mr. Fiore's testimony that he considered different "criteria" when he decided whether he would sell shares, including "volume . . . and [whether] the stock is fairly priced based on what [he] believe[s] the fundamentals of the company are."[38]

## G.  2014 Increase in Plandai Share Price is Replicated Throughout the Related Industry

Early in 2013, Plandai began experimenting with applying its extract technology to create a cannabis extract that was non-psychoactive without losing the medicinal benefits of the plant. In October 2013, Plandai publicly announced the previous formation of its subsidiary, Cannabis Biosciences, Inc., "for the purpose of developing and testing a new Phytofare botanical extract derived from cannabis."[39]  By January 2014, Plandai was listed on the "Cannabis Index," an independent list published by Mentor Capital that chooses and tracks companies related to the marijuana industry.  (*See* Ex. H, a copy of the January 26, 2014 Cannabis Index).

During the first quarter of 2014, many, if not all, of the marijuana-related stocks on that index, including Plandai, were part of an industry-wide boom that caused exponential gains in the trading price and volume of cannabis-related stocks.  The volume and price spikes appeared to track the market's response to unpredictable contemporary developments.  In particular, the states of Washington and Colorado's legalization of marijuana took effect around January 2014 and, shortly thereafter, Attorney General Holder announced regulations relaxing banking restrictions on state-sanctioned marijuana businesses.[40]  The January 27, 2014 issue of The New Yorker further fueled the run up as it quoted then-President Obama as stating that marijuana was

---

[38] Fiore Test. 152:17-23.
[39] Press Release from Plandai Biotechnology, Inc., *Plandai Biotechnoloy, Inc. to Enter Medical Marijuana Field with Phyto Cannabinoid Extract*, Oct. 30, 2013.
[40] Josh Gerstein, *Holder: Feds to set rules for banks and pot money*, Politico, Jan. 23, 2014, *available at* http://www.politico.com/blogs/under-the-radar/2014/01/holder-feds-to-set-rules-for-banks-and-pot-money-181777.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

"[not] more dangerous than alcohol."[41]  Shortly following this article, on January 31, 2014 and February 3, 2014, Plandai experienced its highest ever volume trading days (9,117,900 and 10,609,100 shares, respectively).  On the day after the Holder announcement, Plandai trading volume increased ten-fold and remained high through the end of March 2014.  Similarly, during the last week of January, Plandai's share price rose from $.62 to $2.41/share, and stayed above $1/share until March 31, 2014.  At no point during the nine previous months of the market awareness campaign had Plandai's share price ever risen above $1/share.

Although the cause of these spikes theoretically could be debated, the fact that virtually identical price and volume spikes existed for other stocks on the Cannabis Index cannot be.  (*See* Ex. J).  After the price of Plandai and other cannabis-related stocks began to increase, short sellers apparently were forced to enter the market quickly to cover their short positions, creating further demand for shares and a concomitant increase in price.

The attached Exhibit I graphically shows the trading history of six stocks listed on the cannabis indices, including Plandai.  The stocks on Exhibit I purposefully have not been labeled. These anonymized charts demonstrate that in February 2014, each experienced a dramatic spike in price and volume.  Exhibit J includes the same charts, now labeled.  Absent this identification, the trading patterns are so similar that it would be impossible to identify Plandai's trading from the five others.  Notably, the majority of Mr. Fiore's market sales of Plandai occur in this period. Mr. Fiore sold 7,908,379 shares of Plandai during the first quarter of 2014, versus the net 1,725,599 he sold during the last three quarters of 2013.

---

[41] David Remnick, *Going the Distance:  On and off the road with Barack Obama*, New Yorker, Jan. 27, 2014.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

**H.  The Staff's Position**

In a January 25, 2017 pre-Wells call, the staff asserted that Mr. Fiore's payments to the publishers to write articles about Plandai constituted an illegal scalping scheme because he supposedly failed to disclose his status as a shareholder and his intent to sell shares during the promotional period.  The staff further stated that its theory against Mr. Fiore relied upon Mr. Fiore's testimony that at the time he paid article writers for their services he did not discuss with them that he owned Plandai stock or intended to sell.  Despite the staff's reliance on Mr. Fiore's testimony on that point, the staff indicated that its evidence of Mr. Fiore's intent to sell was based solely on the fact that Mr. Fiore did sell stock during the period.  The staff's position ignores unrefuted aspects of Mr. Fiore's testimony about his intent, the factors that went into his trading decisions, and the purpose of the market awareness campaign.  It also disregards the publishers' sworn statements, and existing law, which imposes no duty to disclose the information the staff postulates should be part of the regulatory or legal framework.

The staff also indicated it was investigating whether to charge Mr. Fiore with violations of Section 13(d).  At trial, we anticipate that the facts will show any failure to file a Schedule 13D was not done for the purpose of misleading investors, but instead was based upon legal advice received that because Plandai's stock was not registered under Section 12(g), the 5% reporting threshold did not apply.

In a follow-up April 5, 2017 call, when questioned about undeniable knowledge on the part of the publishers, the staff claimed that the language in the publishers' disclosures stating that Berkshire "may" sell shares was not sufficient because Mr. Fiore supposedly "knew" he would be selling stock, a proposition for which the staff cited *S.E.C. v. Recycle Tech, Inc.*, No. 12-21656, 2013 WL 12063952 (S.D. Fla. 26, 2013).  The staff further explained its belief that

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

Mr. Fiore was responsible for the publisher's disclosures because he paid for the publications. Although counsel reiterated that the five publishers were available to speak and had given affidavits, the staff declined to review the statements.  The staff indicated that its unprecedented and legally unsupportable position was that Mr. Fiore had an obligation to have specific, clear conversations with the publishers stating that he held Plandai shares and that he (allegedly) intended to sell during the period.

In a final April 26, 2017 conversation, when asked to whom the staff believes Mr. Fiore failed to disclose his shareholder status and supposed intent to sell, the staff switched positions, stating that its previous position that Mr. Fiore failed to inform the publishers was "irrelevant" and that Mr. Fiore supposedly failed to inform the recipients of the publications of his shareholder status and intent to sell.  This position conflicts with the staff's prior statements in the January 25, 2017 and April 5, 2017 conversations, where it represented that Mr. Fiore should have told this information to the publishers.  The staff also failed to identify any facts that suggest that market participants were misled into believing that the party that paid for the publication would not be selling shares.  When asked for the staff's basis for its belief that Mr. Fiore intended to sell Plandai shares during the promotional period, the staff again referenced the fact that Mr. Fiore actually sold shares during the period.  The staff further indicated that they measured Mr. Fiore's intent to sell each time he paid the publishers, meaning each payment captured a new "day one" where Mr. Fiore intended to sell.  Again, when asked, the staff failed to identify any statutory or regulatory basis for Mr. Fiore's obligation to fashion what the staff believed would have been an appropriate disclosure or any factual support for its determination of Mr. Fiore's intent at any point in time other than the fact that he did sell shares at various

23

times.  During the final call, the staff also confirmed that it did not assert nor base its theory on any substantive misrepresentations in the publications paid for by Berkshire.

Finally, on the issue of disgorgement, the staff stated that it seeks disgorgement of all profits received from the purchase or sale of shares of Plandai between April 2013 and April 2014.  The staff asserted that such disgorgement was required regardless of whether the stock price increased due to the publications as opposed to some other reason, including the market-wide increase caused by the cannabis-related news, with which Mr. Fiore had no involvement. This view of disgorgement simply is not the law.

