John J. Bowers
Paul W. Kisslinger
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMISSION
100 F Street, NE
Washington, DC 20549
(202) 551-4645 (Bowers)
(202) 551-4427 (Kisslinger)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**          **7:18-cv-5474 (KMK)**

        **- against -**

**JOSEPH A. FIORE, BERKSHIRE CAPITAL**
**MANAGEMENT COMPANY, INC., and**
**EAT AT JOE'S, LTD. n/k/a SPYR, INC.,**

                              **Defendants.**

---

**SECURITIES AND EXCHANGE COMMISSION'S**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**[CORRECTED VERSION]**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION..............................................................................................1

FACTUAL BACKGROUND ...............................................................................2

    Fiore Used Third-Parties to Engage in a Fraudulent Promotional Campaign ...................2

    Fiore Exercised Control Over the Promotional Campaign ................................................3

    Defendants Sold Plandai Shares During the Promotional Campaign................................4

    Fiore and Berkshire Failed to Disclose That They Intended to Sell.................................4

    Fiore and Berkshire Intended to Sell and Sold Plandai Stock While the
    Promotional Campaign Was Ongoing .............................................................................5

    Defendants Engaged in "Scalping" .................................................................................6

    Fiore, Berkshire, and Eat at Joe's Manipulated the Market for Plandai Stock.................6

    Fiore Lied To Multiple Brokerage Firms and His Own Counsel.....................................8

    Fiore Failed to Disclose His 5% Ownership of Plandai ..................................................9

    Eat at Joe's Operated as an Unregistered Investment Company. ....................................10

LEGAL STANDARD .......................................................................................11

LEGAL ARGUMENT........................................................................................12

    I.     THE COMPLAINT PROPERLY ALLEGES THAT DEFENDANTS
          ENGAGED IN A FRAUDULENT SCALPING AND MARKET
          MANIPULATION SCHEME...........................................................................12

          A.     The Complaint Adequately Alleges That Defendants Engaged in
                 Scalping as Part of a Fraudulent Scheme.................................................13

          B.     The Complaint Adequately Alleges That Defendants Engaged in
                 Market Manipulation as Part of a Fraudulent Scheme............................17

          C.     The Complaint Adequately Alleges That Defendants Made
                 Materially False Statements to Their Brokers.........................................19

D.    Defendants' Deceptive Conduct and False Statements Were Material. ........................................................................................21

E.    The Complaint Adequately Alleges Defendants' Scienter. ......................22

II.    THE COMPLAINT PROPERLY ALLEGES THAT FIORE VIOLATED SECTION 13(d) AND RULE 13d-1 OF THE EXCHANGE ACT ....................24

III.    THE COMPLAINT PROPERLY ALLEGES THAT EAT AT JOE'S VIOLATED SECTION 7(a) OF THE INVESTMENT COMPANY ACT .........25

IV.    THE COMPLAINT PROPERLY PLEADS DISGORGEMENT ........................27

V.    ALL CLAIMS IN THE COMPLAINT ARE TIMELY PLED ..........................28

CONCLUSION ....................................................................................30

## TABLE OF AUTHORITIES

**CASES**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) .................................................................. *passim*

*FDIC v. Kime,*
  12 F. Supp. 3d 1113 (S.D. Ind. 2014) ........................................................ 29

*In re Galena Biopharma, Inc. Sec. Litig.,*
  117 F. Supp. 3d 1145 (D. Or. 2015) ................................................... 15, 24

*Garvey v. Arkoosh,*
  354 F. Supp. 2d 73 (D. Mass. 2005) .......................................................... 22

*Janus Capital Grp., Inc. v. First Derivative Traders,*
  564 U.S. 135 (2011) ................................................................................. 15

*Keiler v. Harlequin Enters. Ltd.,*
  751 F.3d 64 (2d Cir. 2014) ....................................................................... 11

*Kokesh v. SEC,*
  137 S. Ct. 1635 (2017) ............................................................................. 29

*Loginovskaya v. Batratchenko,*
  764 F.3d 266 (2d Cir. 2014) ..................................................................... 11

*Montford and Company, Inc. v. SEC,*
  793 F.3d 76 (D.C. Cir. 2015) ................................................................... 30

*Nanopierce Tech. Inc. v. Southridge Capital Mgmt. LLC,*
  2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002) .......................................... 18

*Sapirstein-Stone-Weiss Found. v. Merkin,*
  950 F. Supp. 2d 621 (S.D.N.Y. 2013) ....................................................... 25

*SEC v. Abellan,*
  674 F. Supp. 2d 1213 (W.D. Wa. 2009) ............................................. 14, 24

*SEC v. AbsoluteFuture.com,*
  393 F.3d 94 (2d Cir. 2004) ....................................................................... 28

*SEC v. Ahmed,*
  263 F. Supp. 3d 381 (D. Conn. 2016) ....................................................... 28

*SEC v. Ahmed,*
  308 F. Supp. 3d 628 (D. Conn. 2018) ........................................................29

*SEC v. Andrescu,*
  117 Fed. Appx. 160 (2d Cir. 2004) ...........................................................29

*SEC v. Blavin,*
  557 F. Supp. 1304 (E.D. Mich. 1983),
  *aff'd,* 760 F.2d 706 (6th Cir. 1985) ...........................................14, 22, 24

*SEC v. Boock,*
  2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012) ............................................28

*SEC v. Capital Gains Research Bureau, Inc.,*
  375 U.S. 180 (1963) ............................................................................*passim*

*SEC v. Cavanagh,*
  155 F.3d 129 (2d Cir. 1998) .....................................................................29

*SEC v. Coffey,*
  493 F.2d 1304 (6th Cir. 1974) ..................................................................16

*SEC v. Collyard,*
  861 F.3d 760 (8th Cir. 2017) ....................................................................29

*SEC v. Competitive Tech., Inc.,*
  2005 WL 1719725 (D. Conn. Jul. 21, 2005) .............................................17

*SEC v. Contorinis,*
  743 F.3d 296 (2d Cir. 2014) .....................................................................28

*SEC v. Corporate Relations Group, Inc.,*
  2003 WL 25570113 (M.D. Fla. Mar. 28, 2003) ...................................14, 22

*SEC v. Fifth Ave. Coach Lines, Inc.,*
  289 F. Supp. 3 (S.D.N.Y. 1968),
  *aff'd,* 435 F.2d 510 (2d Cir. 1970) ...........................................................27

*SEC v. Frohling,*
  851 F.3d 132 (2d Cir. 2016).......................................................................13

*SEC v. Huttoe,*
  1998 WL 34078092 (D.D.C. Sep. 14, 1998) .........................................*passim*

*SEC v. Lek Sec. Corp.,*
  276 F. Supp. 3d 49 (S.D.N.Y. 2017) .....................................................*passim*

*SEC v. Levy,*
   706 F. Supp. 61 (D.D.C. 1989) ................................................................25

*SEC v. Masri,*
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................................ 18, 24

*SEC v. McCaskey,*
   56 F. Supp. 2d 323 (S.D.N.Y. 1999) ......................................................29

*SEC v. McNulty,*
   137 F.3d 732 (2d Cir. 1998) ...................................................................25

*SEC v. Mudd,*
   885 F. Supp. 2d 654 (S.D.N.Y. 2012) ....................................................19

*SEC v. Nat'l Presto Indus., Inc.,*
   486 F.3d 305 (7th Cir. 2007) ..................................................................27

*SEC v. Park,*
   99 F. Supp. 2d 889 (N.D. Ill. 2000) .......................................................15

*SEC v. Penthouse Intern., Inc.,*
   390 F. Supp. 2d 344 (S.D.N.Y. 2005) ....................................................19

*SEC v. Prater,*
   296 F. Supp. 2d 210 (D. Conn. 2003) ....................................................12

*SEC v. Razmilovic,*
   738 F.3d 14 (2d Cir. 2013) .....................................................................28

*SEC v. Reynolds,*
   2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ......................................22

*SEC v. Shapiro,*
   2018 WL 2561020 (S.D.N.Y. Jun. 4, 2018) ..................................... 22, 23

*SEC v. Strebinger,*
   114 F. Supp. 3d 1321 (N.D. Ga. 2015) ............................................*passim*

*SEC v. Thompson,*
   238 F. Supp. 3d 575 (S.D.N.Y. 2017) ..............................................*passim*

*SEC v. Wey,*
   246 F. Supp. 3d 894 (S.D.N.Y. 2017) ....................................................25

*SEC v. Williky,*
    2018 WL 3729137 (S.D. Ind. Aug. 3, 2018) ................................................. 15

*SEC v. Wyly,*
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ........................................................... 25

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016) ....................................................................... 11

*U.S. v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991) ..................................................................... 25

*U.S. v. Naftalin,*
    441 U.S. 768 (1979) ................................................................................... 21

*In re Vivendi, S.A. Sec. Litig.,*
    838 F.3d 223 (2d Cir. 2016) ....................................................................... 11