## DISCUSSION

**BECAUSE THE PUBLISHERS KNEW MR. FIORE HELD
AND MAY TRADE PLANDAI SHARES AND BECAUSE MR. FIORE
HAD NO OBLIGATION TO ENSURE THAT THE INDEPENDENT PUBLISHERS
INCLUDED ADDITIONAL INFORMATION IN THEIR ALREADY ROBUST
DISCLAIMERS, A "SCALPING" ACTION SHOULD NOT BE AUTHORIZED**

The staff has acknowledged that this is not a case where the articles financed by Berkshire contain misstatements about Plandai's operations.  Instead, the staff has set a moving target as to whom Mr. Fiore was obligated to inform of his shareholder status or his supposed intent to sell.  Purporting to rely on the general anti-fraud provisions, the staff essentially attempts to add a new category, "shareholders," to those obligated to make disclosures under Section 17(b).  By its text, Section 17(b) imposes an obligation only on the publisher, not the payer.[42]  Imposing liability on a party who did not make or control the disclaimers at issue creates a new regulation or interpretation of the law, and should be rejected.

---

[42] Section 17(b) provides: "It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to *publish*, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, *from an issuer, underwriter, or dealer*, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. § 77(q) (emphasis supplied).

24

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

## A.  Hiring Publishers to Generate Market Awareness is Appropriate and Legal

Market awareness programs, like that financed by Berkshire, are vital to start-up and small cap companies with products and services that can benefit from public awareness and access to capital markets.  Emerging companies such as Plandai rightfully are encouraged to "get out the facts."  (*See* Final Report of the Advisory Committee on Small Public Companies to the U.S. Securities and Exchange Commission).  Here, Mr. Fiore required that all articles "get out the facts" accurately.[43]  The publishers understood accuracy was their obligation.[44]

"[N]othing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation."  *In re Galectin Therapeutics Inc., Sec. Litig.*, 157 F. Supp. 3d 1230, 1238 (N.D. Ga. 2015), *aff'd* 843 F.3d 1257 (11th Cir. 2016).  As the Court explained in *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005), "the approach taken by the securities laws—in practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities—is to require disclosure of the fact that the analyst has been paid."  Indeed, in 1998, William Walker, the SEC's Director of Enforcement stated: "There is nothing illegal about companies paying fees to touters.  The law requires the touters have to disclose . . . The laws do not cover the companies themselves who make the payments."[45]

The S.E.C. Advisory Committee has recognized the importance of providing the market with research about "small cap" companies.  The Committee, comprised of CEOs, venture capitalists, academics, and attorneys knowledgeable about the "small cap" market,[46] detailed how small cap companies typically receive little or no research coverage, which can lead to a

---

[43] Fiore Test. 101:4-11.
[44] *See* Ex. A, Kerr Aff. ¶ 6; Ex. B, Goldman Aff. ¶ 6.
[45] Statement of William Walker, *available at* http://www.techlawjournal.com/seclaw/81029.htm.
[46] *See* Press Release, *SEC Chairman Donaldson Announces Members of Advisory Committee on Smaller Public Companies,* Mar. 7, 2005, *available at* https://www.sec.gov/news/press/2005-30.htm.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

reduced market capitalization and higher financing costs.  The report recommended that the

S.E.C. "address the need for more independent research for smaller public companies" by

"[m]aintain[ing] policies that allow company-sponsored research to occur," as long as the

researcher discloses the "nature of the relationship with the company being covered."  While the

report concluded that this recommendation was mostly a "continuation of existing [S.E.C.]

policies," it was included to highlight the challenges facing small cap companies and to

encourage the Commission to find "new ways to promote analyst coverage" for them.[47]

Hiring writers to publish information about a stock often serves an important role in a

company's development.  Consistent with the Advisory Committee's findings, Mr. Fiore

understood that a company can receive a multitude of benefits from a market awareness

campaign.[48]  Additionally, as Kenn Kerr explains, researching and publicizing information can

"help companies do a better job of informing the public of their story so that investors [can]

make a more informed decision . . . ."  (Ex. A ¶ 2).  In short, engaging in a market awareness

campaign, as Mr. Fiore did here, is an appropriate way to broaden a company's shareholder base,

obtain new funding sources, and position a company for other growth opportunities.

**B.  No Material Omission Occurred in Mr. Fiore's Disclosures to the Publishers Because
They Knew that Mr. Fiore was a Shareholder and that He Might Sell Shares**

Although its factual theories have changed, the staff purports to base its proposed action

on the general antifraud provisions.  To prevail on its claims of purported violation of Section

17(a) and/or Rule 10b-5, the staff must prove:  (i) material misrepresentations or materially

misleading omissions; (ii) in connection with the purchase or sale of securities; and (iii) that Mr.

Fiore made the misrepresentations with scienter, in the case of Rule 10b-5(b) and Section

---

[47] Advisory Committee Report at 74.
[48] Fiore Test. 184:1-20.

26

17(a)(1), or negligence, in the case of Sections 17(a)(2) and (3).  *See S.E.C. v. Huff,* 758 F. Supp. 2d 1288, 1342 (S.D. Fla. 2010).  An omission is only material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

The staff initially articulated the theory that Mr. Fiore committed an actionable omission because he supposedly failed to disclose at the time he paid each publisher that he was a shareholder and supposedly intended to sell shares.  In more recent calls, the staff has backed away from this theory, describing Mr. Fiore's disclosures to the publishers as "irrelevant."  If the former position remains the staff's view, it is correct that no liability can arise from such a purported omission because the material facts were known to each publisher.

Each publisher retained by Berkshire had actual knowledge that Mr. Fiore and Berkshire were shareholders.[49]  An omission cannot be material if it already is known to the relevant parties.  *See In re GPC Biotech AG Sec. Litig.*, No. 07 CIV. 06728 (DC), 2009 WL 5125130, at *6 (S.D.N.Y. Dec. 29, 2009) (withheld information could not form material omission because parties would have known that information).  Similarly, although no factual basis exists to support the staff's contention that Mr. Fiore had an intent to sell Plandai shares when he paid the publishers, even if he had such intent, the publishers were aware that Mr. Fiore was likely to sell shares during the market awareness campaign.[50]  Because the publishers knew that Berkshire and Mr. Fiore were shareholders and likely to trade shares, any supposed omission was not material.

## C.  Mr. Fiore Had No Duty to Disclose His Holdings or Intent to Sell (If He Even Had Such Intent, Which He Did Not) to The Public

The staff's most recent theory is that Mr. Fiore was required to ensure that the publishers included disclosures to the market stating that he and Berkshire were shareholders who intended

---

[49] Ex. A, Kerr Aff ¶ 4; Ex. B, Goldman Aff ¶ 5; Ex. C, Chipman Aff ¶ 6; Ex. D, Sandifer Aff ¶ 4; Ex. E, Kon Aff ¶ 4.
[50] *See, e.g.,* Ex. C, Chipman Aff. ¶ 10.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

to sell shares.  The staff's approach attempts to create a unique disclosure requirement where none exists under the current securities laws and where no contrary impression was conveyed.

### 1.   Congress Imposed the Obligation for Disclaimer on the Publisher

Section 17(b) of the Securities Act places the duty to include a disclaimer on the newsletter publisher, not the purchaser of its services.  Section 17(b) states that it "shall be unlawful . . . to *publish* . . . any . . . communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an *issuer, underwriter, or dealer*, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. § 77(q) (emphasis supplied).  "As the plain language of Section 17(b) makes clear, the burden to disclose rests on the person who *publishes* the analyst's report," not "on the [party, *i.e.* Berkshire/Mr. Fiore] who has paid for the puffery."  *Garvey*, 354 F. Supp. 2d at 83; *see also In re Galectin,* 843 F.3d at 1263 ("the duty to disclose payments for promotional articles is on the author who receives the payment.")  Section 17(b) requires a publisher to disclose two facts: (1) that he has been paid, and (2) how much he has been paid**.**  *S.E.C. v. Gorsek*, 222 F. Supp. 2d 1099, 1106 (C.D. Ill. 2001).  Indeed, the purpose of Section 17(b) is solely to protect the public from publications that "purport to give an unbiased opinion but which [contain] opinions [that] in reality are bought and paid for." *U.S. v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971).  Such confusion did not occur here.