*Wilson v. Merrill Lynch & Co., Inc.,*
    671 F.3d 120 (2d Cir. 2011) ....................................................................... 16

*Zweig v. Hearst Corp.,*
    594 F.2d 1261 (9th Cir. 1979) ............................................................. *passim*

**SEC RELEASES**

*Certain Research and Development Companies,*
    Investment Company Act Release 26077 (June 16, 2003) ........................... 27

*In the Matter of the Tonopah Mining Co.,*
    26 S.E.C. 426 (1947) ................................................................................. 27

**FEDERAL STATUTES AND REGULATIONS**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203 ................................................................................... 30

Fed. R. Civ. P. 9(b) ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ......................................................................... *passim*

The Investment Company Act,
    15 U.S.C. § 80a, *et seq.* ............................................................................ 26

Private Securities Litigation Reform Act of 1995 ....................................... 11, 12, 16

Securities Act of 1933,
    15 U.S.C. § 77a, *et seq.*..........................................................................*passim*

Securities Exchange Act of 1934,
    15 U.S.C. § 78a, *et seq.*..........................................................................*passim*

# INTRODUCTION

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") hereby opposes Defendants' Motion to Dismiss. *See* Motion to Dismiss and Supporting Memorandum ("Def. Br.") [Docket Nos. 26, 27]. On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), facts alleged in the Complaint are assumed to be true, all inferences that can be drawn from those facts in support of plaintiff's claims must be made, and all ambiguities are resolved in plaintiff's favor. Rule 8 requires nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief," while Rule 9(b) requires that a plaintiff plead sufficient information to enable preparation of a responsive pleading – *e.g.*, the "who, what, when, where, and how" of the fraud – and provides that scienter may be pled generally. The Commission's Complaint easily passes muster under these notice pleading requirements. It provides more than adequate notice to the Defendants of the Commission's claims, and alleges facts in more than sufficient detail to fully support the elements of each claim.

The Complaint alleges in painstaking detail that Joseph Fiore orchestrated and funded a multi-faceted fraudulent scheme – individually and through two corporations he owned and controlled, Berkshire Capital Management Company, Inc., and Eat at Joe's, Ltd. – which included scalping (illegally promoting stock while failing to disclose intent to sell), manipulative trading (wash and matched trades, painting the tape and marking the close), false statements to brokers, and failure to report Fiore's ownership of more than five percent of Plandai's outstanding common stock. The scheme, which was designed to manipulate the share price of Plandai Biotechnology, Inc., a microcap company that purported to operate in the "nutraceutical" industry, was very successful, resulting in illicit proceeds of more than $11.5 million.

1

Rather than directly addressing the allegations in the Complaint, Defendants offer a series of unfocused attacks that mischaracterize or misconstrue the Complaint (*e.g.*, by misidentifying the case as alleging a "pump and dump" (*see* Def. Br. at 12)); misstate or misapply the applicable legal standards (*e.g.*, by citing no scalping cases and relying instead on a series of inapposite cases decided under the Private Securities Litigation Relief Act); and attempt to explain away Defendants' fraudulent scheme as an "investor awareness" program (*see* Def. Br. at 2)*,* coupled with "a series of isolated transactions spread out over the Relevant Period" (*see* Def. Br. at 16). In fact, the Complaint alleges a pattern of scalping, manipulative trading, misrepresentations, omissions and other deceptive actions by Defendants that had the effect of withholding critical information from investors and artificially impacting the market for Plandai stock, all as part of a fraudulent scheme through which Defendants reaped more than $11.5 million in illegal proceeds. Therefore, as explained in more detail below, Defendants' Motion to Dismiss should be denied.

## **FACTUAL BACKGROUND**

### **Fiore Used Third-Parties to Promote Plandai Stock**

As alleged in the Complaint, beginning in or about February 2012, Defendants and certain of Fiore's close associates (including his sister and employees of Berkshire, Eat at Joe's, and another restaurant Fiore owned) acquired millions of shares of Plandai common stock. Fiore ultimately gained control of most of these shares. *Id.*, ¶¶ 20-21, 66.

Beginning in or about March 2013, Fiore then orchestrated a fraudulent scheme to promote, scalp, and otherwise manipulate the market for his block of Plandai stock. From at least April 2013 through March 2014 (the "Relevant Period"), Fiore and others, including Berkshire and Eat at Joe's, successfully implemented and executed Fiore's scalping and manipulation scheme, resulting in substantial ill-gotten gains. *Id.*, ¶ 22.

As part of the scheme, beginning in April 2013, Fiore organized and funded a campaign to promote Plandai stock. *Id.*, ¶ 23. Fiore was deeply involved in almost every aspect of the promotional campaign, including, most significantly, paying for the campaign with funds that he funneled through Berkshire. Fiore directly paid at least five promoters to promote Plandai stock. He also indirectly paid at least twenty other promoters to promote Plandai stock through two intermediary consulting companies he retained. In turn, the promoters that Fiore funded often used multiple stock promotion entities, including websites and email subscription services that they owned and controlled to promote Plandai stock. *Id.*

During the Relevant Period, Fiore paid the promoters at least $2,137,000 to promote penny stocks, including Plandai, with approximately $675,000 going to the two intermediary consulting companies, who then retained third parties to promote Plandai stock. *Id.*, ¶ 24. Fiore personally selected the promoters, including the promoters that the consulting companies located and later retained on his behalf. He also paid the promoters for each promotional publication that they disseminated, and controlled the timing of their promotions. *Id.*

The promoters typically targeted retail investors and encouraged them to buy Plandai stock through bulk emails to subscribers and posts on websites with names such as "Epic Stock Picks," "Awesome Stock Picks," and "Penny Stock Prophet." *Id.*, ¶ 26. The promotional materials were called "Trading Alerts" or "Stock Alerts" and were addressed to "Traders." *Id.*

### Fiore Exercised Control Over the Promotional Campaign

At Fiore's direction, and with his funding, the promoters issued "stock alerts" and "research reports" that made explicit recommendations to potential investors buy Plandai stock. *Id.*, ¶ 25. Throughout the promotional campaign, Fiore suggested topics for promotions and provided promoters with information about Plandai. *Id.*, ¶ 27. He also frequently coordinated

the dissemination of the promotional materials to coincide with Plandai's press releases. *Id.*

Fiore often received copies of Plandai press releases directly from Plandai before they became public, and forwarded them to third-party promoters. *Id.*, ¶ 28. For example, in an October 4, 2013 email to a promoter, Fiore attached a copy of a draft Plandai press release and told the promoter to "write your stories around this topic." In the same email, Fiore also wrote that the promoter should "set the release up for distribution … and I will let you know the date and time we will put it out." *Id.*, ¶ 29. Similarly, in a December 6, 2013 email to the owner of one of the consulting companies that Fiore used to hire stock promoters, Fiore attached six draft Plandai press releases, which he directed the consulting company to forward to third-party promoters. *Id.*, ¶ 30. Fiore also reviewed promotional materials before they were disseminated by the promoters, and he subscribed to several of the promoters' email services to ensure that the promoters earned the fees that he was paying to them. *Id.*, ¶ 31.

**Defendants Sold Plandai Shares During the Promotional Campaign**

Fiore's promotional campaign often included specific recommendations to buy Plandai stock, without disclosing that Defendants were actively selling. *Id.*, ¶ 32. For example, on October 4, 2013, a third-party promoter that one of the consulting firms had retained on behalf of Fiore to promote Plandai stock disseminated a "Street Alert" on Plandai: "Put everything we've told you together and you have a money making opportunity with PLPL like no other []. Buy PLPL now!" *Id.* On Friday, October 4, 2013, and Monday, October 7, 2013, Fiore directed the sale of at least 70,633 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's. *Id.* On February 12, 2014, a third-party promoter that a consulting firm had retained on behalf of Fiore to promote Plandai stock disseminated a "Stock Alert" on Plandai. The alert stated: "PLPL is still a huge stock for our penny-pinching standards, but [] the recent down

4

swing provides another chance to create a position at a deep, deep discount!  [] This is an opportunity that you will not want to miss!"  On February 12, 2014, and February 13, 2014, Fiore directed the sale of at least 1,148,078 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's.

### Defendants Engaged in "Scalping"

While this promotional campaign was ongoing, Fiore and Berkshire failed to disclose that they beneficially owned shares of Plandai stock that they intended to sell and were selling into the public market – a practice called "scalping."  *Id*., ¶ 33.  Fewer than half of the promotions contained generic disclaimers indicating that the promoter had been compensated for promoting the stock, and that Berkshire – or, more commonly, the unnamed entity paying for the promotions – "may own," or "may sell" Plandai stock. *Id*., ¶ 34.  These disclaimers were incomplete, misleading, and materially inaccurate because Fiore and Berkshire were actively selling throughout the Relevant Period.  *Id*.  Moreover, many promotions contained no such disclaimer, and none of the promotions disclosed that Berkshire and Fiore beneficially owned, intended to sell and were actively selling shares of Plandai stock.  *Id*.