Section 17(b) conspicuously omits any duty or obligation on shareholders, like Mr. Fiore, or even on a publisher who is compensated by a shareholder.  Indeed, because Mr. Fiore (a shareholder in Plandai) was not an "issuer, underwriter, or dealer," the publishers arguably had no disclosure obligation and exceeded their statutory obligation when they disclosed that they were paid by a third party.  In essence, the staff attempts to create a separate 17(b) requirement

28

that would extend to those who are not publishers and in circumstances when the payment comes

from an entity that is not an "issuer, underwriter, or dealer." The staff's overreach is outside the

Congressionally-imposed bounds of Section 17(b).

### 2. Mr. Fiore Had No Disclosure Obligation Insofar as Any Lack of Disclosure of His Shareholder Status or Supposed Intent to Sell was Not Misleading.

The essence of the "scalping" cases cited by the staff in pre-Wells discussions is the

failure to disclose that the writer was not disinterested. Here, no such failure occurred. The

writers knew they were paid by Mr. Fiore and/or Berkshire and that they were Plandai

shareholders. The publishers' disclaimers also reflected that they were not disinterested but

rather that the articles were written in return for compensation.

Once it learned that all publishers were aware of Mr. Fiore's status, the staff changed

course and postulated that Mr. Fiore supposedly wrongfully failed to disclose to the public that

he was a shareholder who intended to sell his shares. Section 10(b), Rule 10b-5, and Section

17(a) require that when an individual "speaks," he must disclose all information necessary to

make his statement(s) not materially misleading. *S.E.C. v. Gane,* No. 03-61553-CIV-SEITZ,

2005 WL 90154 (S.D. Fla. Jan. 4, 2005). An omission is only material if it "would have been

viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available." *Basic Inc.*, 485 U.S. at 231-32.

Although a person can acquire a duty to disclose shareholder status if the failure to do so

would mislead, such a duty arises when, unlike here, the speaker gave a contrary impression.

For example, in *S.E.C. v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000), the shareholder/publisher ran

a website, email newsletter, and chat room where he shared stock picks. The S.E.C. alleged that

Park actively made false and misleading statements to his readers by stating that he was buying a

stock when in fact he was selling it, and additionally failed to disclose that he was compensated

29

for the articles.  The *Park* court found that the publisher/shareholder had a duty to disclose his position and intent to sell because he had a duty not to mislead his subscribers.  *Id.* at 892. Additionally, no doubt existed that Park intended to sell shares, as he had placed limit orders *before* publishing his columns.  *Id.*  Unlike the situation in *Park*, even the staff agrees that the publishers hired by Mr. Fiore made no such material misrepresentations about Berkshire's intent. Certainly, no contrary statement is claimed to have been made by Mr. Fiore.

A duty to disclose also arguably may arise when the failure to speak is itself materially misleading.  For example, in *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268 (9th Cir. 1979), the defendant, another publisher/shareholder, was a supposedly independent newspaper columnist at the L.A. Herald-Examiner who regularly wrote flattering articles about companies in which he held shares, knowing that his articles would increase the share price, but failed to include information reflecting his share ownership or his intent to sell his shares.  The *Zweig* court determined that the writer's lack of objectivity was material because his readers remained unaware of the writer's financial incentive, and therefore determined that the writer had a duty to disclose the investments (his financial incentive) to his readers to avoid a conflict of interest.  *Id.* The staff cites no authority to extend the duty to disclose a conflict to a party who is not speaking, such as Mr. Fiore.  Additionally, here, the publications financed by Mr. Fiore included significantly more information than was disclosed in *Zweig*, including in virtually all the publications that they had been paid to prepare the publications, and set forth the amount of compensation received.  In *Zweig*, of course, the supposedly independent newspaper columnist not only failed to reveal the author's investments but included no disclaimer whatsoever.

In other words, where the party's silence is not itself misleading, no disclosure obligation arises.  The failure to disclose certain facts "is actionable only to the extent that the absence of

30

those facts would, under the circumstances, render another reported statement misleading . . . ." *In re Galectin,* 843 F.3d at 1275-76 (finding silence was not misleading when it "did not render the true facts in [the company's] reports misleading.")  Here, Mr. Fiore and the publishers did not take any actions that would lead an observer to think Mr. Fiore was not selling shares, and the staff does not assert otherwise.  Accordingly, Mr. Fiore's supposed lack of disclosure did not serve to mislead the market.

### 3.  Mr. Fiore Did Not Control the Content of the Publishers' Articles and Therefore Had No Duty to Oversee Their Disclaimers.

Inherent in the staff's theory is the assertion that Mr. Fiore was responsible for overseeing the content of the publishers' disclaimers because he paid for the market awareness campaign.  Established law does not support this view.  When a payer maintains tight control over the publication, it may be held liable for the publisher's misstatements.  *See In re Galena Biopharma, Inc. Sec. Litig,*, 117 F. Supp. 3d 1145 (D. Or. 2015) (company maintained tight control, including approval of every article).  When, as here, the party did not make the statements, and did not write or edit the publications, he cannot be held liable for the speaking party's publications.  *See Cortina*, 2016 WL 7480415, at *4 (distinguishing *Galena* where defendants had not "personally reviewed, edited, and approved the [publications].").

The degree of control exerted over the statements and related activity is the crucial touchstone.  Illustrative by its significant distinctions from the facts here is *S.E.C. v. Strebinger,* 114 F. Supp. 3d 1321, 1325 (N.D. Ga. 2015), relied upon by the staff.  The facts set out in the Complaint in *Strebinger* differ significantly from Mr. Fiore's legitimate activity.

The *Strebinger* defendants and their undisclosed nominees acquired (and later manipulated) virtually all the shares in a worthless shell company, Americas Energy Company-AECo ("Americas"), through the use of "obscured offshore accounts" in order to conceal their

31

trading.[51]  Immediately thereafter, the *Strebinger* defendants coordinated a massive $3.5 million

campaign to promote Americas stock through blast emails and direct mailings of stock

promotion reports written by third parties.[52]  The *Strebinger* defendants controlled every aspect

of this campaign: the defendants hired ghost writers to principally draft reports, provided the

ghost writers with outrageously false research, directed the initial drafts to be falsely represented

and distributed as supposedly-independent research by other publishers with stock newsletters,

and decided when the reports were final and how and when they were distributed.[53]  Indeed, the

*Strebinger* defendants directed that reports be prepared pursuant to an agreement giving them

final editing and sign-off authority, which they used to draft portions of the email blasts.[54]

        The stock promotion reports and accompanying emails were replete with substantial lies

about the company's assets and false financial information that the *Strebinger* defendants caused

to be incorporated, including, most egregiously, Strebinger's insistence that the company's assets

(which were none) should be stated as $20 billion to "bring[] into account the potential of the

350m ton property" which, according to Strebinger, translated into "20 billion dollars worth of

coal."[55]  The *Strebinger* defendants further caused the reports to contain false current pricing

information, a fictitious opening stock price, false projections of escalating stock prices based on

projected operations for an incorrect operating company, false identification of the operating

company leading investors to review the incorrect company's financials instead of those of the

worthless shell, and the omission of the alleged valuation formula, with one report using the

---

[51] Compl. ¶ 28, 39, Dkt. 1, *S.E.C. v. Strebinger,* No. 1:14-cv-03533 (N.D. Ga. Nov. 13, 2014), hereinafter,
"Strebinger Compl.").
[52] Strebinger Compl. ¶ 36.
[53] Strebinger Compl. ¶¶ 78, 85, 79, 102, 128, 129.
[54] Strebinger Compl. ¶¶ 102, 105.
[55] Strebinger Compl. ¶ 108.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

other as supposedly "independent" confirmation of its valuation.[56]  Even the reports' disclaimers incorrectly identified the party funding the reports.[57]  The false, ghost-written reports, distributed as supposedly-independent research by two publishers with stock newsletters, included statements urging the readers immediately to buy shares in the public company while the *Strebinger* defendants manipulated trades through "obscured offshore accounts" to reach the fictitious predetermined $1/share opening price they caused to be included in the phony reports.[58]

Additionally, the *Strebinger* defendants' intent to sell was clear from their scheme to use "obscured offshore accounts" to conceal their trading.[59]  Shortly before the start of the marketing campaign, the defendants used the offshore accounts to fraudulently "walk up" or manipulate the price of the stock by using small, incremental trades to increase volume and price to "build momentum for the upcoming promotion."[60]  Furthermore, the defendants regularly received charts showing stock price movements before and after the email blasts, evidencing the sole purpose of the marketing campaign: to inflate stock price before they sold.[61]

The *Strebinger* court found the above allegations that the promotions failed to fully disclose the shareholders' status and intent to sell were sufficient to survive a motion to dismiss because, although publishers distributed the reports, the *Strebinger* defendants retained substantial control of the reports by both "direct[ing] the initial draft" and "determin[ing] when the contents . . . were final."[62]  *Strebinger,* 114 F. Supp. 3d at 1325.  The *Strebinger* defendants,

---

[56] Strebinger Compl. ¶¶ 83, 85, 99, 101, 114, 128.