Fiore controlled the promotional campaign through Berkshire, was aware of what the disclaimers did and did not disclose, and had ample opportunity to correct the promoters' incomplete, inaccurate and misleading disclaimers.  *Id*., ¶ 35.  He and Berkshire had the economic power to insist that the promoters he hired include complete and accurate disclosures about his and Berkshire's funding of the campaign and intent to sell Plandai stock, but failed to do so.  For example, Fiore knew at least as early as April 2013 that certain Plandai promotional materials that he paid for through Berkshire, including an April 29, 2013 research report with a "buy" recommendation for Plandai, failed to disclose his beneficial ownership of Plandai stock,

and that he intended to sell, and was selling, at the time that the paid promotions were being published. *Id.*, ¶ 36. Fiore knew that the promoters could not make accurate disclosures regarding his intention to sell Plandai stock because he never told any of the promoters or consulting companies that he and Berkshire owned Plandai stock that they intended to sell, and were, in fact, actively selling while the promotional campaign was ongoing. *Id.*, ¶ 37.

Contemporaneous documents confirm that Defendants intended to sell Plandai stock throughout the Relevant Period. Account opening documents for at least two of the brokerage accounts from which Fiore sold Plandai stock specifically identify "liquidation" as one objective for the accounts. *Id.*, ¶ 41. From April 2013 through March 2014, Fiore sold a total of 4,805,359 shares of Plandai stock from these two accounts, and he sold shares from at least one of these accounts during every month of the Plandai promotional campaign. *Id.* Fiore also completed and signed at least five documents that were sent to brokerage firms where Berkshire and Eat at Joe's maintained accounts that held Plandai stock, disclosing his intent to sell Plandai stock from those accounts. *Id.*, ¶¶ 42-43.

During the Relevant Period (and within five years of the Complaint filing date), Fiore sold 11,961,898 shares of Plandai stock from his own account and accounts he controlled in the names of Berkshire and Eat at Joe's, generating proceeds totaling approximately $11.5 million. *Id.*, ¶¶ 45, 47. He often sold Plandai shares on the same day and/or the day after promotions he paid for were disseminated to potential investors. *Id.*, ¶ 47. On at least ninety occasions over the course of the scheme, Fiore sold Plandai stock within a week or less of the publication of a promotion that he had paid for, including seventy-three occasions when he sold on the same day. *Id.*, ¶ 48. During the Relevant Period, Fiore sold nearly ten times more shares of Plandai stock than he bought on the public market. During ten of the twelve months of the scheme, he sold

substantially more shares than he bought. *Id.*, ¶ 49. Between April 2013 and March 2014, Fiore sold Plandai stock on at least 176 of 252 possible trading days, and his trading often comprised a significant portion of the daily market volume in Plandai stock. *Id.*, ¶ 50.

### Defendants Manipulated the Market for Plandai Stock

To coincide with and enhance the scalping campaign, Fiore used three well-known methods to manipulate the market for Plandai stock, acting individually and through Berkshire and Eat at Joe's: wash and matched trades, marking the close, and painting the tape. *Id.*, ¶¶ 63-64. These trades had no legitimate business or economic purposes. *Id.*, ¶ 64. Instead, they were designed to induce investors to purchase Plandai stock by giving them the false impression that Plandai's increasing share price and trading volume were the result of market interest in the stock. *Id.* Fiore made the manipulative trades through accounts he maintained and controlled at three brokerage firms. *Id.*, ¶¶ 63-77. Fiore exercised exclusive trading authority over all of these accounts, held in his name and in the names of Berkshire and Eat at Joe's. *Id.*, ¶ 65.

From May 2013 to December 2013, for example, Fiore executed a series of matched and wash trades – buying and selling exactly the same amount of Plandai stock at exactly the same price with no change in beneficial ownership, through accounts he controlled in the name of himself, Berkshire, and Eat at Joe's. *Id.*, ¶¶ 67-68. On at least sixteen other occasions during the same time period, Fiore bought and sold substantially the same amounts of Plandai stock at nearly the same times and prices through brokerage accounts he controlled. *Id.*, ¶ 69.

From May 2013 to September 2013, Fiore also repeatedly marked the close – executing trades at or near the close of the market to attempt to raise the closing price of Plandai stock and create the misleading appearance that it was the result of legitimate market demand. *Id.*, ¶ 70. Fiore set the closing price of Plandai stock on at least eighteen trading days during this time

period. *Id.*, ¶¶ 71-72.  On seven of those days, Fiore was also responsible for the previous reported execution.  *Id.*  During the same time period, Fiore also repeatedly painted the tape – initiating multiple offers to purchase Plandai stock on the same day, and within the same short period of time, often at increasing purchase prices – an approach designed to artificially inflate the stock price and create the false and misleading appearance that the increase in share price was the result of legitimate market demand. *Id.*, ¶¶ 73-75.

These manipulative trades had no legitimate economic purpose. *Id.*, ¶ 76. Fiore executed these trades to create the misleading appearance of active trading in Plandai stock, to artificially increase the share price and trading volume of the stock, and to induce investors to purchase shares. *Id.*

Defendants' multifaceted scheme – the promotional campaign, targeted purchases and manipulative trading – was designed to create the false perception of liquidity and market demand and to offset downward pressure on Plandai's share price caused by negative press, and Defendants' own undisclosed selling of Plandai shares in the accounts Fiore controlled. *Id.*, ¶¶ 59, 77. The scheme had the desired effect: Market demand for Plandai stock increased significantly, as did the share price. *Id.*, ¶¶ 60-61.

### Fiore Lied To Multiple Brokerage Firms and His Own Counsel

To facilitate the scheme, Fiore also made materially false and misleading statements to multiple brokerage firms that enabled him to deposit and then sell more than 3,000,000 shares of Plandai stock. *Id.*, ¶ 78. For example, on January 27, 2014, Fiore signed and submitted a document titled Customer Stock Deposit Representations ("Stock Deposit Rep.") to a brokerage firm in connection with his deposit of 2,000,000 shares of Plandai stock in a brokerage account owned by Eat at Joe's and controlled by Fiore in which he represented, *inter alia*, that (i) he

would not sell additional shares through another broker; (ii) he would not engage in any promotional efforts related to the shares; and (iii) his sale of the shares was not part of a plan or scheme to evade or violate the federal securities laws. *Id.*, ¶¶ 8, 79-80. Each of these statements was false. Within days of making this representation, Fiore sold more than 80,000 shares of Plandai stock through other brokerage firms and continued to promote Plandai.

Fiore made similar representations in two Shareholder Representation Letters ("Shareholder Rep. Letters") he submitted to another brokerage firm in connection with sales of 1,250,000 shares of Plandai stock. *Id.*, ¶ 81. Again, these were false statements, given Defendants' promotional campaign, payments to consultants and promoters related to Plandai stock and buy and sell orders for hundreds of thousands of shares of Plandai stock with other brokers. *Id.* Fiore also made similar misrepresentations to his counsel, who incorporated them into attorney opinion letters that were forwarded to a broker on Fiore's behalf. *Id.,* ¶ 82.

Fiore's misrepresentations to brokerage firms and his counsel were material. *Id.*, ¶ 83. The brokerage firms would not have accepted the Plandai stock for deposit, or subsequently permitted Fiore to sell the shares, if they had known that any or all of the above statements made by Fiore or his counsel were or had become untrue. *Id.* Fiore knew or was reckless in not knowing that each statement was false at the time that he executed the documents in question, or had become untrue prior to some or all of the sales of Plandai stock from the respective accounts he controlled, based on his ongoing promotional campaign orchestrated through Berkshire and his trading of Plandai stock in other accounts. *Id.*, ¶ 84. He never corrected any of these misrepresentations by disclosing the truth to the brokers in question or his counsel. *Id.*, ¶¶ 81-84.

### Fiore Failed to Disclose His 5% Ownership of Plandai

Fiore also knowingly or recklessly failed to file the required Schedules 13D with the Commission that would have publicly disclosed his ownership of more than five percent of the outstanding shares of Plandai common stock at various times during the Relevant Period, further concealing the extent of his holdings as he sold millions of Plandai shares. *Id.*, ¶¶ 38, 85, 89, 90.