[57] Strebinger Compl. ¶ 132.

[58] Strebinger Compl. ¶ 91.

[59] Strebinger Compl. ¶ 39.

[60] Strebinger Compl. ¶ 102.

[61] Strebinger Compl. ¶¶ 21, 39, 143-155.

[62] This requirement that the party paying for the statements must retain some control is consistent with the requirements in the context of Section 10b-5(b) that the "maker" of the statement is the party that retains control. *See, e.g., In re Galectin,* 843 F.3d at 1271-72 (determining that without allegations the defendant had "ultimate authority over the statement, including its content . . ." to "control" the publishers' statements, the fact that the company paid for the publishers' articles was "not sufficient to support a claim under Rule 10b-5(b).")

33

unlike Mr. Fiore, maintained tight control over both their surreptitious trading practices and

promotional campaign, and through this control caused the promotional materials to contain

"false or otherwise misleading statements." *Strebinger,* 114 F. Supp. 3d at 1329.

Berkshire and Mr. Fiore's actions do not approach the misconduct alleged in *Strebinger*

and are distinguishable on multiple grounds:

- Each publisher/writer unequivocally confirms Mr. Fiore's testimony that he did not have control over the content of their publications; the *Strebinger* defendants directed the initial content for email newsletters and retained authority to approve the final publications.[63]

- Mr. Fiore engaged publishers who independently researched and published their own materials, examined the company's data and technology, and traveled to Plandai's South African facilities; in *Strebinger,* the writers "did not actually perform the purportedly independent research."[64]

- The staff confirmed that it does not allege that the Plandai-related publications contained any substantive misstatements; in *Strebinger,* the SEC alleged that the publications contained multiple substantive misstatements, including $20 billion of imaginary assets, and reference to another company's projections.

- Mr. Fiore transacted legitimately on the open market; the *Strebinger* defendants manipulated stock prices using nominees and concealed offshore accounts.

- Mr. Fiore had been a long-term investor in Plandai and its successor company for nine years before the start of the market awareness campaign, and Mr. Fiore bought Plandai stock during the marketing campaign; the *Strebinger* defendants surreptitiously acquired shares in the company a few months before initiating a market awareness campaign, after which they did not purchase any market stock other than as part of an orchestrated stock manipulation.

- Here, the staff does not allege that the disclaimers made affirmative false statements, but rather that the disclosures were incomplete; in *Strebinger*, the publications' disclaimers included numerous incorrect statements.

The writers engaged by Berkshire also uniformly affirmed that they controlled their own

disclaimers.[65]  Unlike recent cases brought by the Commission alleging that the purchaser

---

[63] *See, e.g.*, Ex. A, Kerr Aff. ¶ 6; Ex. B, Goldman Aff. ¶ 8; Ex. C, Chipman Aff. ¶ 7; Ex. D, Sandifer Aff. ¶ 6, Ex. E, Kon Aff. ¶ 6.

[64] Strebinger Compl.¶ 116.

[65] As Mr. Chipman explained, "[n]either Joe Fiore nor Berkshire had control over the language of our disclosure or disclaimers."  (Ex. C ¶ 10).  *See also* Ex. A, Kerr Aff. ¶ 7 ("Mr. Fiore did not determine the language I used in my disclaimer."); Ex. B, Goldman Aff. ¶ 7 ("Berkshire and Joe Fiore had no control over the language of my disclaimer."); Ex. D, Sandifer Aff. ¶ 7; Ex. E, Kon Aff. ¶ 7.

34

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

attempted to manipulate the publisher's disclosures, no such conduct occurred or is alleged here.[66]  Here, the publications indicated to the reader that the writer had been compensated, and nearly all of the publishers' disclaimers essentially met the strict requirements of Section 17(b).[67]  No basis exists to find that Mr. Fiore separately should have controlled the publishers' disclaimers, even though he did not control any other aspects of the writers' publications.

### 4.   Disclaimers Stating that Mr. Fiore "May" Sell Shares Accurately Reflected Mr. Fiore's Uncertain Intent.

Even if the staff is correct that Mr. Fiore was required to oversee the publishers' disclaimers, the majority of the disclaimers[68] stating that the party paying for the publication "may" sell shares accurately reflected Mr. Fiore's intent.[69]  Disclaimers stating that a party "may" sell shares are appropriate when, as here, the party harbors an uncertain intent.  *See Wilson v. Merrill Lynch & Co.*, *Inc.*, 671 F.3d 120, 129 (2d Cir. 2011).  A "critical distinction [exists] between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur."  *Id.* at 130 (internal quotations omitted).

Here, in the nine relevant months leading up to the first quarter of 2014, Mr. Fiore's state of mind demonstrably is as he explained:  he made a decision to buy or sell shares based on market conditions.[70]  When prices were low he bought.  (*See* Ex. G.)  When liquidity and prices were high he sold.  (*Id.*)  In some months he was a net buyer and in others a net seller.  (Ex. F.)

---

[66] *See* Complaint, *S.E.C. v. Lidingo Hldgs, et al.,* No. 17-2540 (S.D.N.Y. Apr. 10, 2017) (alleging that purchaser directed publishers not to indicate that the publication was a paid promotion).

[67] Despite the difficulty in recreating the content of every disclaimer due to the passage of time and to the lack of access to previously available web-based materials, based on our review of the disclaimers in the documents available to us, we estimate that at least 97% of the publications included a disclaimer stating both that the publisher was compensated and the amount paid.

[68] Although a majority of the disclaimers included language that the third party compensating the writer "may" sell shares, to the extent it was not included in every publisher's disclaimers, is irrelevant.  The staff cites no authority requiring that a shareholder should be held liable for the publisher's failure to include disclaimer language that is not required by, or even discussed, in the text of Section 17(b).

[69] *See, e.g.,* Stock Market Media Group Disclaimer, April 2013 (stating that the third party who paid for the publication "may hold free-trading shares . . . and could very well be selling shares of the company's stock at the same time the profile is being disseminated").

[70] Fiore Test. 152:17:23.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

In late January through March of 2014, however, the unpredictable news and market reaction to a segment of the industry propelled increased prices and liquidity.  Again, consistent with his logical testimony, Mr. Fiore sold into the market rise, which he did not create.

The recent case of *S.E.C. v. Thompson* is instructive. No. 14-cv-9126 (KBF), 2017 WL 874973 (S.D.N.Y. Mar. 2, 2017).  The court examined whether a publisher's statements that he "may" sell a stock were materially misleading.  In reviewing the pleadings on a motion to dismiss, the *Thompson* court examined the Second Circuit's *Wilson* decision, which found a bank's disclosure that it "*may* routinely place bids" was not incomplete or misleading because it was not alleged to have *always* placed such bids.  As the *Thompson* court found, however, the complaint's allegations that the defendant "intended to *always* sell his shares" did not reflect uncertain intent, and thus held that the government stated a claim for a violation.  *See id.* at *15.