### Eat at Joe's Operated as an Unregistered Investment Company

According to periodic filings with the Commission, Eat at Joe's was originally incorporated in Delaware in 1988 as Conceptualistics, Inc. *Id.*, ¶ 91. In January 1997, after a series of changes in corporate structure and control, the company changed its name to Eat at Joe's, Ltd. and initiated a plan to "develop, own and operate theme restaurants called 'Eat at Joe's.'" *Id.*, ¶¶ 91-92. During the relevant period, however, Eat at Joe's operated a single cheesesteak stand in the Philadelphia airport that reported recurring losses. *Id.*, ¶ 92. In reality, at least in 2013 and 2014, Eat at Joe's acted primarily as an investment company engaged in the business of investing in securities. *Id.*, ¶ 93. Fiore frequently used Eat at Joe's as a vehicle to buy and sell shares of OTC issuers, including Plandai. *Id.*, ¶ 94. According to its filings with the Commission, as of May 21, 2013, Eat at Joe's had acquired approximately 30,000,000 shares of penny stock companies with a stated face value of over $7.5 million from Berkshire, including approximately 3.5 million shares of Plandai stock with a stated face value of over $1.5 million. *Id.*, ¶¶ 94-95. Eat at Joe's also purchased numerous shares of Plandai and other issuers' stock on the open market and in private transactions. *Id.*, ¶ 95. As of December 31, 2013, investment securities constituted approximately 52 to 65 percent of Eat at Joe's total assets, and as of December 31, 2014, that figure had increased to approximately 62 to 80 percent of the company's total assets. *Id.*, ¶ 96. Because Eat at Joe's investment securities exceeded forty

percent of total assets as of December 31, 2013 and December 31, 2014, Eat at Joe's was operating as a *de facto* unregistered investment company within the meaning of the Investment Company Act of 1940, in violation of § 7(a) of the Investment Company Act. *Id.*, ¶ 97.

## LEGAL STANDARD

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the non-moving party's favor. *SEC v. Lek Sec. Corp.,* 276 F. Supp. 3d 49, 57 (S.D.N.Y. 2017) (citing *Loginovskaya v. Batratchenko,* 764 F.3d 266, 269-70 (2d Cir. 2014)). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." *Id.* (citing *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014)). A claim has facial plausibility when the factual content of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Tongue v. Sanofi,* 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted)).

Because the SEC has raised fraud claims, it must also comply with Federal Rule of Civil Procedure 9(b), which imposes a heightened pleading standard on complaints alleging fraud. *Lek*, 276 F. Supp. 3d at 57 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007)). Under Rule 9(b), parties alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The particularity requirement is satisfied when a complaint includes "facts as to time, place, and substance of the defendant's alleged fraud." *Id.* "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.*[1]

---

[1]    In addressing Rule 12(b)(6), Defendants rely heavily on cases decided under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See, e.g.,* Def. Br. at 7, 8, 9, 14 (citing, *inter alia, In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016); *Cortina v. Anavex Life Sciences Corp.*, No. 15-CV-10162(JMF), 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016)). Rule 9(b), rather than the PSLRA,

## LEGAL ARGUMENT

**I.  THE COMPLAINT PROPERLY ALLEGES THAT DEFENDANTS ENGAGED IN A FRAUDULENT SCALPING AND MARKET MANIPULATION SCHEME**

In the First and Second Claims for Relief, the SEC alleges that the Defendants, Fiore and the corporate entities he controlled, Berkshire and Eat at Joe's,[2] engaged in a fraudulent scheme that involved scalping and manipulating the market for Plandai stock, in violation of § 17(a) of the Securities Act of 1933 ("Securities Act"), § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a) and (c) thereunder. *See* Complaint ¶¶ 2-3, 22-51 (scalping claims); ¶¶ 4-7, 62-77 (market manipulation claims).  As part of the scheme, Defendants made false and misleading statements to their brokers in account documents in violation of the above provisions, as well as Exchange Act Rule 10b-5(b).  Complaint ¶¶ 8, 78-84.

To state claims under § 10(b) and Rule 10b-5(a) and (c) based on deceptive conduct and market manipulation, the SEC must allege that the Defendants, in connection with the purchase or sale of securities, and through use of any means of interstate commerce,[3] "(1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." *SEC v. Thompson,* 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (citations omitted).  A "manipulative or deceptive act" is "some act that gives the victim a false impression."  *Id.*

To state claims under § 10(b) and Rule 10b-5(b) based on false statements or omissions,

---

establishes the "particularity" requirements applicable to SEC cases. *See, e.g.*, *SEC v. Prater*, 296 F. Supp. 2d 210, 215 (D. Conn. 2003) (explaining that "[s]ince actions brought by the SEC are not considered 'private litigation,' the standard imposed in the PSLRA for pleading scienter does not apply to the SEC") (internal citations omitted).

[2]    Contrary to Defendants' contention (Def. Br. at 18-19), the Complaint raises well-pleaded allegations against Defendants Berkshire and Eat at Joe's as well as their principal, Fiore.  Fiore used these corporations as independent entities to facilitate his scheme by, *inter alia*, funding the illegal promotions campaign (Complaint, ¶¶ 2, 13, 14, 22, 23, 34-36, 51); participating as counterparties on illegal trades (*id.*, ¶¶ 4, 13, 14, 63, 65, 68-75); and trading in Plandai shares, allowing the generation of more than $11.5 million in illegal proceeds by all Defendants (*id.*, ¶¶ 15, 16, 46-47, 94, 95).

[3]    Defendants do not contest that Defendants' deceptive acts, as alleged, were made in connection with the purchase and sale of Plandai stock, or that the scheme employed the means of interstate commerce. *See* Complaint, ¶ 11.

the SEC must allege that Defendants, by the use of any means of interstate commerce, (1) made a material misrepresentation or a material omission as to which they had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale of securities. *See id.* at 591 (citations omitted); *see also SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016). The elements of the Commission's § 17(a) claims are "essentially the same," with the exception that claims under § 17(a)(2) and (3) do not require scienter. *See Frohling,* 851 F.3d at 136; *Thompson,* 238 F. Supp. 3d at 591.[4]

As set forth below, the Complaint satisfies the pleading and particularity requirements of Rules 12(b)(6) and 9(b). It clearly, and in abundant detail, pleads all of the requisite elements for both the deceptive conduct and false statement claims.

### A.   The Complaint Adequately Alleges That Defendants Engaged in Scalping as Part of a Fraudulent Scheme

The Complaint properly alleges that Defendants engaged in "scalping" – recommending that investors purchase a security while owning the same security and intending to sell. The Complaint precisely describes a scheme through which Defendants obtained millions of shares of Plandai stock, and organized, funded and controlled a campaign to promote that stock while concealing from investors that they intended to sell, and indeed were actively selling, millions of shares worth millions of dollars – the textbook definition of scalping. *See* Complaint ¶¶ 2-3, 22-51.

The Supreme Court, appellate courts, and district courts (including this Court) have long recognized that scalping constitutes fraud or deceit in violation of the federal securities laws. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963) ("'scalping' operates as a fraud or deceit upon any client or prospective client"); *Thompson,* 238 F. Supp. 3d at 590-91,

---

[4]   Because Fiore controlled and acted through Berkshire and Eat at Joe's, his intent can be imputed to both corporate defendants.

596-98 (S.D.N.Y. 2017) (citing cases) (recognizing scalping as fraudulent conduct and denying motion for summary judgment).[5]

Against this well-established legal framework, the Defendants fail to cite a single scalping case.[6] Nor do they examine the detailed factual allegations in the Complaint setting forth the Commission's scalping claims. Instead, they raise a few scattered objections, none of which have merit. Their first contention, that the Complaint does not allege that the Defendants had a duty to disclose their scalping activity (Def. Br. at 6-8) simply ignores paragraph 3 of the Complaint, which states: "[t]hese promotions recommended that investors buy Plandai stock, *while failing to disclose as required by law,* that Fiore [] intended to sell [] his Plandai holdings...") (emphasis added). "Failing to disclose as required by law" means that the Defendants had a legal duty to disclose.

Defendants also ignore settled case law establishing that scalping, by definition, creates a duty to disclose. That is, scalpers assume a duty to disclose their interest in a targeted security when they promote it, and breach that duty when they fail to disclose that they intend to sell. *See Thompson,* 238 F. Supp. 3d at 597 (citing cases) (observing that "many courts have found that scalpers have a duty to disclose their financial interests in touted securities so that their

---

[5] *See also Zweig v. Hearst Corp.,* 594 F.2d 1261, 1267-68 (9th Cir. 1979) (reversing dismissal, finding that plaintiff alleged actionable scalping fraud claims); *SEC v. Abellan,* 674 F. Supp. 2d 1213, 1219-20 (W.D. Wa. 2009) (citing *Capital Gains Research,* 375 U.S. at 181) (granting summary judgment after observing that "scalping ... constitutes fraud or deceit for purposes of establishing violations of the Exchange Act"); *SEC v. Corporate Relations Group, Inc.,* No. 99CV1222, 2003 WL 25570113, *9 (M.D. Fla. Mar. 28, 2003) (holding that scalping "shows an intent to manipulate the market in a manner proscribed the securities laws"); *SEC v. Huttoe,* No. 96-2543, 1998 WL 34078092, *6-7 (D.D.C. Sep. 14, 1998) (citing cases) (explaining that scalping has long been recognized as a fraud or deceit upon investors); *SEC v. Blavin,* 557 F. Supp. 1304, 1311 (E.D. Mich. 1983), *aff'd,* 760 F.2d 706 (6th Cir. 1985) (stating that "[c]ourts have uniformly held that such schemes violate the securities Law and that a failure to disclose such a 'scalping' scheme is a material omission prohibited by §10(b)").