Disclosing that a party "may" sell shares is appropriate, however, as here, when the party has uncertain intent.  Mr. Fiore was not certain to be a seller, as evidenced by the fact that he bought shares in half the months where Berkshire purchased Plandai publications, and bought more shares than he sold in two months.

Because the *Wilson* case does not support the staff's view, the staff attempts to rely upon *S.E.C. v. Recycle Tech,* No. 12-21656, 2013 WL 12063952 (S.D. Fla. Sept. 26, 2013).  In *Recycle Tech*, the SEC alleged that publishers' inclusion of "may" sell in the disclaimer language was a material misstatement because it "failed to disclose that [the publishers] were definitively selling . . . shares immediately after issuing the newsletter promoting the stock."  *Id.* at *5.  The facts surrounding the promotional campaign and the defendants' trades set out in the Complaint in *Recycle Tech*, however, differ significantly from the legitimate activity here.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

First, the *Recycle Tech* defendants' promotional campaign was based on and included outrageously false information.  Although the company actually had no assets, operations, customers, products, sales, money, or revenues, it was falsely promoted as a "manufacture[r] and delivere[r] [of] premium eco-friendly Container Homes."[71]  The promotional reports included reprinted portions of Recycle Tech's false and misleading press releases authored by the company's CEO, which included the following blatantly false statements, among others:

- that the sham company that acquired Recycle Tech, was "a builder of green structures made of recycled materials," "the only builder of container homes in South Florida," and had "assembled a highly experienced and dedicated team of architects, engineers and contractors," none of which were true;

- that Recycle Tech had signed a binding letter of intent to build up to 50 homes in Haiti, failing to disclose that Recycle Tech was expected to fund the building of these homes and had no cash or other ability to do so;

- that Recycle Tech was "breaking ground" to showcase a container building in a month's time, failing to disclose that the company did not have the funds, equipment, or staff to do so.[72]

Not only did Mr. Fiore have no control over the content of the articles about Plandai, the staff does not allege that the publications paid for by Berkshire contained any substantive misstatements, in contrast to the many fabrications contained in the publications in *Recycle Tech*.

Second, the defendants in *Recycle Tech* included publishers who received stock immediately prior to the promotional campaign and sold shares on the same day they published articles containing multiple false statements recommending that readers purchase the same securities, which plainly demonstrated an intent to sell.  In contrast, Mr. Fiore, a third-party shareholder who had been a long-term investor in Plandai for nine years before the promotional campaign began, was not certain to be a seller.  Mr. Fiore did not undertake a short-term liquidation of his Plandai position, and instead bought over 1,285,000 shares during an extended

---

[71] Amended Compl. ¶¶ 24, 63, *S.E.C. v. Recycle Tech, Inc.*, No. 1:12-cv-21656 (S.D.N.Y. Aug. 17, 2012) (hereinafter, "Recycle Tech Compl.").
[72] Recycle Tech Compl. ¶¶ 55, 58, 60, 61.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

promotional effort.  Additionally, as the *Recycle Tech* opinion addresses a motion to dismiss, it established only that the allegations were sufficient to survive that motion, not that a "may" sell disclaimer was itself a material misstatement.  Accordingly, the staff's reliance on *Recycle Tech* to conclude that disclaimers stating the purchaser "may sell" were inadequate is misplaced.

## DISGORGEMENT IS NOT AVAILABLE BECAUSE THE STAFF CANNOT ALLEGE ANY PROFITS DUE TO THE ALLEGED INSUFFICIENCY OF THE DISCLAIMERS

Even if a violation were established, disgorgement is not justified because any profits resulted from market activity unrelated to the purported failure to disclose.  In seeking disgorgement, the staff must distinguish between legally derived gains from valid market trading and the alleged "illegal" gains from the purported failure to disclose.  *See Wyly*, 56 F. Supp. 3d at 264.  Because "[d]isgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct, . . . the disgorgement amount may not exceed the amount obtained through the wrongdoing."  *Id.*  Where a defendant benefits from "both lawful and unlawful conduct, the party seeking disgorgement must distinguish between the legally and illegally derived profits."  *Id.* at 265.

The staff has asserted that disgorgement of all gains from Mr. Fiore's trading of Plandai shares is justified, regardless of whether the rise in stock prices was caused by Berkshire's payment of the publishers and the resultant news articles.  The law, however, requires a demonstration that any profits were due to the supposed improper activity.  As the *Wyly* court held, "the SEC cannot satisfy its burden to *reasonably* approximate a disgorgement amount merely by proving the violations and then calculating the total profits on each of the trades during the existence of the unlawful scheme."  *Id.* at 269.  A Court must be able to determine the specific gains *caused by the publications*, rather than by other market factors.  Here, the staff has

38

not, and cannot, show any link between the increases in share price and the publications.  Indeed, no evidence demonstrates that the market relations campaign had any effect on the price of the stock; and, as Mr. Fiore testified, that certainly was not the primary goal of the campaign.

The staff's apparent position is that all trading in the year-long time period was "causally connected" to the market awareness campaign.  The facts do not support such a position.  Indeed, the court rejected a similar argument in *S.E.C. v. E-Smart Technologies, Inc.*, 139 F. Supp. 3d 170, 186 (D.D.C. 2015).  There, the defendant was found to have sent an allegedly false press release.  The SEC sought disgorgement of all proceeds obtained over a 46-month period, starting from the date of the press release.  The Court rejected the position, finding that the SEC "failed to carry its initial burden of showing that all proceeds obtained by [the defendant] . . . were 'causally connected to' the fraudulent press release."  *Id.*  The Court noted that "intervening events likely weakened any connection" between the press release and the profits.  *Id.*

Here, the staff similarly ignores other intervening events that occurred in the market, most notably, the market-wide increase in price and volume for cannabis-related stocks. Importantly, the large increase in share price that occurred between January and March 2014— the period in which the vast majority of Mr. Fiore's profitable sales of Plandai occurred—was common for marijuana stocks across the market.  This increase almost certainly was related to the legalization of marijuana in two states, the Obama Administration's statements and desire to lessen banking restrictions, along with the addition of Plandai to the cannabis indices.  As demonstrated on the trading charts showing similar cannabis-related stocks (Ex. J), a nearly identical increase in price and volume occurred for many stocks during this period, where Berkshire did not fund any market awareness campaign.  Any disgorgement, therefore, must identify gains due specifically to the alleged promotions, rather than gains due to other

<div align="center">39</div>

intervening market factors.  Because the gains in 2014[73] were not "causally connected" to the market awareness campaign, those profits cannot be included in the staff's disgorgement claim.

## CONCLUSION

The staff's proposed action conspicuously disregards vital facts and attempts to stretch the law beyond its bounds.  Mr. Fiore had no statutory duty under Section 17(b) to make a disclosure to the market, and the staff's attempt to unduly expand Section 17(b) to cover conduct that is not included should be rejected.  Mr. Fiore made no material omission because he did not control the publishers' articles nor did those articles mislead the public.

Additionally, even if the staff is correct that the publications somehow were improper, the staff is not entitled to disgorgement because Mr. Fiore's profits from his sales of Plandai shares were largely due to intervening factors such as the industry-wide increase in price for cannabis-related shares, and not the Berkshire-funded market awareness campaign.

Respectfully Submitted,

By: _____
    Robert J. Anello, Esq.
    Jodi Misher Peikin, Esq.
    Nicole L. Buseman, Esq.
    MORVILLO, ABRAMOWITZ, GRAND,
       IASON, & ANELLO, P.C.
    565 Fifth Avenue
    New York, NY 10017
    212-856-9600 (telephone)
    212-856-9494 (facsimile)

    *Attorneys for Berkshire Capital Management*
    *Company, Inc. and Mr. Joseph A. Fiore*

---

[73] In fact, no causal connection between any gains and the advertising at issue exists or can be proven.  This argument focuses primarily on early 2014 because the majority of profits were made during that time and the lack of a causal connection is at its most obvious.