[6] As noted above, Defendants rely heavily on *Cortina,* but the court there went to great lengths to distinguish the facts presented from a scalping case. *See* Def. Br. at 7-8; *Cortina,* 2016 WL 7480415, *4. In addition, unlike the Commission here, the *Cortina* plaintiffs (i) failed to allege that the defendants organized or commissioned a paid promotional scheme; and (ii) failed to identify "a single bulletin, video, newsletter, or report written by, edited by, or commissioned by Defendants." *Id.* at *4-5.

promotional materials are not materially misleading"); *Zweig,* 594 F.2d at 1268 (stating that "[t]here are instances in which Section 10(b) and Rule 10b-5 require disclosures. Here . . . the defendant assumed those duties when, with knowledge of the stock's market and an intent to gain personally, he encouraged purchases of these securities in the market."); *SEC v. Park,* 99 F. Supp. 2d 889, 899 (N.D. Ill. 2000) (holding that a "person who intends to engage in scalping assumes a duty to disclose his interest in the targeted stock").

Rather than squarely addressing the relevant case law, Defendants mistakenly rely on *Janus Capital Grp. v. First Derivative Traders,* 564 U.S. 135 (2011), for the proposition that they cannot be liable because they promoted Plandai through third parties. *See* Def. Br. at 7-8. This assertion is demonstrably false for two reasons.

First, Defendants are liable for their deceptive conduct regardless of whether they personally wrote or published any of the misleading promotions. *See, e.g., SEC v. Strebinger,* 114 F. Supp. 3d 1321, 1332 (N.D. Ga. 2015) (holding that *Janus* is inapplicable to scalping claims brought under § 17(a) and the conduct-based provisions of § 10(b) and Rule 10b-5(a) and (c)); *see also SEC v. Williky,* No.15-cv-0357, 2018 WL 3729137, *2 (S.D. Ind. Aug. 3, 2018) (awarding disgorgement in scalping case in which defendant "hired public relations firms to publicize" the issuer).[7] Second Circuit law is crystal clear that the antifraud provisions preclude <u>both</u> fraudulent conduct and misstatements, and neither claim depends on the other. *See, e.g.,*

---

[7]    The cases cited by Defendants support this analysis. *See* Def. Br. at 8 (citing, *inter alia, In re Galena Biopharma, Inc. Securities Litig.*, 117 F. Supp. 3d 1145, 1165 (D. Or. 2015)) (denying motion to dismiss)). Here, as in *Galena*, "Defendants' argument that only the individual authors are the 'makers' stretches the holding of *Janus* too far." *Id.* at 1187. And as in *Galena*, Fiore paid for promotions, fewer than half of which contained disclaimers indicating that the promoter was compensated, or that the entity paying for the promotions "may own" or "may sell" Plandai stock. *See* Complaint, ¶¶ 34-36. Fiore also exercised control over the most important omission – that while promoting Plandai shares, Defendants were actively selling those same shares – by concealing this fact from promoters. *Id.* Thus, Fiore effectively had "final say on the content of the articles" comparable to that in *Galena*. *See Galena*, 117 F. Supp. 3d at 1187.

*Thompson,* 238 F. Supp. 3d at 591 (explaining that "[the antifraud provisions] prohibit both material misstatements and omissions . . . . Conduct itself can be deceptive, and so liability under § 10(b) or 10b-5 does not require a specific oral or written statement") (citing, *inter alia, Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 129 (2d Cir. 2011)).[8]

Second, Defendants are separately liable under § 20(b) of the Exchange Act, which precludes a defendant from violating the securities laws "through or by means of others" – here, by hiring promoters to do that which they could not do themselves. *See* Complaint, ¶¶ 115-18 (Fifth Claim for Relief). The court in *Strebinger* analyzed this exact issue and found that, pursuant to § 20(b), an organizer and beneficiary of a scalping scheme could not escape liability simply by engaging a third-party promoter to tout on his behalf. *Id.*, 114 F. Supp. 3d at 1333-35.[9] As the court observed, defendants' hiring of third party promoters "appears to be the exact scenario that Section 20(b) attempts to guard against." *Id.*[10] The same logic applies here.

Finally, Defendants are wrong in their assertion that the Commission's scalping claims must be dismissed because the Complaint does not allege that the promotional materials were

---

[8]     Defendants mistakenly cite *Thompson* and *Wilson* for the proposition that their purchases of Plandai shares somehow insulate them from liability for scalping. *See* Def. Br. at 9. In fact, Fiore sold nearly ten times more shares of Plandai stock than he bought during the Relevant Period, and his purchases were designed to support the fraudulent scheme. Complaint, ¶ 49. On at least seventy-three occasions, Fiore sold Plandai stock on the same day as the publication of a promotion that he had paid for. *Id.*, ¶ 48. Fewer than half of Fiore's promotions contained any disclaimer, and none disclosed that he was actively selling. *Id.*, ¶¶ 33-34; *cf. Wilson,* 671 F.3d at 138-39 (applying PSLRA standard in affirming dismissal where defendant's "particular disclosures sufficiently alerted investors" to purported deceptive conduct).

[9]     Defendants' assertion that the SEC did not allege "independent unlawful acts" to support its § 20(b) claims is baffling. *See* Def. Br. at 18. The Complaint alleges, *inter alia,* that the Defendants engaged in many unlawful acts, including an illegal scalping campaign; manipulative trades designed to support and ultimately benefit from the campaign; lying to brokers; and concealing the extent of their holdings in Plandai by failing to file required Schedules 13D. *See* Complaint, ¶¶ 1-9, 23, 35, 51, 78, 89.

[10]     Defendants' assertion that the person funding the campaign must have "editorial control" over the misleading promotions to be liable for scalping under § 20(b) is incorrect. *See* Def. Br. at 8-9; *cf. Strebinger,* 114 F. Supp. 3d at 1331-35 (finding that § 20(b) has no control requirement, distinguishing *SEC v. Coffey,* 493 F.2d 1304, 1318 (6th Cir. 1974)); *see also Huttoe,* 1998 WL 34078092, *8 (stating that "[a]ssuming … that he did not know about every article in the Newsletter and that he did not have editorial control, those facts are immaterial to the SEC's charges").

16

false. *See* Def. Br. at 9.   Defendants have confused scalping, which is pleaded in the Complaint, with a "pump and dump" scheme, which is not. *See Strebinger,* 114 F. Supp. 3d at 1335 (distinguishing scalping from a pump and dump).   To allege scalping, there is no requirement that promotions be false. *See, e.g., Huttoe,* 1998 WL 34078092,  *6 (explaining that "[e]ven if every word of the articles written by [the defendant] were true, [he] would still be in violation of [the securities laws] for failing to disclose the paid promotional nature of those articles").   The fraud in scalping lies not in false statements in the promotions,  but in the failure of the promoters (or their sponsors) to disclose that the funder of the touts owned and intended to sell the same security. *See id.*; *see also Strebinger,* 114 F. Supp. 3d at 1335 (finding actionable scalping case where complaint did not allege that promotions were false).

Accordingly, the Commission has more than sufficiently stated its scalping claims under § 17(a), § 10(b) and Rule 10b-5(a) and (c).

### B.   The Complaint Adequately Alleges That Defendants Engaged in Market Manipulation as Part of a Fraudulent Scheme

The Complaint also properly alleges that, in order to complement their scalping of Plandai stock, Defendants engaged in a variety of manipulative trading practices designed to artificially increase the volume and trading price of Plandai stock.  Complaint,  ¶¶ 4-7, 63-77. Defendants employed three classic types of manipulative trading practices – matched and wash trades (¶¶ 5, 67-69), marking the close (¶¶ 6, 70-72), and painting the tape (¶¶ 7, 73-77). *See SEC v. Competitive Tech., Inc.,* No. 3:04CV1331(JCH),  2005 WL 1719725,  *1 (D. Conn. Jul. 21, 2005) (denying motion to dismiss complaint alleging similar manipulative trading).