40

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit A

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

AFFIDAVIT OF KENN KERR

UNITED STATES OF AMERICA

BEFORE THE

SECURITIES AND EXCHANGE COMMISSION

In the Matter of Plandai

Biotechnology, Inc.

File No. HO-12349

I, **Kenn Kerr** hereby affirms that the following is true:

1. **I have been asked by counsel for Mr. Fiore to provide this affidavit in connection with questions that have been raised regarding certain information I published on Plandai.**

2. I graduated from the University of North Carolina at Chapel Hill in 1998 with a Bachelor of Arts in Journalism and Mass Communication.  Thereafter, I worked in the television news industry for a number of years as a television news anchor and reporter for both CBS and ABC affiliates.  Thereafter, I left television news to write a book, and I also spent some time working as a small business consultant with ADP (Automatic Data Processing).  I eventually began to offer my experience in writing press releases to CEOs to assist in drafting their press releases, which later led me to start my own business to help companies do a better job of informing the public of their story so that investors could make a more informed decision on a particular stock.

3. Currently, I am the President and CEO of Stock Market Media Group ("SMMG"), which "is dedicated to uncovering the stories that make publicly traded companies come alive."  Our view is that many public companies do not have the wherewithal to develop their message properly, so investors are less informed to invest.  SMMG attempts to help its audience better understand the companies they own, focuses on creating content that is substantive but easier to understand than corporate press releases, and regularly puts out interviews with CEOs and other executives, as well as corporate videos, articles and corporate reports.

4. A friend recommended Joe Fiore to me, who I knew was a shareholder of Plandai, and who may be trading stock.  Mr. Fiore told me that he was looking for someone who could clearly and concisely tell Plandai's story.  Mr. Fiore believed that there was confusion in the marketplace regarding the understanding of what Plandai was doing with its technology, and asked me if I could help provide a more direct message to investors and potential investors.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

5. Soon after our discussion, I reached out to executives at Plandai, including the CEO, Roger Duffield and the company's U.S. contact Shane Traveller.  I peppered them with questions in an effort to understand the technology and accurately report on it.  I began to write informational articles about the company and a full overview in a corporate research report.  At some point, I also traveled to South Africa, where Plandai was based, so that I could get a better understanding of the facilities.  I was paid for each piece I wrote and its distribution.

6. After my relationship with Plandai was developed, I no longer had to go through Mr. Fiore to get my report and articles to Plandai for review.  However, I did ask Mr. Fiore to continue sending me industry-related articles as I do all of my clients.  My main contacts were Shane Traveller and Roger Duffield, and Mr. Fiore was not involved in the process.  Thus, when I created written material, I would seek approval for publication from Mr. Traveller and Mr. Duffield.  My understanding was that for accuracy purposes, they had to sign off on every publication, which they did.  Every piece I wrote regarding Plandai was my own work, and no one outside of Plandai, including Mr. Fiore, assisted me in insuring the accuracy of my work, and no one tried to influence the content of my articles. Nor did anyone, including Mr. Fiore, have any control regarding the content of my articles.  With regard to the publication of my articles, I would work with Plandai on the release date so as not to conflict with any press releases the company may have been publishing at the same time.

7. I was very careful to include a full disclaimer on my comprehensive research report, which represented the very first content I produced on Plandai and our initiation of coverage on the company.  My website also included the same full disclaimer on Plandai.  The disclaimer I used on my website and in my initial research report said that I was paid by a third party that could be buying, selling or holding shares, and I assumed that most clients who paid for promotional services were shareholders and thus likely to be buyers, sellers, or holders of the stock. That is what I understood regarding Mr. Fiore and his company Berkshire.  Mr. Fiore did not determine the language I used in my disclaimer.  My disclaimer would not change if I understood that Mr. Fiore would be selling stock at a particular time.  I did not believe I had to include any additional information.  And, in fact, in a conversation with FINRA, FINRA agreed that I had no obligation to disclose the name of the third parties that had paid me.

8. **This Affidavit was prepared based upon information I provided.  I have reviewed it, made changes as necessary and affirm under penalties of perjury that it is true.**

_____

**Kenn Kerr**
**Dated: February 16, 2017**

# Exhibit B

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

**AFFIDAVIT OF ROB GOLDMAN**

**UNITED STATES OF AMERICA**

**BEFORE THE**

**SECURITIES AND EXCHANGE COMMISSION**

In the Matter of Plandai

Biotechnology, Inc.

File No. HO-12349

**I, Rob Goldman** hereby affirms that the following is true:

1. **I have been asked by counsel for Mr. Fiore to provide this affidavit in connection with questions that have been raised regarding certain information I published on Plandai.**

2. I am the Founder and President of Goldman Small Cap Research ("Goldman"), which was founded in 2009.  Goldman specializes in sponsored research on various types of companies, including emerging growth companies, as well as prepares investment newsletters on a free and premium basis.  Additionally, Goldman posts reports it prepares on its website, sends out emails to subscribers, issues press releases with the permission of companies, and maintains links of various social media cites.  Sponsored research is paid for by a company or third party that enlists the firm's services.  In most cases, the third party enlisting Goldman's services is a shareholder of the company.

3. Prior to founding Goldman Small Cap Research, I was an analyst that led international research teams for Piper Jaffray and Josepththal, managed an international mutual fund, and worked at two boutique money management firms as Chief Investment Officer.  Based on this experience, I am familiar with the micro-cap market.

4. I was introduced to Berkshire Capital Management, Co., Inc. ("Berkshire") and Joseph Fiore a number of years ago and started to work for Berkshire several years after this initial introduction.  Like most of my clients, Berkshire hired Goldman on a regular basis to write initial research reports and publish follow on research, which would include articles, reports, and updates on publicly traded companies. In connection with Plandai, one of the aspects that was a focus of my articles was the health benefits of green tea extracts.  My impression was that Berkshire's goal in hiring Goldman was to get the word out about Plaindai, generate interest in the company, and potentially attract investors or an acquirer.  I did not believe that Berkshire's goal in hiring Goldman was to simply increase the share price of Plandai.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

5.  Once Berkshire indicated that it was seeking publications relating to Plandai on a sponsored research basis, I did my own due diligence on Plandai, and reviewed the company's SEC filings among other things.  After that was accomplished, I informed Berkshire that I would take it on as a client.  I also did my own due diligence on Berkshire and learned that it was a shareholder of Plandai.  I recall that individuals at Plandai also confirmed in conversations that Berkshire was a shareholder of Plandai. I understood that Berkshire might trade in the securities of Plandai.

6.  As is my general practice, prior to publication of any research reports, releases, or updates, I sent all materials to Plandai to review for factual accuracy.  More specifically, in most instances I sent the materials to Shane Traveller for review, but in some cases I communicated by email or phone with Roger Duffield. I recall that all of the materials I sent to Plandai were signed off on by the company and published under the company ticker symbol, with permission from Plandai.

7.  Third parties paying for our services may own shares and may buy and sell stock in the companies in which they are paying for research or investor relations type activities. Additionally, as is my practice, without using the name of the third party (which was Berkshire in this instance), I disclosed that a third party was paying for my firm's services, and the amount of payment received  I did not name the third party nor did I note that the third party was a shareholder because my understanding was that I was not required to do so.  Thus, the fact that Berkshire was a Plandai shareholder who had paid Goldman for its services, and may or may not have been buying or selling stock, did not necessitate that I change my standard disclaimer language. Berkshire and Joe Fiore had no control over the language of my disclaimer.

8.  Although I was paid by Berkshire, I made it clear from the beginning of the relationship that I would be the sole writer of any materials relating to Plandai.   To that end, I never permitted Berkshire an opportunity to review my work in advance of publication.  Nor did I ever give Berkshire an opportunity to offer edits on any of my reports, or the timing of publication. Berkshire adhered to this policy.