As an initial matter, there can be no question that these manipulative trading practices represent fraudulent devices governed by the antifraud provisions of the securities laws. *See ATSI,* 493 F.3d at 99–100 (describing manipulative trading practices, including matched and

wash trading, as a "term of art" for deceptive conduct). Such conduct "is patently manipulative, serving no purpose other than to transmit false information to the market and artificially affect prices. The defendant's manipulative intent can be inferred from the conduct itself." *SEC v. Masri,* 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). Moreover, because market manipulation claims often involve facts that are "solely within the defendant's knowledge," the Second Circuit has recognized that a plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Lek,* 276 F. Supp. 3d at 57 (citing *ATSI,* 493 F.3d at 102). The plaintiff need only "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.*

Here, the Complaint clearly satisfies these pleading requirements. It describes the Defendants' manipulative trading practices in detail, including the type of illegal trade (matched or wash trades, marking the close, and/or painting the tape), with examples of specific trades; the parties and brokerage accounts involved (Fiore, Berkshire, Eat at Joe's); the time period (April 2013 to March 2014, the "Relevant Period," as well as the specific dates of manipulative trades); the illegal purpose (to create a misleading appearance of active trading and induce investors to purchase); and the impact of Defendants' scheme on the market (artificially raising the volume and closing price of Plandai common stock). Complaint, ¶¶ 5-8, 63-75.[11] The Complaint also includes four tables, providing examples of each type of manipulative trade employed by Defendants, with precise dates, times, share prices, accounts, and quantities bought and sold. Complaint, ¶¶ 68, 69, 74, 75. *Cf. Nanopierce Tech., Inc. v. Southridge Capital Management, LLC,* 2002 WL 3819207, *5 (S.D.N.Y. Oct. 10, 2002) (denying motion to dismiss after

---

[11]   Defendants' claim that there was nothing illegal about their trading activities is not a relevant defense in the Second Circuit. *See* Def. Br. at 13; *cf. Lek,* 276 F. Supp. 3d at 60 (quoting *ATSI* 493 F.3d at 102 (explaining that "[m]arket manipulation can be accomplished through otherwise legal means. As the Second Circuit has noted, 'in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation'")).

observing that "[t]he Complaint amply lays out the nature and purpose of the manipulation alleged here, and provides a detailed chart of the sales [that] underlie the scheme").

Defendants do not challenge the Commission's claims that these trades were designed to artificially inflate the trading volume and price of Plandai stock, or that their matched and washed trades violated Exchange Act § 9(a)(1) and (2), as alleged (*see* Third and Fourth Claim for Relief). *See* Def. Br. at 15-17. Instead, their primary challenge is that the Complaint does not allege any impact on the market. *See* Def. Br. at 17. First, this assertion is false. As noted above, the Complaint clearly alleges that Defendants manipulative trades, including both marking the close and painting the tape, led to artificially inflated closing prices and falsely gave the appearance of active trading. *See* Complaint, ¶ 71(stating that "Fiore set the closing price . . . on at least eighteen trading days"), ¶¶ 74-75 (providing examples where Fiore "painted the tape" by setting a new, higher price).

Second, Defendants' misread the law – manipulative trading need not be successful in raising share prices to be illegal. *See, e.g., Lek,* 276 F. Supp. 3d at 60 (citations omitted) (observing that "[n]or does manipulative conduct need to be successful to violate the securities laws. As the D.C. Circuit has noted, 'Intent, not success, is all that must accompany manipulative conduct to prove a violation of the Exchange Act.'").

Finally, whether or not there was sufficient market impact goes to materiality, not deceptive intent, and Second Circuit law is clear that "there is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion." *SEC v. Mudd,* 885 F. Supp. 2d 654, 667 (S.D.N.Y. 2012) (quoting *SEC v. Penthouse Intern., Inc.,* 390 F. Supp. 2d 344, 353 (S.D.N.Y. 2005)).[12]

---

[12]   And as set forth in Section D below, Defendants' ongoing scheme, including funding a promotional campaign through third parties, scalping, manipulative trades and false statements to brokers would be of

### C.    The Complaint Adequately Alleges That Defendants Made Materially False Statements to Their Brokers

The Complaint also properly alleges that Defendants furthered their scheme by knowingly or recklessly making materially false and misleading statements to two brokerage firms. Complaint, ¶¶ 8, 78-84. As alleged in detail, and described above, Fiore filled out and signed stock transmission letters stating that (i) he was not engaged in any promotional efforts regarding Plandai; (ii) he would not sell any shares of Plandai stock through any other brokerage firms; (iii) he had not executed or made arrangements for buy orders of Plandai stock; and (iv) his proposed sales of Plandai stock were not part of a plan to violate the federal securities laws. Each of these statements was demonstrably false, since Fiore was knee deep in his scalping campaign. Fiore made these misrepresentations in furtherance of the scheme, so that the brokerage firms would allow him to deposit his shares of Plandai stock into their accounts and thus monetize the scheme by selling the shares into the public market. Complaint, ¶¶ 8, 78.

Despite Defendants' attempts to contort the plain language of their representations, these allegations sufficiently plead materially false statements in connection with the purchase and sale of securities, pursuant to § 10(b) and Rule 10b-5(b). *See* Def. Br. at 10-11. First, Defendants' statements were unambiguously false – they misrepresented (and falsely omitted) their on-going promotional campaign, as well as their concurrent sales of Plandai shares through other accounts. Defendants' idiosyncratic interpretation of their statements to brokers not only goes well beyond the well-pleaded allegations in the Complaint, it seeks to draw improper inferences against the SEC.[13] *Cf. Lek,* 276 F. Supp. 3d at 57 (stating that all reasonable inferences are to be drawn in

---

concern to any reasonable investor.

[13]    For example, no reasonable reading of Fiore's misrepresentations to Broker B – in which he promised not to engage in any "enhanced selling or promotional efforts" (Complaint, ¶ 80(b)); or to Broker C – in which he promised not to "make any payment in connection with the offer or sale of the Restricted Security" (Complaint, ¶ 81(b)) – will support Defendants' assertion that what was intended

favor of nonmoving party on a motion to dismiss pursuant to Rule 12(b)(6)).

Second, Defendants' misrepresentations were material. *See* Complaint, ¶¶ 78, 83 (alleging materiality); *see also SEC v. Czarnak*, No. 10 Civ. 745(PKC), 2010 WL 4860678,*5 (S.D.N.Y. Nov. 29, 2010) (explaining that "[a] misstatement made in any phase of the selling transaction can be material if a reasonable investor would have considered the defendant's alleged misrepresentations important, even if the statement is not made directly to the investor") (citing *U.S. v. Naftalin*, 441 U.S. 768, 773 (1979)). Here, the information withheld by Defendants, including an ongoing promotional campaign, scalping, and manipulative trades, would clearly have been considered important by a reasonable investor.

Finally, there can be no question that Defendants' false statements to their brokers were "in connection with" the offer or sale of securities as required by § 17(a) and the purchase or sale of securities as required by § 10(b) and Rule 10b-5. The stock transmission letters that Defendants signed at their brokers' request were necessary to allow them to sell shares of Plandai stock into the market at artificially inflated prices. The brokers would not have allowed Defendants to open the accounts and sell the shares in question had Fiore admitted simultaneously buying and selling Plandai stock in other accounts or promoting the stock. The brokers would not have allowed Defendants to open the accounts in question and sell the shares in question had Fiore admitted simultaneously buying and selling Plandai stock in other accounts or promoting the stock. Complaint, ¶¶ 78, 83.

### D.    Defendants' Deceptive Conduct and False Statements Were Material

The Complaint also properly alleges that every aspect of Defendants' scheme was

---

was "a promise that Fiore was not aiding in a breach of fiduciary duty by the issuer by selling shares for more than their fair value." *See* Def. Br. at 11. There is no mention of any "breach of fiduciary duty" or "fair value" in either representation – only a clear promise not to fund "promotional efforts," which Defendants repeatedly violated by promoting Plandai stock throughout the Relevant Period.

material to a reasonable investor.  As an initial matter, whether a false statement is material is a mixed question of law and fact that generally should not be resolved from the face of the Complaint.  *See SEC v. Shapiro,* 2018 WL 2561020, *5 (S.D.N.Y. Jun. 4, 2018) (citing cases, internal quotation omitted) (stating that "[m]ateriality is a mixed question of law and fact which ought not to be resolved on a motion to dismiss unless the alleged misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

Further, scalping is material as a matter of law.  *See Zweig,* 594 F.2d at 1266 (observing that "[t]he facts revealing [defendant's] lack of objectivity were material . . . ."); *Blavin,* 557 F. Supp. at 1311 (stating that "[i]t is obvious, of course, that if [the Defendant] revealed his scalping scheme to those receiving the newsletter, those parties would not have bought the stock").[14]  Similarly, reasonable investors undoubtedly would care that their stocks were being artificially inflated through Defendants' manipulative trading practices.  *See ATSI,* 493 F.3d at 101 (stating that "trading engineered to stimulate demand can mislead investors into believing that the market has discovered some positive news and seeks to exploit it; the duped investors than transact accordingly").  Finally, as explained above, Defendants' misrepresentations to their brokers were material.