9.  **This Affidavit was prepared based upon information I provided.  I have reviewed it, made changes as necessary and affirm under penalties of perjury that it is true.**


*Rob Goldman*

**Rob Goldman**
**Dated: February 16, 2017**

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit C

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

**AFFIDAVIT OF MATT CHIPMAN**

**UNITED STATES OF AMERICA**

**BEFORE THE**

**SECURITIES AND EXCHANGE COMMISSION**

**In the Matter of Plandaí**

**Biotechnology, Inc.**

**File No. HO-12349**

**I, Matt Chipman** hereby affirms that the following is true:

1. **I have been asked by counsel for Mr. Fiore to provide this affidavit in connection with questions that have been raised regarding certain information that, as Editor in Chief, we published on Plandai.**

2. Currently, I am President of a company called Green Chip Investor Relations, which provides consulting and investor relations services.

3. Prior to managing Green Chip Investor Relations, I was the Vice President and Secretary of a company called Evergreen Marketing Incorporated, which put out an online, web-based publication called "The Green Baron Report."  The name of the company was later changed to Evergreen Marketing, Inc. DBA Green Baron Ventures, Inc. when that State of Incorporation was changed from Illinois to Florida.  Both entities operated a public website at TheGreenBaron.com and its newsletter titled "The Green Baron Report". One of the basic objectives of Green Baron Ventures/Evergreen Marketing Inc. was to profile or advertise emerging companies who wanted to get out to the public their message, product, or story.  This was accomplished with newsletters, audio interviews of CEO's and others with deep market experience, and reprint of press releases to our opt in database of email subscribers, text alerts to subscribers, and posting of information on our website.

4. I have known Berkshire Capital Management, Co., Inc. ("Berkshire") and Mr. Fiore for many years.  I am familiar with Plandaí because I was hired on one occasion by Berkshire to provide a short profile of the company in late April / early May 2013.  Such a profile usually costs somewhere between $3,000 and $5,000 dollars.  In this instance, our Company was compensated $3,000.

5. In connection with creating and distributing this profile for Plandaí, I gathered public materials regarding Plandaí that included SEC filings,  recent press releases issued from the company, and information posted on Plandaí's website.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

6. At the time we put together this profile, I understood that Berkshire and/or Mr. Fiore was a Plandaí shareholder.  I also recall that Berkshire / Mr. Fiore was a long-term shareholder where ownership dated back to Plandaí's predecessor company.

7. At no time did Joe Fiore or Berkshire give me any input regarding the content of my publication. Nor did Joe Fiore or Berkshire ask to review the content.  Even if they had I would not have permitted them to do so unless it was to point out factual material already in the public domain and was missing from our report.

8. I also understood at the time that individuals or companies, like Berkshire, were permitted to pay to advertise a particular stock and its business plan, and likely did so because they held shares in the company.

9. With respect to the profile our company published, our records confirm, which included an "Important Notice and Disclaimer," that "Green Baron Ventures, Inc.  has received compensation of (U.S.) $3,000 for services that includes coverage of Plandaí Biotechnology (PLPL) as a Trading Alert from a third party… "

10. Our general understanding was that third parties often paid for the types of services described in the previous paragraph, and were authorized to makes trades in the stocks that were advertised.  I also understood that the disclaimer language did not need to change simply because Berkshire was a shareholder of Plandaí.  Our practice was to use the same disclaimer whether or not an outside shareholder intended to buy or sell.  However, we did state in our disclaimer if any of our own officers, directors or employees owned stock in a company prior to when it was profiled or advertised. Neither Joe Fiore nor Berkshire had control over the language of our disclosure or disclaimers.

11. The only other time Plandaí was mentioned in one of our Green Baron reports was in late December 2013 / early January 2014 when Plandaí was selected as one of three "January Effect" stock ideas.  This section of the newsletter was designed to generate more content for members subscribing to our newsletter and to promote three companies the authors believed were due for a "bounce" in stock price.  Berkshire had no role or involvement in picking Plandaí as one of the "January Effect" stocks, and it did not pay for this coverage.  Additionally, Berkshire did not review the content of the "January Effect" section prior to publication.  In fact, no company ever profiled as a "January Effect" stock idea ever paid for this coverage.  Selections were made at the sole discretion of the Editor in Chief and employees of Evergreen Marketing, Inc.

12. **This Affidavit was prepared based upon information I provided.  I have reviewed it, made changes as necessary and affirm under penalties of perjury that it is true.**

_[signature]_   02/16/2017

**Matt Chipman**            **Dated: February 16, 2017**

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit D

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

**AFFIDAVIT OF STEVE SANDIFER**

**UNITED STATES OF AMERICA**

**BEFORE THE**

**SECURITIES AND EXCHANGE COMMISSION**

**In the Matter of Plandaí**

**Biotechnology, Inc.**

**File No. HO-12349**

**I, I Steve Sandifer** hereby affirms that the following is true:

1. I have been asked by counsel for Mr. Fiore to provide this affidavit in connection with questions that have been raised regarding certain information I published on Plandaí.

2. I am a list broker who works with publishers of independent financial newsletters through my company, Cream Consulting.  Cream Consulting assists companies and shareholders in companies with marketing and advertising, list brokering, and social media relations.

3. Cream Consulting served as a list broker for Berkshire, which included recommending newsletter publishers to Berkshire. I believe that Cream Consulting hired approximately 20-30 newsletters for Berkshire to advertise Plandaí through.

4. When I was hired by Berkshire, I understood that it, Eat at Joe's, Ltd. and Joe Fiore were shareholders in Plandaí and Berkshire was interested in getting Plandaí's message out to a broader audience.  While never discussed, it is commonly known that shareholders and companies like Berkshire/Fiore, are likely to be engaging in the purchase and sale of their stock in the companies for which they hire me to provide list brokerage services.

5. A list broker is essentially an agent for companies like Berkshire to conduct direct marketing campaigns via email.  The concept of a list broker is that Berkshire pays Cream Consulting a fee to obtain independent newsletters to publish information about the company, and the newsletter subscribers have access to that information only after they "opt in," or open the initial email sent to them by the publisher of the newsletter (which is not Cream Consulting).  It is standard industry practice, and preferred, that all of the newsletter publishers hired through Cream Consulting, as the list broker, require subscribers to be "double-opt in" to access more content.  "Double-opt in" refers to a process by which the recipient has twice confirmed the desire to receive the publication.

6. None of Berkshire, Mr. Fiore or Cream Consulting ever created any content for the newsletter publishers or determined the timing of when any newsletter publication was put out.

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

7. With respect to disclaimers, every independent newsletter publisher that I hire in my role as a list broker has their own disclaimer.  Additionally, whether the company or a third party pays for advertising through that independent newsletter, the disclaimers do not change.  The only things that change are the amount paid and who is paying.  Neither Berkshire nor Mr. Fiore requested that their name not appear on any disclaimer.  Rather the traditional disclaimer states that payment was made by a third party.  And this disclaimer remains the same whether or not the paying third party intends on selling stock.

8. **This Affidavit was prepared based upon information I provided.  I have reviewed it, made changes as necessary and affirm under penalties of perjury that it is true.**

_____

**Steve Sandifer**
**Dated: February** __16__ **, 2017**

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit E

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

**AFFIDAVIT OF ALEXANDER KON**

**UNITED STATES OF AMERICA**

**BEFORE THE**

**SECURITIES AND EXCHANGE COMMISSION**

**In the Matter of**

**Plandaí Biotechnology, Inc.**

**File No. HO-12349**

**I, Alexander Kon** hereby affirms that the following is true:

1. I have been asked by counsel for Mr. Fiore to provide this affidavit in connection with questions that have been raised regarding certain information I published on Plandaí.

2. I am a list broker who works with publishers of independent financial newsletters through my company, Stock Chat. Stock Chat assists companies and shareholders in companies with marketing and advertising, list brokering, and social media relations.