### E.    The Complaint Adequately Alleges Defendants' Scienter

The Complaint also properly alleges that Defendants acted with scienter.  *See* Def. Br. at

---

[14]    *See also SEC v. Reynolds,* No. 3-08-CV-0384, 2008 WL 3850550, at *6 (N.D. Tex. Aug. 19, 2008) (stating that the "fact that Defendants were encouraging recipients of promotional mailers [] to buy stock at the same time that they were selling their stock would be material to reasonable investors"); *Huttoe,* 1998 WL 34078092, *4-5 (explaining that scalping "reflects on the objectiveness of the investment advice and is therefore material"); *Corporate Relations Group,* 2003 WL 25570113, *9 (stating that the "fact that Defendants were not heeding their own advice about the subject stocks would be important to a reasonable reader of the publications").  The primary case relied on by Defendants is inapposite because it relates to whether an issuer can pay an analyst to promote its shares, not whether scalping is material.  *See* Def. Br. at 10 (citing *Garvey v. Arkoosh,* 354 F. Supp. 2d 73, 83 (D. Mass. 2005)).

11-15. [15] Scienter, like materiality, is a factual question that generally may not be resolved from the face of a complaint. *See, e.g., Shapiro,* 2018 WL 2561020, \*4 (internal quotations omitted) ("'A complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on 'fairly tenuous inferences' of intent, because intent is a fact that a jury should find.'").

In the Second Circuit, a plaintiff may satisfy the scienter pleading requirement "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI,* 493 F.3d at 99 (citations omitted). The former requires a plaintiff to allege that the defendant benefitted in some concrete and personal way from the purported fraud. The latter requires allegations of either actual intent or conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.* (citations and internal quotations omitted).

Focusing on "motive and opportunity," the Complaint pleads in detail that Fiore, Berkshire, and Eat at Joe's, collectively, reaped proceeds of more than $11.5 million from sales of Plandai stock, while actively working to increase its share price through scalping and manipulatively trading. *See* Complaint, ¶¶ 1, 44, 47. Thus, Defendants had both motive and opportunity to engage in their multi-faceted scheme.

Focusing on "evidence of misbehavior or recklessness," the Complaint alleges in detail that Fiore knew, or was reckless in not knowing, that the promotional materials he funded contained materially incomplete and misleading information. *See* Complaint, ¶¶ 34, 36. He also

---

[15]   Defendants' assertion that "the Complaint fails to sufficiently allege any an 'intent to deceive, manipulate or defraud' or 'knowing misconduct'" is simply puzzling. *See* Def. Br. at 8 (citing *SEC v. Aly*, No. 16 CIV. 3853 (PGG), 2018WL 1581986 (S.D.N.Y. Mar. 27, 2018); *see also* Def. Br. at 11. Here, the Complaint easily meets the standard stated in *Aly* by alleging in detail that Defendants repeatedly acted knowingly, recklessly and with intent to deceive by concealing material facts from investors. *See, e.g.*, Complaint, ¶¶ 1, 4, 8, 9, 35, 38, 51, 54, 90.

knew that the promoters could not accurately disclose his intent to sell Plandai stock during the promotional campaign, because he never told the promoters or listing agents that he beneficially owned Plandai stock, that he intended to sell, and was in fact actively selling, Plandai stock. Complaint, ¶ 37; *see also Galena*, 117 F. Supp. 3d at 1158 (denying motion to dismiss where complaint alleged that promotions did not disclose that campaign was funded by company defendant). Moreover, despite numerous opportunities during the months-long campaign to correct the misleading disclaimers, Defendants repeatedly failed to do so. Complaint, ¶ 35. This continuing failure knowingly or recklessly deprived investors of critical information. *Id.*, ¶ 51.

Viewed through a broader lens, the very nature of the scalping claims creates an "overwhelming presumption" that the Defendants acted with the requisite scienter. *See Blavin*, 557 F. Supp. at 1312 (noting that "[i]n *Zweig v. Hearst*, the 9th Circuit presumed an intent to sell by the very fact of the columnist's trading activity … and that the pattern of defendant's activity "creates an overwhelming presumption that this activity was intentional"); *see also Abellan,* 674 F. Supp. 2d at 1219 (quoting *Capital Gains Research,* 375 U.S. at 181, for the point that "'[e]ngaging in the well-known fraud of scalping is an 'extreme departure from the standard of ordinary care'"); *Huttoe,* 1998 WL 34078092, *8 (same). Simply put, there is no innocent explanation for promoting a security to investors while actively selling the same security.

Similarly, market manipulation "is patently manipulative, serving no purpose other than to transmit false information to the market and artificially affect prices. The defendant's manipulative intent can be inferred from the conduct itself." *Masri,* 523 F. Supp. 2d at 367. Here, the Complaint describes in detail the three forms of manipulative trading employed by Defendants (Complaint, ¶¶ 63-77), and Defendants have yet to come forward with a legitimate economic rationale for their suspect trading practices.

Taking all reasonable inferences as true, the Complaint more than adequately alleges that Defendants acted with scienter, and goes well beyond the requirements of Rules 12(b) and 9(b).

## II.   THE COMPLAINT PROPERLY ALLEGES THAT FIORE VIOLATED SECTION 13(d) AND RULE 13d-1 OF THE EXCHANGE ACT

In the Sixth Claim for Relief, the Complaint properly alleges that Fiore violated § 13(d) and Rule 13d-1 of the Exchange Act by failing to file Schedule 13D's disclosing his ownership of more than five percent of Plandai stock. *See* Complaint, ¶¶ 38, 85-90; *see also SEC v. Wyly,* 788 F. Supp. 2d 92, 97 (S.D.N.Y. 2011) (stating that "Schedule 13D is a disclosure report required under section 13(d) of the Exchange Act to be filed by any person who 'is directly or indirectly the beneficial owner of more than five percent' of the stock of any class of a public company's outstanding stock"); *SEC v. Wey*, 246 F. Supp. 3d 894, 908 (S.D.N.Y. 2017) (explaining that "[t]hese requirements apply to single investors and to multiple investors acting as a group for the purpose of 'acquiring, holding, or disposing of securities of an issuer'") (internal citations omitted).[16]   Here, Defendants concealed their substantial stake in Plandai while promoting the company and simultaneously selling millions of shares.

Defendants do not contest that Fiore actually violated § 13(d).  Instead, they contend that he did not intend to violate the law, as he was somehow unaware of Plandai's registration status. *See* Def. Br. at 24-25.  Their contention, even if true, is without merit.  Scienter is not an element of a § 13(d) violation.  *See, e.g., SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998); *SEC* v. *Levy,* 706 F. Supp. 61, 69 (D.D.C. 1989).  Moreover, whether Fiore acted reasonably or appropriately under the circumstances is a mixed issue of fact and law that is inappropriate on a motion to dismiss.  *See Sapirstein-Stone-Weiss Found. v. Merkin*, 950 F. Supp. 2d 621, 629

---

[16]    The purpose of § 13(d) is to "alert investors to [] potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing."  *U.S. v. Bilzerian,* 926 F.2d 1285, 1297 (2d Cir. 1991) (citations omitted).

(S.D.N.Y. 2013) (holding that "[a]ny determination relating to the relevant duty of care owed by Defendants [is] necessarily linked to Defendants' state of mind and other factual determinations that make resolution of these issues inappropriate at the motion to dismiss phase").

## III.   THE COMPLAINT PROPERLY ALLEGES THAT EAT AT JOE'S VIOLATED SECTION 7(a) OF THE INVESTMENT COMPANY ACT

The Complaint also properly alleges that Eat at Joe's was an investment company during the Relevant Period, and that it violated § 7(a) of the Investment Company Act ("ICA") by failing to register as such prior to trading in the market. *See* Complaint, ¶¶ 91-100; 124-29 (Seventh Claim for Relief). Section 3(a)(1)(C) of the ICA defines an "investment company" as an issuer which (1) is engaged, or proposes to engage, in the business of investing, reinvesting or trading in securities, and (2) that owns or proposes to acquire investment securities having a value exceeding 40 percent of the issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. 15 U.S.C. § 80a-3(a)(1)(C). The Complaint plainly alleges that Eat at Joe's satisfied these elements during the Relevant Period without properly registering with the Commission. *See* Complaint, ¶¶ 93-97, 127-128.

Defendants incorrectly assert that Eat at Joe's falls within an exception to the definition of an investment company – which provides that an issuer primarily engaged in a business other than investing or trading in securities is not an investment company. *See* Def. Br. at 19-22 (citing ICA § 3(b)(1)). Here, however, although Eat at Joe's purported to be engaged in the restaurant business, the scope of the company's investing and trading in securities dwarfed any other operations. The Commission has adopted a five-factor test for determining whether a company is "primarily engaged" in a business other than investing or trading in securities: (1) the company's historical development; (2) its public representations of policy; (3) the investment activities of its officers and directors; (4) the nature of its assets; and (5) the sources of its

26

income.  *See In the Matter of the Tonopah Mining Co.,* 26 S.E.C. 426, 427 (1947) (explaining

that the fourth and fifth factors (assets and income) are the most significant);  *see also Certain*

*Research and Development Companies,* Investment Company Act Release No. 26077 (June 16,

2003), *2 (explaining that "[w]hen the Commission determines whether a company is primarily

engaged in a non-investment business . . . , it looks principally at the composition of the

company's assets and the sources of its income").