3. Stock Chat served as a list broker for Berkshire, which included recommending newsletter publishers to Berkshire. I believe that Stock Chat hired approximately 5-6 newsletters for Berkshire to advertise Plandaí through.

4. When I was hired by Berkshire, I understood that it and Joe Fiore were shareholders in Plandaí and Berkshire was interested in getting Plandaí's message out to a broader audience. When I met Mr. Fiore through Matt Chipman, Mr. Chipman introduced Mr. Fiore to me as a shareholder and investor in Plandai. It is quite common that shareholders and companies like Berkshire/Fiore, are likely to be engaging in the purchase and sale of their stock in the companies for which they hire me to provide list brokerage services.

5. A list broker is essentially an agent for companies like Berkshire to conduct direct marketing campaigns via email. The concept of a list broker is that Berkshire pays Stock Chat a fee to obtain independent newsletters to publish information that they independently author about a company. Mr. Fiore must go through myself, a list broker, to rent these newsletters, and is unable to obtain access to these select newsletter publishers directly for hire.

6. Berkshire/Mr. Fiore never created any content for the newsletters. Mr. Fiore never edited or reviewed newsletter publishers' content prior to its dissemination to the public, nor did Mr. Fiore determine the timing of when any newsletter publication was to be released to the public. Each newsletter publisher authored their own content and Mr. Fiore/Berkshire never had any contact with the newsletter publishers brokered through Stock Chat.

7. With respect to disclaimers, every independent newsletter publisher that I hire in my role as a list broker has their own disclaimer.  Additionally, whether the company or a third party pays for  advertising through that independent newsletter, the disclaimers do not change.  The only things that change(s) are the amount paid and who is paying.  Neither Berkshire nor Mr. Fiore requested that their name not appear on any disclaimer.  Rather the traditional disclaimer states that payment was made by a third party.  And this disclaimer remains the same whether or not the paying third party intends on selling stock.

8. **This Affidavit was prepared based upon information I provided.  I have reviewed it, made  changes as necessary and affirm under penalties of perjury that it is true.**


**Alexander Kon**

**Dated: March 7, 2017**

*Alex Kon*

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit F

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.



FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit G

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.



J. Fiore's Net Market Sales and Plandai's Average Trade Volume and Closing Prices
Volume of Shares (Weekly Avg.)
Price Per Share (Weekly Avg.)
Year.Month.Week
5000000
4000000
3000000
2000000
1000000
0
-1000000
2.00
1.60
1.20
0.80
0.40
0.00
-0.40
Berkshire, Eat at Joe's, and J. Fiore's Net Sales
Average Volume
Average Close Price

# Exhibit H

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Mentor Capital CANNABIS INDEX

Last Update : January 26, 2014

| Cannabis or MMJ Company | Symbol | Business Focus | Market | Share Price 2013 end | 2014 YTD | 2014 Gain | Shares (MM) | Market cap ($MM) | Sales ($MM) | Cash ($,000) |
|---|---|---|---|---|---|---|---|---|---|---|
| Advanced Cannabis Solutions | CANN | CO Based Sale/Leaseback of Dispensaries | OTCQB | $3.25 | $17.47 | 438% | 15 | $264 | $1.8 | $465 |
| Cannabis Sativa | CBDS | High THC Cannabis & Kush | OTCQB | $1.00 | $13.72 | 1272% | 8 | $107 | $0.0 | $65 |
| Cannabis Science, Inc. | CBIS | Doctors Developing MMJ Products | OTCQB | $0.05 | $0.14 | 176% | 786 | $112 | $0.3 | $24 |
| CannaVEST Corp | CANV | Hemp Based Products & Oils | OTCQB | $28.50 | $85.55 | 200% | 6 | $528 | $0.0 | $166 |
| ENDEXX Corp. | EDXC | Monitor Hemp & MMJ | OTCPink | $0.07 | $0.19 | 155% | 200 | $38 | $0.0 | $0 |
| GreenGro Technologies, Inc. | GRNH | Indoor Growing Systems | OTCPink | $0.04 | $0.43 | 870% | 114 | $49 | $0.1 | $5 |
| Growlife, Inc. | PHOT | Equipment and Supplies | OTCQB | $0.15 | $0.25 | 65% | 545 | $135 | $4.3 | $237 |
| GW Pharmaceuticals Plc | GWPH | CBD & MMJ Focused Biotech – UK | NASDAQ | $41.54 | $49.15 | 18% | 15 | $760 | $44.2 | $61,649 |
| Hemp, Inc. | HEMP | Hemp & Other Products | OTCPink | $0.02 | $0.06 | 186% | 653 | $37 | $2.2 | $2 |
| Latteno Food Corp | LATF | Edibles & Other Food | OTCQB | $0.0003 | $0.0009 | 200% | 1,809 | $2 | $14.6 | $14 |
| mCig | MCIG | Vape System | OTCQB | $0.09 | $0.29 | 226% | 270 | $79 | $0.1 | $100 |
| Medbox, Inc | MDBX | Automated Dispensing | OTCPink | $18.26 | $40.25 | 120% | 14 | $583 | $7.1 | $35 |
| Medical Cannabis Financial Group | REFG | Seed to Sale Integrated S/W Solutions | OTCPink | $0.15 | $0.20 | 34% | 75 | $15 | $0.0 | $2,040 |
| Medical Marijuana, Inc. | MJNA | Diversified MMJ & Hemp | OTCPink | $0.16 | $0.31 | 100% | 595 | $184 | $2.4 | $153 |
| Mediswipe, Inc. | MWIP | Beverages and Meal Payment Systems | OTCQB | $0.11 | $0.34 | 205% | 45 | $15 | $0.2 | $139 |
| Mentor Capital, Inc. | MNTR | Diversified MMJ & Cannabis Funding | OTCMkts | $0.33 | $1.94 | 483% | 6 | $12 | $0.0 | $376 |
| Plandai Biotech | PLPL | Extraction & Tea | OTCQB | $0.25 | $0.62 | 152% | 106 | $66 | $0.5 | $9 |
| Puget Technologies | PUGE | Energy Drinks and Cannabis Medicinals | OTCQB | $0.87 | $0.75 | -14% | 43 | $32 | $0.1 | $2 |
| Rapid Fire Marketing, Inc. | RFMK | Vape Systems | OTCPink | $0.0003 | $0.0010 | 233% | 2,330 | $2 | $0.0 | $0 |
| SK3 Group, Inc. | SKTO | MJ Collectives Administration | OTCPink | $0.01 | $0.03 | 277% | 602 | $17 | $0.0 | $41 |
| Terra Tech | TRTC | Hydroponics, Edible Gardens | OTCQB | $0.14 | $0.38 | 169% | 101 | $38 | $1.7 | $4 |
| Tranzbyte Corp Inc. | ERBB | RFD & Dispenceries CA, CO, AR | OTCPink | $0.003 | $0.01 | 300% | 747 | $9 | $0.0 | $0 |
| Vape Holdings | PLPED | New Vape System Emphasis | OTCQB | $7.60 | $9.00 | 18% | 2 | $14 | $0.0 | $0 |
| CANNABIS INDEX Totals | 23 MJ Co's | | | | | 256% (Average) | 395 | $3,098 | $79.5 | $65,666 |

NO INVESTMENT ADVISORY DISCLAIMER: Readers are cautioned that Mentor Capital, Inc. does not intend this Cannabis Index to be investment advice. The CI Index is a mathematical, information only Index and will be published on a regular basis. The original and continuing purpose is to establish a benchmark as to how the cannabis and medical marijuana sector as a whole has behaved. As such, it presents historic information and does not purport nor imply any opinion or advice on the current or future value of any stock, nor account for trading costs that in practice will reduce investment gains. Always consult with your investment advisor before buying MNTR or CI Index stocks.

# Exhibit I

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.



FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.

# Exhibit J

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.



FOIA CONFIDENTIAL TREATMENT
REQUESTED BY JOSEPH A. FIORE & BERKSHIRE CAPITAL MANAGEMENT COMPANY, INC.