  As the Complaint properly alleges, during the Relevant Period, investment securities

comprised between 52 percent and 80 percent of EAJ's total assets – well in excess of the 40

percent threshold set forth in § 3(a)(1)(C). Complaint, ¶ 96. In addition, Eat at Joe's proceeds

from trading in securities overwhelmed any revenue from operating the restaurant at the

Philadelphia airport. *See* Complaint, ¶¶ 92, 93, 94 (alleging net losses from selling cheesesteaks

versus $7.5 million in net income from selling shares).

  Defendants do not dispute these critical facts, choosing instead to focus on the three less

important *Tonopah* factors. *See* Def. Br. at 19. Even assuming their factual arguments are true,

which is not evident from the face of the Complaint, they are premature. Because Defendants

have raised factual questions beyond the face of the well-pleaded allegations of the Complaint,

their Motion to Dismiss should be denied as to this claim.[17]

---

[17] The primary case cited by Defendants does nothing to change this analysis. *See* Def. Br. at 19
(citing *SEC v. National Presto Indus., Inc.,* 486 F.3d 305 (7th Cir. 2007)). National Presto was an "active
manufacturer of industrial, consumer, and military products," and only the fourth *Tonopah* factor – assets
– favored treating the company as an investment company. *Id.* at 312-13. In contrast, Eat at Joe's
operated only one cheesesteak stand at a loss during the Relevant Period, while Fiore generated millions
by trading penny stocks on the company's behalf. Complaint, ¶ 95. As such, Eat at Joe's is more akin to
the "model inadvertent investment company" described in *National Presto*, where "the firm has sold all or
almost all of its assets [and] reduced its operations to a skeleton staff," *e.g.,* the mining company in
*Tonopah Mining* (which was "down to one unprofitable mine"), or the bus company in *SEC v. Fifth Ave.
Coach Lines, Inc.,* 289 F. Supp. 3, 24 (S.D.N.Y. 1968), *aff'd,* 435 F.2d 510 (2d Cir. 1970), "which had no
operating busses at all." *Id.*

27

IV.     **THE COMPLAINT PROPERLY PLEADS DISGORGEMENT**

The Complaint also properly alleges that the Defendants are jointly and severally liable[18] for disgorging more than $11.5 million in illegal proceeds that they received as a result of the fraudulent scheme alleged in the Complaint. *See* Complaint, ¶¶ 1, 22, 47, 130-132, and Prayer for Relief III.

Disgorgement is an equitable remedy that requires "a defendant to give up the amount by which he was unjustly enriched." *SEC. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). "Because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds—especially profits from transactions in securities whose market price has been affected by the frauds—the court need not determine the amount of such gains with exactitude. The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Razmilovic,* 738 F.3d 14, 31 (2d Cir. 2013) (internal citations omitted).

Defendants raise two meritless challenges to the SEC's claims for disgorgement as to Eat at Joe's. *See* Def. Br. at 22-24. First, their assertion that disgorgement is a remedy rather than a claim ignores Second Circuit decisions which refer to disgorgement as both a remedy and a claim for relief. *See, e.g., SEC v. Ahmed,* 263 F. Supp. 3d 381, 388 (D. Conn. 2016) (discussing SEC's "claims for disgorgement"). The distinction Defendants attempt to draw is unclear. Second, their assertion that the Complaint does not properly allege that Eat at Joe's profited from the scheme ignores the many detailed allegations describing the exact manner in which Eat at Joe's received proceeds from scalping and manipulative trades and is liable, as both an active

---

[18]     Joint and several liability for disgorgement is appropriate here, where Fiore, Berkshire and Eat at Joe's closely collaborated in their activities, particularly when they transferred funds and shares between accounts. *See, e.g., SEC v. Boock,* No. 09 Civ. 826 (DLC), 2012 WL 3133638, *4-5 (S.D.N.Y. Aug. 2, 2012) (citing *SEC v. AbsoluteFuture.com,* 393 F.3d 94, 97 (2d Cir. 2004) (finding defendants jointly and severally liable for "collective gains" from sales of unregistered securities)).

participant and relief defendant,[19] for disgorging the proceeds[20] it received from the fraud. *See* Complaint, ¶¶ 47, 63, 65, 68, 69, 94, 95, 103, 130-132.

## V.  ALL CLAIMS IN THE COMPLAINT ARE TIMELY PLED

Finally, all claims in the Complaint are timely pled – Defendants' assertion that the SEC somehow was too late or too slow in filing this action is wrong on the facts and the law. *See* Def. Br. at 25-30.  As an initial matter, "considering a statute of limitations on a motion to dismiss is inappropriate.  A statute of limitations represents an affirmative defense.  Because a plaintiff need not anticipate or allege facts that would defeat affirmative defenses, a court typically cannot dismiss a complaint for failure to satisfy a statute of limitations until summary judgment." *FDIC v. Kime,* 12 F. Supp. 3d 1113, 1119 (S.D. Ind. 2014) (citations omitted).

Second, as the SEC previously informed the Court, all of the $11.5 million in proceeds generated by Defendants' sale of Plandai shares were received on or after June 18, 2013, within the five-year statute of limitations period set forth in *Kokesh v. SEC,* 137 S. Ct. 1635 (2017). [Docket No. 18]. Allegations concerning earlier conduct are included to support claims for injunctive and equitable relief, which are not subject to the five-year statute of limitations, and to provide necessary context to understand the Defendants' fraudulent scheme. *See* Complaint, ¶¶ 19-20, 22-23; *see also SEC v. Ahmed,* 308 F. Supp. 3d 628, 651 (D. Conn. 2018) (citing *SEC v. Collyard,* 861 F.3d 760, 764 (8th Cir. 2017) (stating that injunction was not a penalty barred by five-year statute of limitations)); *SEC v. McCaskey,* 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999)

---

[19]   *See SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998) (discussing relief defendant liability).

[20]   As for Defendants' objection that the Complaint refers to illegal "proceeds" as opposed to "profits" (Def. Br. at 24), the Second Circuit uses both terms when describing disgorgement liability.  *See SEC v. Andrescu,* 117 Fed. Appx. 160, 161 (2d Cir. 2004) (stating that "the money is the *proceeds* of fraud to which they have no claim, and the SEC is entitled to have it disgorged") (emphasis added).  Here, the allegations are based on proceeds rather than profits because it remains unclear what, if anything, Defendants actually paid for the Plandai shares they later sold.  The Commission will ultimately seek disgorgement of all of Defendants' ill-gotten gains received during the applicable five-year period as determined through fact discovery.

(internal citations omitted) (explaining that "[n]o statute of limitations applies to the SEC's claims for equitable remedies").

Finally, Defendants' contentions based on the 180-day Dodd-Frank deadline (Def. Br. at 27-30) are similarly inapposite. *See, e.g., Montford and Company, Inc. v. SEC,* 793 F.3d 76, 82-83 (D.C. Cir. 2015) (finding that the Dodd-Frank deadline is an internal directive to SEC staff, and has no operational effect as a statute of limitations or jurisdictional bar).[21] Even assuming that the Complaint was untimely filed under the Dodd-Frank deadline, which it was not, Defendants' demand here that the Court make new law is not supported by the facts, law, public policy or equitable considerations.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

Dated: December 7, 2018          /s/John J. Bowers
                                 John J. Bowers
                                 Paul W. Kisslinger
                                 100 F Street, N.E.
                                 Washington, DC 20549-4473
                                 Telephone: 202-551-4645 (Bowers)
                                             202-551-4427 (Kisslinger)

                                 COUNSEL FOR PLAINTIFF SECURITIES
                                 AND EXCHANGE COMMISSION

---

[21]     Section 929U of the Dodd-Frank Wall Street Reform and Consumer Protection Act amended the Exchange Act to direct that "[n]ot later than 180 days after the date on which Commission staff provide a written Wells notification to any person, the Commission staff shall either file an action against such person or provide notice to the Director of the Division of Enforcement of its intent to not file an action." 15 U.S.C. § 78d–5(a)(1).  The amendment also provided for extensions of time based on complexity of a matter.  Commission staff sought and received three such extensions here, based in part on the need to investigate new evidence provided by Defendants during the Wells process, settlement discussions and current defense counsel's request for more time after replacing prior counsel.  *See id.; see also Montford,* 793 F.3d at 81 (recognizing that Dodd-Frank allows extensions of time for "certain complex actions").

## CERTIFICATE OF SERVICE

The undersigned certifies that he filed the above document electronically on December 7, 2018, by using the Court's Electronic Case Filing System, and relied upon that system's automatic service of this document upon counsel.

*/s/ John J. Bowers*

John J. Bowers