UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

              v.

JOSEPH A. FIORE, BERKSHIRE CAPITAL
MANAGEMENT COMPANY, INC., and EAT
AT JOE'S, LTD. n/k/a SPYR, INC.,

                              Defendants.

No. 18-CV-5474 (KMK)

OPINION & ORDER

Appearances:

John J. Bowers, Esq.
Paul W. Kisslinger, Esq.
Securities and Exchange Commission
Washington, DC
*Counsel for Plaintiff*

Alexander B. Spiro, Esq.
Crystal Nix-Hines, Esq.
Quinn Emmanuel Urquhart & Sullivan, LLP
New York, NY and Los Angeles, CA
*Counsel for Defendants*

Marc S. Gottlieb, Esq.
Ortoli Rosenstadt LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        The Securities and Exchange Commission (the "SEC" or "Plaintiff") brings this Action

against Joseph A. Fiore ("Fiore"), Berkshire Capital Management Company, Inc. ("Berkshire"),

and Eat at Joe's, Ltd. n/k/a SPYR, Inc. ("Eat at Joe's") (collectively, "Defendants"), alleging that

Defendants engaged in manipulative trading practices in violation of federal securities laws, in

violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

Sections 9(a)(1) and (2) of the Exchange Act, 15 U.S.C. §§ 78i(a)(1), (2); Section 20(b) of the

Exchange Act, 15 U.S.C. § 78t(b); Section 13d of the Exchange Act, 15 U.S.C. § 78m(d), and

Rule 13d-1 thereunder, 17 C.F.R. § 240.13d-1; and Section 7(a) of the Investment Company Act,

15 U.S.C. § 80a-7(a).  (*See* Compl. ¶¶ 1–9 (Dkt. No. 2).)  Before the Court is Defendants'

Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the

"Motion").  (*See* Not. of Mot. (Dkt. No. 26).)  For the reasons stated below, Defendant's Motion

is denied.

## I.  Background

### A.  Factual History

The following facts are taken from the SEC's Complaint, and are assumed true for the

purpose of resolving the instant Motion.

#### 1.  Relevant Parties and Entities

Joseph Fiore "owns and controls Berkshire and is the Chairman of the Board of Directors

of SPYR, Inc., previously known as Eat at Joe's."  (Compl. ¶ 13.)  From April 2013 to March

2014 (the "Relevant Period"), (*id.* ¶ 2), Fiore maintained and controlled six brokerage accounts

held in the name of Berkshire and six brokerage accounts held in the name of Eat at Joe's, (*id.*

¶ 13).  Berkshire is a New York private equity firm that provides financing to penny stock

companies.  (*Id.* ¶ 14.)  Eat at Joe's is a Nevada corporation of which Fiore served as chief

executive officer ("CEO"), chief financial officer ("CFO"), and chairman of the board, and

owned more than 50% of its common stock.  (*Id.* ¶ 15.)  In early 2015, Eat at Joe's changed its

name to SPYR, Inc., and shifted the focus of its business from "developing, owning, and

operating theme restaurants" to "digital publishing and advertising and the development of mobile applications and games." (*Id.*)

Non-party Plandai Biotechnology, Inc. ("Plandai") is a Nevada corporation with its principal offices located in London, England. (*Id.* ¶ 17.) "Plandai purports to be in the business of producing botanical extracts from live plant material, including from green tea leaves, tomatoes, and more recently, marijuana, for the nutraceutical and pharmaceutical industries." (*Id.*) Plandai's stock was a "penny stock," as defined by the Exchange Act; at all relevant times, Plandai's stock traded at less than $5.00 per share. (*Id.* ¶ 18.)

### 2. The Promotional Campaign

In early 2011, Fiore was introduced to Plandai's CEO, and they entered into a business relationship. (*Id.* ¶ 19.) Plandai's common stock was registered with the SEC pursuant to § 12(g) of the Exchange Act, and was quoted on OTC Link under the ticker symbol "PLPL." (*Id.* ¶ 17.) Fiore acquired a large supply of Plandai stock through several separate transactions. (*Id.* ¶ 20.) Specifically, Fiore, through Berkshire and Eat at Joe's, beneficially acquired 5.5 million shares of Plandai stock as part of merger transactions between Plandai and its predecessor, Diamond Ranch Ltd. ("Diamond Ranch"). (*Id.*) Additionally, pursuant to a stock transfer agreement, the parties converted approximately $2.6 million in debt that Diamond Ranch purportedly owed to Berkshire, Eat at Joe's, and certain of Fiore's close associates and beneficially-owned companies, into 14 million shares of Plandai common stock. (*Id.*) Of those shares, Berkshire received 2 million, Eat at Joe's received 3.5 million, and Fiore's associates received the remaining 8.5 million. (*Id.*) Fiore later purchased 4.5 million of these shares from his associates "at below market prices," and soon after sold 3.5 million of them into the market for a large profit. (*Id.* ¶ 21.)

3

In March 2013, Fiore met with Plandai's CEO in New York City, and Fiore agreed to promote Plandai stock. (*Id.* ¶ 22.) Beginning in April 2013, Fiore organized and funded a campaign promoting the stock, including by paying for the campaign with funds that he funneled through Berkshire, in order to sell his shares at a profit, a practice known as "scalping." (*Id.* ¶ 23.)[1]

Fiore directly paid at least five promoters to promote Plandai stock, and indirectly paid at least twenty others to do so through two intermediary consulting companies. (*Id.*) In total, Fiore paid promoters at least $2,137,000 to promote penny stocks, including Plandai, with approximately $675,000 going to the two intermediary consulting companies. (*Id.* ¶ 24.) The promoters primarily distributed promotional materials through bulk emails and in posts on websites they controlled, targeting retail investors and encouraging them to buy Plandai stock. (*Id.* ¶ 26.) Fiore allegedly remained deeply involved in the promotional process, including by providing promoters with information and press releases about Plandai for use in their promotional materials, and by reviewing their materials and informing Plandai when he felt a promoter was underperforming. (*Id.* ¶¶ 27–28, 31.)

The promotional campaign emphasized the investment merits of Plandai stock and often included specific recommendations to buy Plandai stock, without disclosing that Fiore was actively selling that stock. (*Id.* ¶ 32.) For example, on April 29, 2013, a promoter paid by Fiore issued an eighteen-page "research report" that included a positive review of Plandai, and was accompanied by a "Speculative BUY" rating. (*Id.* ¶ 32(a).) The same day and the following day, Fiore directed the sale of at least 55,629 shares of Plandai common stock from accounts held by

---

[1] Scalping is "a practice in which the owner of a security recommends it for investment and then sells it at a profit." *S.E.C. v. Thompson*, 238 F. Supp. 3d 575, 590 (S.D.N.Y. 2017) (citations omitted).

4

Berkshire and Eat at Joe's. (*Id.*) On October 4, 2013, a third-party promoter retained by one of

the consulting firms on behalf of Fiore disseminated a "Street Alert" on Plandai that stated:

> Put everything we've told you together and you have a money making opportunity
> with PLPL like no other – and when it starts to run fast, so get in
> while you can. Go with the experts. Buy PLPL now! . . . Keep a very close eye
> on this fast innovative play today. PLPL could tear up the charts once again. PLPL
> looks ready to lock and load!! Be prepared for an exciting trading session. This is
> an opportunity that you will not want to miss!

(*Id.* at ¶ 32(b).) On the same day, and on October 7, 2013, Fiore directed the sale of at least

70,633 shares of Plandai common stock from accounts held by Berkshire and Eat at Joe's. (*Id.*)

On January 23, 2014, a promoter paid directly by Fiore issued a research report that included

positive reports about the company and included a "Speculative BUY" rating; the same day and

the following day, Fiore directed the sale of at least 227,200 shares of Plandai common stock

from accounts held by Berkshire and Eat at Joe's. (*Id.* ¶ 32(c).) On February 12, 2015, a third-

party promoter retained by one of the consulting firms on behalf of Fiore disseminated a "Stock

Alert" on Plandai that indicated, "PLPL is a huge proven winner for us in the past and it was

arguably the breakout company of the entire junior markets in early 2014," and concluded,

"PLPL looks ready to lock and load!! Be prepared for an exciting trading session. This is an

opportunity that you will not want to miss!" (*Id.* ¶ 32(d).) That same day and the following day,

Fiore directed the sale of at least 1,148,078 shares of Plandai common stock from accounts held

by Berkshire and Eat at Joe's. (*Id.*) Fewer than half the promotions contained disclaimers

indicating that the promoter was compensated for promoting the stock, or disclosing that

Berkshire "may own" or "may sell" Plandai stock. (*Id.* ¶ 34.) Most promotions did not contain

this disclaimer, and none of them disclosed that Berkshire and Fiore "beneficially owned,

intended to sell[,] and were actively selling shares of Plandai stock." (*Id.*)

Fiore's actions demonstrate that he "clearly intended to sell throughout the Relevant Period." (*Id.* ¶ 41.)  For example, at least two of the brokerage accounts from which Fiore sold Plandai stock identified "liquidation" among the objectives for the accounts. (*Id.* ¶ 41.) Furthermore, Fiore completed and signed at least five documents that were sent to brokerage firms where Berkshire and Eat at Joe's maintained accounts that held Plandai stock, disclosing his intent to sell stock from those accounts. (*Id.* ¶ 42.)  For example, on November 8, 2013, in connection with his deposit and intended sale of 1.25 million shares of Plandai stock owned by Eat at Joe's, Fiore submitted a representation letter to his brokerage firm in which he certified, "I have sold, or am in the process of selling, the above referenced [Plandai] shares," and from November 2013 through January 2014 he did, in fact, sell all the shares referred to in the letter. (*Id.* ¶ 43.)

During the Relevant Period, Fiore sold 11,961,898 shares of Plandai from accounts held at six brokerage firms in the names of Fiore, Berkshire, and Eat at Joe's; the three entities collectively received proceeds totaling approximately $11,521,778 from the sales. (*Id.* ¶¶ 46–47.)  On at least 90 occasions, Fiore sold Plandai stock within a week or less of the publication of a promotion that he had paid for, including seventy-three occasions when he sold on the same day. (*Id.* ¶ 48.)  During the Relevant Period, Fiore sold Plandai stock on at least 176 of the 252 trading days, and his trading often "comprised a significant portion of the daily market volume in Plandai stock"; by contrast, Fiore did not sell any shares of Plandai stock in the public market in the three months preceding the start of the promotional campaign. (*Id.* ¶ 50.)  Fiore received no compensation from Plandai or anyone else for promoting Plandai stock. (*Id.* ¶ 44.)

### 3.  Market Manipulation

Fiore also made targeted purchases of Plandai stock to artificially increase the market activity and stock price of Plandai.  (*Id.* ¶ 52.)  For example, in late June to early July 2013, Fiore purchased Plandai stock "in anticipation of and to offset the potential market impact of" the impending publication of a July 6, 2013 article in the *Seattle Times* that was highly critical of Plandai and its senior management.  (*Id.* ¶ 53.)  On eighteen trading days from June 25, 2013 to July 22, 2013, Fiore bought more Plandai shares than he sold, and his purchasing accounted for a significant portion of the market volume in Plandai stock.  (*Id.* ¶ 55.)  Fiore's trades "set the closing price for Plandai stock on eleven of these eighteen trading days."  (*Id.*)  During this time, Fiore also paid for promotional materials that drew attention to the active trading in Plandai stock.  (*Id.* ¶ 56.)

In December 2013, the month prior to the legalization of marijuana in Colorado and Washington, and shortly after Plandai had announced its entry into the medical marijuana industry, Fiore "bought more Plandai stock than he sold."  (*Id.* ¶ 57.)  In February 2014, Fiore purchased a total of 4.5 million shares of Plandai stock for $1.35 million from his sister, a director of Eat at Joe's, and employees of Berkshire and a restaurant that Fiore owned; he then "quickly sold 3.5 million of these shares in the public market for proceeds of approximately $5.65 million."  (*Id.* ¶ 58.)  The SEC alleges that these "buying efforts, coupled with [Fiore's] promotional campaign, were deceptive actions, designed to create the false perception of liquidity and market demand and to offset downward pressure on the stock price caused by negative press[] and his own undisclosed selling of Plandai shares in the accounts he controlled." (*Id.* ¶ 59.)  Both market demand for, and the share price of, Plandai stock increased significantly over the Relevant Period.  (*Id.* ¶ 60.)

The SEC alleges that Fiore used "three well-known methods for manipulating the market for Plandai stock: wash and matched trades, marking the close, and painting the tape." (*Id.* ¶ 64.)

### a.  Matched and Wash Trades

The SEC alleges that on "at least fourteen occasions from May 2013 to June 2013," Fiore executed matched and wash trades by buying and selling "exactly the same amount of Plandai stock at exactly the same price with no change in beneficial ownership, through accounts he controlled in the name of himself, Berkshire, and Eat at Joe's." (*Id.* ¶¶ 67–68 (listing examples of matched and wash trades).)[2]  Fiore engaged in similar trading activity on at least sixteen occasions from May 2013 to December 2013.  (*Id.* ¶ 69 (listing examples).)

### b.  Marking the Close

The SEC alleges that Fiore repeatedly "marked the close" by executing trades "at or near the close of the market to attempt to raise the closing price of Plandai stock and create the false and misleading appearance that it was the result of legitimate market demand." (*Id.* ¶ 70.)[3] Fiore "set the closing price of Plandai stock on at least eighteen trading days" from May 2013 to September 2013.  (*Id.* ¶¶ 70–71; *see also id.* ¶ 72 (listing examples of Fiore marking the close).)

---

[2] "Matched orders are 'orders for the purchase or sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security.'" *S.E.C. v. Competitive Techs., Inc.*, No. 04-CV-1331, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005) (quoting *S.E.C. v. U.S. Envtl. Inc.*, 155 F.3d 107, 109 (2d. Cir. 1998)).

[3] "'Marking the close' is defined as the practice of repeatedly executing the last transaction of the day in a security in order to affect its closing price." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007) (citation and some quotation marks omitted).

### c.  Painting the Tape

Fiore allegedly "painted the tape" from May 2013 to September 2013 by "initiat[ing] multiple offers to purchase Plandai stock on the same day, and within the same short period of time, often at increasing purchase prices to artificially inflate the stock price and create the false and misleading appearance that the increase was the result of legitimate market demand."  (*Id.* ¶ 73; *see also id.* ¶¶ 74–75 (listing examples of Fiore "painting the tape").)[4]

### 4.  False and Misleading Statements

In furtherance of the scheme, Fiore allegedly made false and misleading statements to brokerage firms in connection with the sale of Plandai securities.  (*Id.* ¶ 78.)  For example, on January 27, 2014, Fiore signed and submitted to "Broker B" a document titled "Customer Stock Deposit Representations" in connection with an Eat at Joe's deposit of 2,000,000 shares of Plandai stock in a brokerage account.  (*Id.* ¶ 79.)  The document included several allegedly false representations, including: affirmations that Eat at Joe's would not sell Plandai shares through other broker-dealers while the shares held at Broker B remain unsold, that Eat at Joe's had not and would not engage in selling or promotional efforts, and that Eat at Joe's was in compliance with securities laws.  (*Id.* ¶ 80.)  On November 8, 2013, and January 27, 2014, Fiore signed and submitted two "Shareholder Representation Letters" to "Broker C" in connection with sales of 1,250,000 shares of Plandai stock.  (*Id.* ¶ 81.)  The letters included multiple alleged misrepresentations, including: affirmations that neither Fiore nor any related person would make any payment in connection with the sale of Plandai stock to anyone other than "the usual and

---

[4] "'Painting the tape' signifies creating an appearance of trading activity without an actual change in beneficial ownership."  *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC.*, No. 02-CV-767, 2002 WL 31819207, at *5 n.8 (S.D.N.Y. Oct. 10, 2002).

customary broker's fee or commissions," and that neither Fiore nor any related person had buy or sell orders open with any other broker, dealer, or bank, nor would he place any such order.  (*Id.*)

### 5.  Failure to Disclose Beneficial Ownership

Fiore beneficially owned more than five percent of the outstanding shares of Plandai common stock at various times, but allegedly failed to file the required Schedule 13D with the SEC that would have publicly disclosed his ownership.  (*Id.* ¶¶ 38, 86–88.)  By failing to make the required disclosure, Fiore further concealed his ownership and sales of Plandai stock during the course of the scheme.  (*Id.* ¶ 90.)

### 6.  Eat at Joe's Operated as an Unregistered Investment Company

The SEC alleges that Eat at Joe's claimed to "develop, own[,] and operate theme restaurants called 'Eat at Joe's,'" but in reality, operated only one restaurant, a cheesesteak stand in the Philadelphia airport that reported recurring operational losses.  (*Id.* ¶ 92.)  For at least the years 2013 and 2014, Eat at Joe's allegedly acted primarily as a securities investment company. (*Id.* ¶ 93.)  Fiore frequently used Eat at Joe's as a vehicle to buy and sell Plandai and other penny stocks acquired from Berkshire in a 2003 related party agreement.  (*Id.* ¶ 94.)  According to SEC filings, Eat at Joe's had acquired approximately 30 million shares of penny stock companies from Berkshire by May 21, 2013, with a stated face value of over $7.5 million, including approximately 3.5 million shares of Plandai with a stated face value of over $1.5 million.  (*Id.* ¶¶ 94–95.)  Eat at Joe's "also purchased numerous shares of Plandai and other issuers on the open market and in private transactions."  (*Id.* ¶ 95.)  The SEC alleges that because its investment assets exceeded forty percent of total assets at the end of 2013 and 2014, Eat at Joe's was operating as an unregistered investment company within the meaning of the Investment Company Act.  (*Id.* ¶ 97.)

7.  Causes of Action

The SEC asserts eight causes of action based on the above allegations.  The first four causes of action are for deceptive conduct in connection with Defendants' purchase, sale, and promotion of Plandai stock, in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 9(a)(1) and (2) of the Exchange Act. (*See id.* ¶¶ 101–14.)  The fifth cause of action is for violation of Section 20(b) of the Exchange Act based on the use of third-party promoters.  (*See id.* ¶¶ 115–18.)  The sixth cause of action is against Fiore for his failure to disclose his more than five percent beneficial ownership of Plandai in violation of Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.  (*See id.* ¶¶ 119–23.)  The seventh cause of action is against Eat at Joe's for failure to register as an investment company, in violation of Section 7(a) of the Investment Company Act.  (*See id.* ¶¶ 124–29.)  The final cause of action is for disgorgement of unlawful proceeds arising from the identified violations.  (*See id.* ¶¶ 130–32.)

B.  Procedural History

The SEC filed the operative Complaint on June 18, 2018.  (Compl.)  On November 2, 2018, with leave of the Court, Defendants filed the instant Motion to Dismiss.  (Not. of Mot.; Defs.' Mem. in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 27); Defs.' Decl. in Supp. of Mot. ("Defs.' Decl.") (Dkt. No. 28); Decl. of Marc S. Gottlieb, Esq. in Supp. of Mot. ("Gottlieb Decl.") (Dkt. No. 29).)  The SEC filed a response on December 7, 2018, (Dkt. No. 30), and filed an amended version on December 14, 2018.  (Pl.'s Mem. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 31).)  Defendants filed a reply on December 20, 2018.  (Defs.' Reply Mem. in Further Supp. of Defs.' Mot. ("Defs.' Reply") (Dkt. No. 32).)

## II.  Discussion

### A.  Standard of Review

 "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [its] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alteration and quotation marks omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

### B.  Analysis

#### 1.  Sections 17(a) and 10(b)-5

Rule 10b-5 states, in relevant part, that it is "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  To establish a violation of subsection (b), the SEC must allege that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (citation and quotation marks omitted).  To establish

a violation of subsections (a) or (c), "the SEC must allege that the defendant (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." *Thompson*, 238 F. Supp. 3d at 591 (citations omitted).  A "manipulative or deceptive act" is "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  The requisite state of mind, scienter, requires an "intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and quotation marks omitted).  Additionally, "[m]arket manipulation comprises a class of conduct prohibited by Section 10(b), which typically involves practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity." *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004) (citation and quotation marks omitted), *on reconsideration in part*, No. 99-CV-793, 2004 WL 1781148 (S.D.N.Y. Aug. 10, 2004).

Similarly, Section 17(a) forbids: "(1) the direct or indirect use of any device, scheme, or artifice to defraud; (2) obtaining money or property through misstatements or omissions of material facts; and (3) any transaction or course of business that operates as a fraud or deceit upon a purchaser of securities." *S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (citing 15 U.S.C. §§ 77q(a)(1)–(3)).  The first subsection requires proof of scienter, while the other two sections require only proof of negligence.  *See Aaron v. S.E.C.*, 446 U.S. 680, 697 (1980) ("[T]he language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).").  "The elements of a claim under § 17(a) . . . are essentially the same as the elements of claims under § 10(b) and Rule 10b-5." *Frohling*, 851 F.3d at 136 (citation, alteration, and quotation marks omitted).  Because "[s]ection 10(b), Rule 10b-5[,] and [s]ection 17(a) all sound in fraud[,] . . . the plaintiff must state the circumstances constituting

14

fraud or mistake with particularity." *Thompson*, 238 F. Supp. 3d at 591 (citing Fed. R. Civ. P.

9(b)) (quotation marks omitted); *see also S.E.C. v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y.

2010) (same).

<u>a.  Deceptive Conduct under 10b-5(a) and (c)</u>

Defendants argue that "[w]hether cast as an omission or a misrepresentation of a material

fact, or as a market manipulation, the Complaint lacks the requisite specificity necessary to

survive a motion to dismiss."  (Defs.' Mem. 5.)  Defendants specifically argue, relying on *Janus*

*Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011), that Fiore cannot be primarily

liable under Rule 10b-5 because he did not "make" any statement or omission.  (Defs.' Mem. 6–

7.)  In *Janus*, the Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a

statement is the person or entity with ultimate authority over the statement, including its content

and whether and how to communicate it."  *Janus Cap.*, 564 U.S. at 142.

However, "[t]he Supreme Court's recent ruling in *SEC v. Lorenzo* forecloses

[D]efendants' . . . argument in this case."  *S.E.C. v. SeeThruEquity, LLC*, No. 18-CV-10374,

2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (citing *Lorenzo v. S.E.C.*, 139 S. Ct. 1094

(2019)).  In *Lorenzo*, the Supreme Court rejected Defendants' argument, instead holding that

"dissemination of false or misleading statements with intent to defraud can fall within the scope

of subsections (a) and (c) of Rule 10b-5," and that even a disseminator who did not "make" the

misstatements as defined by *Janus* can thus be held liable as a primary violator.  *Lorenzo*, 139 S.

Ct. at 1100–01; *see also Set Cap. LLC v. Credit Suisse Grp. AG*, No. 18-CV-2268, 2019 WL

3940641, at *14 n.6 (S.D.N.Y. Aug. 16, 2019) ("[E]ven if the . . . [d]efendants did not 'make'

the [misleading statement] for the purposes of Rule 10b-5(b), [the] [p]laintiffs would still have a

viable claim under Rule 10b-5(a), (c) for employment of a scheme to defraud investors using the

[misleading statement]." (citing *Lorenzo*, 139 S. Ct. at 1100–01)).  Therefore, even if the SEC

"[had] not allege[d] [Fiore] 'made' a misstatement in furtherance of this scheme, thereby

prohibiting liability solely under subsection (b) of Rule 10b-5," the Court's analysis would be the

same "because "subsection (a) and (c) . . . do not require an individual 'make' a false statement

to establish liability."  *S.E.C. v. Strebinger*, 114 F. Supp. 3d 1321, 1329, 1331 (N.D. Ga. 2015)

(holding the SEC "appropriately allege[d] a claim under Section 10(b)" where the defendant

allegedly "failed to file a Schedule 13D after acquiring more than 5% of [the promoted

company's] stock," contributed to, edited, and otherwise provided information for independent

research reports promoting the stock and "helped arrange the[ir] dissemination," and then "sold

his stock . . . for a substantial profit"); *see also S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d

279, 287 (2d Cir. 2013) (noting that subsection 10b-5(b) "was the only subsection at issue in

*Janus*" and holding that the defendant's "fraudulent activities independently satisfy the

requirements of scheme liability under Rule 10b-5(a) and (c) and Section 17(a)"); *S.E.C. v.

Killion*, No. 16-CV-621, 2017 WL 7052310, at *8 n.69 (S.D. Tex. Mar. 24, 2017) (noting the

defendant's "argument that *Janus* applies equally to claims of scheme liability has been

repeatedly rejected by courts, which generally hold that *Janus*'s applicability is limited to Rule

10b-5(b)" (citations and quotation marks omitted) (collecting cases)); *S.E.C. v. Garber*, 959 F.

Supp. 2d 374, 380 (S.D.N.Y. 2013) ("The textual basis for *Janus* does not extend to claims based

on schemes to defraud under Rule 10b-5(a) and (c), which do not focus on the 'making' of an

untrue statement.  By the same logic, *Janus* would not affect claims under Section 17(a)(1) . . . ."

(citations omitted)).

    Here, the SEC alleges a deceptive scheme involving multiple forms of market

manipulation, as well as various misstatements or omissions, which, combined with a misleading

promotional campaign, were designed to convince the public that there was more market interest in Plandai stock than in fact existed, encouraging the public to buy Plandai and then allowing Fiore to sell his shares at a profit. (*See* Pl.'s Mem. 12 (alleging scheme liability in violation of § 10b-5(a) and (c) and § 17(a)).) These allegations are sufficient to establish scheme liability in violation of the securities laws. *See SeeThruEquity*, 2019 WL 1998027, at *5 (holding the SEC stated 10b-5 claim where the "complaint alleges that the defendants' entire business model, beyond any [specific] misstatements or omissions, is deceptive," including allegations that they "repeatedly made false or misleading statements in their research reports, press releases, and website"); *In re CytRx Corp. Sec. Litig.*, No. 14-CV-1956, 2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015) (noting that "the Rule 10b-5(b) 'maker' limitation described in *Janus* is inapplicable to scheme liability claims" and holding the plaintiffs stated a 10b-5(a) and (c) claim where they alleged the defendants "participated in the preparation of and/or disseminated or approved" false and misleading statements); *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) ("[T]he SEC has competently pled the existence of a larger scheme, one that went beyond mere misrepresentations to investors, whereby [the] defendants enriched themselves and their families at shareholders' expense."); *S.E.C. v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009) (holding the SEC stated a 10b-5 claim where the defendants allegedly "created a fraudulent scheme whereby they (1) obtained significant blocks of [a particular] stock without registering the transaction; (2) artificially inflated the stock price by engaging in a fraudulent promotional campaign in which they failed to disclose their intent to sell their holdings . . . ; and then (4) dumped the stock on the unsuspecting public for substantial profits"). Therefore, the Court finds the SEC has sufficiently pled deceptive conduct.

### b.  Misstatements or Omissions under 10b-5(b)

The SEC also argues that Fiore made material misstatements to brokers in violation of

Rule 10b-5(b).  (Pl.'s Mem. 20–21.)  Specifically, the SEC alleges that Fiore made affirmative

misrepresentations to brokers in connection with selling his Plandai stock, including affirmations

that Eat at Joe's would not sell Plandai shares through other broker-dealers, that Eat at Joe's had

not and would not engage in selling or promotional efforts, that neither Fiore nor any related

person would make any payment in connection with the sale of Plandai stock to anyone other

than "the usual and customary broker's fee or commissions," and that neither Fiore nor any

related person had buy or sell orders open with any other broker, dealer, or bank, nor would he

place any such order.  (Compl. ¶¶ 80–81.)  Defendants argue that the representations were in fact

"accurate," although they cite no caselaw in support of their position that the Court should decide

that the statements were accurate as a matter of law at this stage.  Taking the SEC's allegations as

true and drawing all inferences in its favor, the Complaint sufficiently alleges that Fiore's

representations to brokers were untrue in light of the alleged scheme to promote Plandai stock

and manipulate its price while concealing ownership.  *Set Capital*, 2019 WL 3940641, at *13

(holding the plaintiffs sufficiently alleged a materially misleading statement because it would

"inarguably have misled a reasonable investor," and noting that "[f]or the purposes of Rule 10b-

5, the veracity of a statement or omission is measured not by its literal truth, but by its ability to

accurately inform rather than mislead" (citations and quotation marks omitted)); *In re BioScrip,*

*Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (holding the plaintiffs "adequately

alleged a misstatement" where, "[c]onstruing the allegations in [the] [p]laintiffs' favor, . . . the

inference is available that a reasonable investor could have read" the statements to mean the

company had no pending investigatory requests, even if the statements "were not literally false").

The SEC has therefore adequately alleged misrepresentations in connection with the sale of securities.

### c.  Materiality

Defendants argue that the SEC fails to plead that the alleged omission of Fiore's ownership of Plandai stock from the promotional materials was material.  To fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*ECA*") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether [the] defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." (citation omitted)); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) ("At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." (collecting cases)). Materiality depends on all relevant circumstances, and a complaint normally should not be dismissed based on materiality "unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (quotation marks omitted) (quoting *Ganino*, 228 F.3d at 162); *see also Halperin*, 295 F.3d at 359 ("[A] complaint fails to state a claim of securities

fraud if no reasonable investor could have been misled about the nature of the risk when he invested." (emphasis omitted)).

Defendants briefly argue that the alleged misrepresentations, omissions, and deceptive conduct were not material because "it is widely assumed that promotional campaigns have been funded by someone[,] and knowledge of the practice is incorporated into the market price." (Defs.' Mem. 10.)  The Court disagrees.  First, the SEC has alleged an overarching deceptive scheme, only part of which is the failure to disclose ownership of Plandai stock to promoters; "considered together and in [the] context" of the promotional and market manipulation scheme, including Fiore's failure to register his more than 5% interest in Plandai and his use of multiple entities and individuals to allegedly conceal his ownership, the omission of his interest "would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin*, 295 F.3d at 357 (citation omitted); *see also S.E.C. v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) (holding that a defendant was a primary violator of § 10(b) where he "did not simply fail to disclose information when there was no duty to do so, . . . or fail to prevent another party from engaging in a fraudulent act," but also "himself committed a manipulative act by effecting the very buy and sell orders that manipulated [the defendant company's] stock upward" (citation, alterations, and quotation marks omitted)). Second, the fact that "it is widely assumed that promotional campaigns have been funded by *someone*," (Defs.' Mem. 10 (emphasis added)), has not prevented courts from finding that failing to disclose a beneficial interest in promoted stock and a present intent to sell is a material omission under the securities laws.  *See Thompson*, 238 F. Supp. 3d at 597 ("Many courts have found that scalpers have a duty to disclose their financial interests in touted securities so that their promotional materials are not materially misleading." (collecting cases)); *In re CytRx*

*Corp.*, 2015 WL 5031232, at *12 (holding the plaintiffs stated 10b-5(a) and (c) claims based on scheme that "included conduct beyond [misleading] statements, including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the [c]ompany's involvement"); *S.E.C. v. Corp. Rels. Grp., Inc.*, No. 99-CV-1222, 2003 WL 25570113, at *8 (M.D. Fla. Mar. 28, 2003) ("[T]he fact that the . . . [d]efendants were selling their stock at the same time they were encouraging their readers to buy would clearly be material to reasonable investors."); *S.E.C. v. Blavin*, 557 F. Supp. 1304, 1312 (E.D. Mich. 1983) (holding the defendant investment advisor's "failure to disclose his substantial ownership of stock in the companies he was touting, and his intent to sell them soon after recommending that they be bought, was a material omission in violation of § 10(b)").  Third and finally, "[m]ateriality is a mixed question of law and fact, which ought not to be resolved on a motion to dismiss unless the alleged misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *S.E.C. v. Shapiro*, No. 15-CV-7045, 2018 WL 2561020, at *5 (S.D.N.Y. Jun. 4, 2018) (quoting *ECA*, 553 F.3d at 197), *reconsideration denied*, 2018 WL 5999607 (S.D.N.Y. Nov. 15, 2018).  Accordingly, the Court declines to find at this stage that the omissions were immaterial.

### d.  Scienter

"Section 10(b) requires plaintiffs to plead scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Schiro v. Cemex, S.A.B. de C.V.*, No. 18-CV-2352, 2019 WL 3066487, at *8 (S.D.N.Y. July 12, 2019) (quoting *Tellabs*, 551 U.S. at 319).  To survive a motion to dismiss, a plaintiff must allege facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." *Tellabs*, 551 U.S. at 324.  "[T]he scienter requirement is met where the complaint alleges facts showing either [(1)] a motive and opportunity to commit the fraud, or [(2)] strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation and quotation marks omitted).  A plaintiff need not present direct evidence of scienter: "[c]ircumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Id.* (ultimately quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

Here, there are ample allegations to support a reasonable inference of scienter.  The SEC alleges that Fiore owned and sold a significant amount of Plandai shares, and stood to make significant profits if the stock price was inflated during the Relevant Period.  While the "mere desire to increase . . . stock prices does not give rise to a 'strong inference' of fraudulent intent," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007), Fiore also allegedly engaged in various deceptive trading practices, including marking the close, matched and wash trades, and painting the tape, while he was paying for promotion of the stock, and actively selling it while encouraging others to buy.  *See S.E.C. v. Competitive Techs., Inc.*, No. 04-CV-1331, 2005 WL 1719725, at *1, *6 (D. Conn. July 21, 2005) (holding the SEC sufficiently alleged scienter where it "allege[d] that [the] defendants acted with the purpose of creating a false appearance of active trading . . . and the purpose of inducing others to trade in the stock" through practices such as marking the close, painting the tape, and matching orders); *S.E.C. v. Schiffer*, No. 97-CV-5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998) (denying motion to dismiss where the

complaint "state[d] a reasonably inferable claim that [the defendant] executed a series of intra-day and 'marking the close' transactions, knowing or reckless to the fact that he was effecting an illegal manipulative scheme").

Taken together, and drawing all inferences in the SEC's favor, these allegations are sufficient to create a plausible inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also S.E.C. v. Aly*, No. 16-CV-3853, 2018 WL 1581986, at \*23 (S.D.N.Y. Mar. 27, 2018) (holding scienter established based on, inter alia, "the benefits [the defendant] received from the scheme," and the "temporal proximity between [the defendant's] filing of the Schedule 13D and [his] sale of his call options" (alteration omitted)), *reconsideration denied*, 2018 WL 4853031 (S.D.N.Y. Oct. 5, 2018); *S.E.C. v. Dubovoy*, No. 15-CV-6076, 2016 WL 5745099, at \*5 (D.N.J. Sept. 29, 2016) (finding temporal proximity between the defendant's trades and the publication of press releases supported an inference of intent to participate in alleged fraud); *Abellan*, 674 F. Supp. 2d at 1219 ("Scienter is . . . evident where persons engage in 'scalping.'"); *In re Alstom SA*, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) (holding the plaintiffs sufficiently alleged scienter where "it is at least arguable that [the defendant] deliberately omitted adequate information about its vendor financing arrangements from its public statements, and thus portrayed the performance of [a particular division] far more favorably than the full facts warranted"); *S.E.C. v. Schiffer*, No. 97-CV-5853, 1998 WL 307375, at \*6 n.32 (S.D.N.Y. June 11, 1998) ("When a person who has a 'substantial, direct pecuniary interest in the success of a proposed offering takes active steps to effect a rise in the market' in the security, a finding of manipulative purpose is prima facie established." (italics and alteration omitted) (quoting *Crane Co. v. Westinghouse Air Brake Co.*,

419 F.2d 787, 795 (2d Cir. 1969)).  Accordingly, the SEC has alleged sufficient information to

justify a reasonable inference of scienter.

For the reasons stated, the SEC has sufficiently alleged a deceptive scheme in violation of

§§ 17(a), 10(b), and Rule 10b-5.  Accordingly, Defendants' Motion To Dismiss those claims is

denied.

### e.  Market Manipulation

The SEC also asserts claims for market manipulation in violation of §§ 9(a)(1) and (2).

Section 9(a)(1) provides:

> It shall be unlawful for any person, directly or indirectly, . . . [f]or the purpose of
> creating a false or misleading appearance of active trading in any security . . . to
> effect any transaction in such security which involves no change in the beneficial
> ownership thereof, or . . . to enter an order or orders for the purchase [or sale] of
> such security with the knowledge that an order or orders of substantially the same
> size, at substantially the same time, and at substantially the same price, for the sale
> of any such security, has been or will be entered by or for the same or different
> parties.

15 U.S.C. § 78i(a)(1).  Section 9(a)(2) makes it unlawful for one or more persons to "effect . . . a

series of transaction in any security . . . creating actual or apparent active trading in such security,

or raising or depressing the price of such security, for the purpose of inducing the purchase or

sale of such security by others."  *Id.* § 78i(a)(2).  "On a market manipulation theory under [§] 9 a

complaint must allege: (1) a series of transactions in a security creating actual or apparent trading

in that security or raising or depressing the price of that security, (2) carried out with scienter, (3)

for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the

plaintiff, (5) and affected plaintiff's purchase or selling price."  *Fezzani*, 384 F. Supp. 2d at 637

(citation and quotation marks omitted).  The Complaint alleges three forms of conduct that the

SEC argues constitute market manipulation under these provisions: matched and wash trades,

marking the close, and painting the tape.  (Pl.'s Mem. 17.)

24

Defendants did not expressly move to dismiss the SEC's claims under §§ 9(a)(1) and (2),
although they generally assert that the Complaint "should be dismissed in its entirety." (Defs.'
Mem. 2.) Moreover, courts in the Second Circuit have expressly held that §§ 9(a)(1) and (2) of
the Exchange Act forbid the type of conduct alleged. *See S.E.C. v. Masri*, 523 F. Supp. 2d 361,
366 (S.D.N.Y. 2007) (noting that § 9(a)(1) "explicitly forbids several common types of market
manipulation, known as matched orders and wash sales, that involve fictitious transactions and
do not result in any change of beneficial ownership," while § 9(a)(2) "more broadly prohibits
securities transactions that create actual or apparent active trading in such security, or raise or
depress the price of such security, for the purpose of inducing the purchase or sale of such
security by others." (alterations and quotation marks omitted) (citing 15 U.S.C. §§ 78i(a)(1),
(2))); *see also S.E.C. v. Kwak*, No. 04-CV-1331, 2008 WL 410427, at *1 (D. Conn. Feb. 12,
2008) (noting that "matched trade[s]" violate § 9(a)(1) and "marking the close" violates
§ 9(a)(2)); *Schiffer*, 1998 WL 307375, at *6 ("[U]nder Section 9(a) of the Exchange Act, when a
series of transactions that have raised or depressed a stock price (or have created actual or
apparent sales volume) is carried out for the purpose of inducing others to buy or sell that stock,
a market manipulation has occurred."). Because Defendants made no specific argument with
respect to whether the SEC has stated claims under § 9(a), and caselaw makes clear that the
alleged conduct is the precise conduct § 9(a) was enacted to address, the Court will not dismiss
those claims. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 103 n.10 (S.D.N.Y. 2015)
(noting that the defendants' motion "argues exclusively that [the] [p]laintiffs have not
[sufficiently] alleged . . . claims for market manipulation and misrepresentation in violation of
Section 10(b) and Rule 10b-5—citing to case law applicable only to those sections—and with no
separate discussion of [the elements] under Section 9," and therefore construing the motion "as

arguing only that [the] [p]laintiffs have failed to [sufficiently plead] their claims pursuant to Section 10(b) and Rule 10b-5" and declining to "discuss the standards applicable to analyzing such claims—or the sufficiency of the [complaint's] allegations under—Section 9").

In any event, Defendants' arguments that the SEC failed to plead market manipulation even with respect to its § 10(b) claims are unavailing.  Defendants argue that the SEC failed to state a market manipulation claim because it "does not even attempt to allege that the trading activity *actually* impacted the market."  (Defs.' Mem. 16.)  However, courts have upheld market-manipulation-based enforcement actions on manipulative intent alone.  *See Koch v. S.E.C.*, 793 F.3d 147, 153–54 (D.C. Cir. 2015) ("[I]ntent—not success—is all that must accompany manipulative conduct to prove a violation of the Exchange Act and its implementing regulations." (citation omitted)); *S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) (noting that "manipulative conduct need [not] be successful in order to violate the securities laws" (citing *Koch*, 793 F.3d at 153–54)); *Masri*, 523 F. Supp. 2d at 367–72 (analyzing the limited caselaw addressing whether intent alone can support a market manipulation claim, and concluding that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation"); *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 287 (S.D.N.Y. 2003) (noting that "an attempted manipulation is as actionable as a successful one," and "the SEC need not identify a specific victim who acted upon the manipulation"); *cf. C.F.T.C. v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) ("A claim for attempted manipulation . . . does not require that the CFTC assert that an attempt to manipulate prices would, in fact, affect market prices." (collecting cases)).  Accordingly, the SEC need only allege sufficient facts to establish "that defendants . . . engaged in conduct designed to deceive or to

defraud investors, and . . . that defendants acted with scienter," *S.E.C. v. Cavanagh*, No. 98-CV-1818, 2004 WL 1594818, at *25 (S.D.N.Y. July 16, 2004), *aff'd*, 445 F.3d 105 (2d Cir. 2006), and it has done so here by alleging that Defendants engaged in a scheme involving, among other things, wash trading, marking the close, and painting the tape, conduct that courts have specifically identified as potentially deceptive, *see Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977) (noting that market manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity"); *accord Masri*, 523 F. Supp. 2d at 366; *Fezzani*, 384 F. Supp. 2d at 641. Specifically, the SEC identifies fourteen occasions from May 2013 to June 2013 in which Fiore, through Berkshire and Eat at Joe's, allegedly bought and then, within minutes or even seconds, sold the exact same quantity of Plandai stock.  (Compl. ¶ 68.)  On sixteen more occasions from May 2013 to December 2013, Fiore, through Eat at Joe's and Berkshire, bought and sold identical or substantially similar amounts of Plandai stock within minutes of each other.  (*Id.* ¶ 69.)  From May 2013 to September 2013, the SEC alleges that Fiore repeatedly executed trades at or near the close of the market, and that he in fact succeeded in setting Plandai's closing price on at least eighteen trading days during this time.  (*Id.* ¶ 72.)  During that same period, the SEC alleges that Fiore repeatedly "painted the tape" by initiating multiple offers for Plandai stock on the same day within a short period of time, "often at increasing purchase prices to artificially inflate the stock price," and lists several examples of this conduct.  (*Id.* ¶¶ 73–76.)  Finally, the SEC alleges that the promotional campaign described in the Complaint, (*id.* ¶¶ 22–51), included promotions paid for by Fiore "that explicitly referenced the increased trading activity" that had in many cases resulted from Fiore's own trading, (*id.* ¶ 77).  Viewed as a whole, these allegations, if proven true, support the SEC's theory that Fiore, using his control over Berkshire and Eat at

Joe's, engaged in a scheme in which he sought to deceive potential investors into believing that Plandai stock was being actively traded and increasing in value as a result of typical market activity. These allegations are sufficient to give rise to an inference that Defendants' conduct was done with the intent to deceive investors. *See Masri*, 523 F. Supp. 2d at 372 (holding the SEC stated market manipulation claim where it "alleged that (1) [the] defendants conducted activity within several minutes of the close of trade; (2) the transactions constituted a large majority of the purchases that day; (3) [a defendant] had outstanding put options expiring that day that he did not wish to be assigned; and (4) by purchasing 200,000 shares, [that defendant] was able to avoid being assignment of these options"); *Competitive Techs.*, 2005 WL 1719725, at *5 (denying motion to dismiss 10b-5 market manipulation claim because "it is clear that the pattern of phone calls between [the defendants] in relation to the pattern of [a defendant's] trading, as well as the substance of the phone . . . , constitute strong circumstantial evidence of conscious misbehavior"); *Schiffer*, 1998 WL 226101, at *3 (holding the SEC stated a market manipulation claim where the complaint "establishe[d] an association between [the defendants], and states a reasonably inferable claim that [one defendant] executed a series of intra-day and 'marking the close' transactions, knowing or reckless to the fact that he was effecting an illegal manipulative scheme"). Accordingly, the SEC has sufficiently alleged market manipulation in violation of the Exchange Act.

### 2. Section 7(a) of the Investment Company Act

Defendants argue that the SEC's claim against Eat at Joe's for violation of § 7(a) of the Investment Company Act, based on its failure to register as an investment company, should be dismissed because Eat at Joe's was exempt from the registration requirement. (*See* Defs.' Mem. 19–22.)

28

Under § 7(a) of the Investment Company Act, a company must register as an investment company if it "is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."  15 U.S.C. § 80a-3(a)(1)(c). Notwithstanding this language, a company is not an investment company if it is "primarily engaged . . . in a business . . . other than that of investing, reinvesting, owning, holding, or trading in securities."  *Id.* § 80a-3(b)(1).

In determining whether a company is an investment company, the SEC considers "[(1)] the company's historical development, [(2)] its public representations of policy, [(3)] the activities of its officers and directors, and, most important, [(4)] the nature of its present assets, and [(5)] the sources of its present income."  *Moses v. Black*, No. 78-CV-1913, 1981 WL 1599, at *6 (S.D.N.Y. Feb. 3, 1981) (quoting *Tonopah Mining Co.*, 26 S.E.C. 426, 427 (1947)); *see also* Lyft, Inc., Investment Company Act Release No. 33399, 2019 WL 1199584, at *3 (Mar. 19, 2019) (noting that in determining whether an issuer is "primarily engaged" in a non-investment company business, the SEC considers "(a) the company's historical development, (b) its public representations of policy, (c) the activities of its officers and directors, (d) the nature of its present assets, and (e) the sources of its present income" (citing *Tonopah Mining*)).

Defendants argue that Eat at Joe's is exempt from registration requirements because it has never been primarily engaged in securities investment, and that instead its primary focus was the operation of theme restaurants.  (Defs.' Mem. 20–22.)  The SEC responds that the exception does not apply, given that "the scope of the company's investing and trading in securities dwarfed any other operations."  (Pl.'s Mem. 26.)

Here, consideration of the *Tonopah* factors suggest that, based on the allegations in the Complaint, Eat at Joe's was required to register as an investment company under §7(a). First, although Eat at Joe's may have begun life as a restaurant company, and later transitioned to a company dedicated to "digital publishing and advertising and the development of mobile applications and games," (Compl. ¶ 15; *see also* Def.'s Mem. 20), the Complaint alleges that throughout the Relevant Period, Eat at Joe's and its officers (namely, Fiore) engaged in significant securities trading activity, (Compl. ¶¶ 93–94). Second, the SEC alleges that "investment securities constituted approximately 52 percent to 65 percent" of Eat at Joe's assets on an unconsolidated basis on December 31, 2013, and "between 62 percent and 80 percent" of Eat At Joe's assets by December 31, 2014. (*Id.* ¶ 96.) Finally, the SEC notes that Eat at Joe's operated only one restaurant between 1997 and 2014, and that it "reported recurring losses from operations." (*Id.* ¶ 92.) These allegations, if true, suggest that Eat at Joe's was an investment company.

Defendants ask the Court to take judicial notice of "all form 10-K public filings referenced" to establish that Eat at Joe's was primarily engaged in non-investment activity. (Defs.' Mem. 21 n.5.) Defendants argue that based on the company's 10-K filings, Eat at Joe's is analogous to the company the Seventh Circuit held was not required to register as an investment company in *S.E.C. v. National Presto Industries, Inc.*, 486 F.3d 305 (7th Cir. 2007). In *National Presto Industries*, the Seventh Circuit reversed a grant of summary judgment in favor of the SEC, relying heavily on an evidentiary record that confirmed that "[r]easonable investors would [have] treat[ed] Presto as a[] [military products] operating company rather than a competitor with a closed-end mutual fund." 486 F.3d at 315.

30

Here, it would be inappropriate to consider Eat at Joe's 10-K filings to determine whether Eat at Joe's was exempt from registration because it would require considering the documents for their truth.  Although courts may take judicial notice of "legally required public disclosure documents filed with the SEC," *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 434 (S.D.N.Y. 2018), they may "not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted," *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008) (citation, quotation marks, and alterations omitted).  Here, Defendants ask the Court to consider the truth of the SEC filings' contents and hold as a matter of law that the statements made therein establish that Eat at Joe's was primarily involved in the business of "creating American Diner themed restaurants, not investing."  (Defs.' Mem. 21.)  Because considering such statements for their truth would be improper at this stage, the Court declines to take judicial notice of the information in the 10-Ks. *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (taking judicial notice of SEC filings with respect to "the fact that these documents contain certain information," but declining to "accept these documents for the truth of the matters asserted in them"), *on reconsideration*, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), *and on reconsideration*, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011).[5]

For these reasons, Defendants' Motion To Dismiss the SEC's § 7(a) claim against Eat at Joe's is denied.

---

[5] Defendants assert that the 10-K filings show that the SEC was placed "on notice" that Eat at Joe's was primarily engaged in the business of operating theme restaurants; however, this assertion does nothing to undermine the SEC's allegation that despite their public appearance and statements, Eat at Joe's was *in fact* an investment company, and that it concealed that fact by holding itself out as primarily a restaurant operator.  The characterization of Eat at Joe's in the company's 10-Ks is thus perfectly consistent with the SEC's allegations that Eat at Joe's intentionally concealed its status as an investment company.

### 3.  Section 13(d) of the Exchange Act and Rule 13d-1

The SEC alleges that Fiore never filed a Schedule 13D form within ten days of the acquisition of more than five percent of Plandai stock, as required by § 13(d) of the Exchange Act and Rule 13d-1.  (Compl. ¶¶ 120–22.)  Defendants argue that Plandai's public filings indicated that it was not a Section 12 reporting company, and that Fiore therefore "had no way of ascertaining that he was subject to this statutory filing requirement."  (Defs.' Mem. 24.)  The SEC argues that "[s]cienter is not an element of a § 13(d) violation," and thus that ignorance is no excuse.  (Pl.'s Mem. 25 (citing *SEC v. McNulty*, 137 F.3d 732).)  The SEC further argues that "whether Fiore acted reasonably or appropriately under the circumstances is a mixed issue of fact and law that is inappropriate on a motion to dismiss."  (*Id.* (citing *Sapirstein-Stone-Weiss Found. v. Merkin*, 950 F. Supp. 2d 621, 629 (S.D.N.Y. 2013)).)

Section 13(d) states that "[a]ny person who, after acquiring . . . the beneficial ownership of any equity security . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition," file with the SEC a statement containing certain information.  15 U.S.C. § 78m(d).  "Schedule 13D is a disclosure report required under [§] 13(d) of the Exchange Act to be filed by any person who 'is directly or indirectly the beneficial owner of more than five percent' of the stock of any class of a public company's outstanding stock."  *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 97 (S.D.N.Y. 2011), *modified in part on reconsideration*, 950 F. Supp. 2d 547 (S.D.N.Y. 2013).  "For the purpose of determining if the reporting requirements of Section 13(d) have been met, a potential filer may rely upon 'information set forth in the issuer's most recent quarterly or annual report . . . unless he knows or has reason to believe that the information contained therein is inaccurate.'"  *In re Luxottica Grp. S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224, 234 (E.D.N.Y. 2003) (quoting 17 C.F.R.

§ 240.13d–1(j)).  The Second Circuit has specifically held that "scienter is not an element of civil

claims under" § 13(d).  *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (affirming district

court's ruling that "lack of scienter would not be a defense to the claims," and finding that the

ruling "was consistent with precedent in this Circuit and with the Commission's interpretive

regulations" (citing *S.E.C. v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972))).

Here, Defendants argue that Fiore should not be held liable for violating § 13(d) because

he acted in reliance on Plandai's public filings, which incorrectly stated that Plandai was not a

Section 12 reporting company.  (Def.'s Mem. 24–25; *see also* Defs.' Decl. Exs. F at 32, G at 24,

H at 26, I at 34 (Plandai's 10-K forms from 2011–2014).)  Although Fiore may be able to

establish a defense if he reasonably relied on Plandai's inaccurate filings, Fiore's reasonable

reliance is a mixed question of fact and law that cannot be resolved solely from the facts alleged

in the Complaint.  *Cf. Cohn v. Kind, LLC*, No. 13-CV-8365, 2015 WL 9703527, at *3 (S.D.N.Y.

Jan. 14, 2015) (noting that reasonable reliance "is a question of fact inappropriate for resolution

on a motion to dismiss"); *Gen. Motors Corp. v. Watson Enters., Inc.*, No. 04-CV-120, 2004 WL

2472268, at *5 (D. Conn. Oct. 27, 2004) (denying motion to dismiss and noting that "[w]hether

[the plaintiff] was justified in relying upon [the defendant's] representations presents a question

of fact").

Because the SEC has adequately pled that Fiore failed to comply with § 13(d), and

Fiore's defense would require the Court to consider facts outside the Complaint, Defendants'

Motion To Dismiss this claim is denied.

### 4.  Statute of Limitations

Defendants argue that the SEC's § 17(a), 10(b), and disgorgement claims are barred in

whole or in part by the five-year statute of limitations imposed by 28 U.S.C. § 2462, which holds

that the statute of limitations "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise" is five years.  (Def.'s Mem. 25 (quoting 28 U.S.C. § 2462).) Specifically, Defendants argue that because the "Relevant Period" discussed in the Complaint began in April 2013, and the Complaint was not filed until June 18, 2018, any and all claims in the Complaint arising from events before June 18, 2013 are time-barred.  (*Id.*)  Defendants also argue that the SEC cannot rely on a "continuing violations" theory of liability in order to litigate claims arising from actions outside the statutory term, as the Second Circuit has not adopted such a theory, and "most courts in this circuit have been skeptical of [the doctrine's] application in securities cases."  (*Id.* at 27.)

The SEC argues that all of the proceeds that Defendants received from their alleged violations were received on or after June 18, 2013, within the statute of limitations period.  (Pl.'s Mem. 29.)  Moreover, the SEC argues that any information "concerning early conduct [is] included to support claims for injunctive and equitable relief, which are not subject to the five-year statute of limitations, and to provide necessary context to understand the Defendants' fraudulent scheme."  (*Id.*)

"[T]he statute of limitations is normally an affirmative defense, on which the defendant has the burden of proof."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (citations omitted).  As a result, a claim should only be dismissed on a motion to dismiss based on a statute of limitations defense "if the factual allegations in the complaint clearly show that the claim is untimely," and if "drawing all reasonable inferences in favor of the plaintiff, the court concludes that the plaintiff's own factual allegations prove the defendant's statute of limitations defense."  *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010) (citing, inter alia, *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).

Here, the SEC has alleged a fraudulent scheme involving conduct that occurred both within and before the statute of limitations.  Specifically, the Complaint contains allegations of matched and wash trades executed between May 8, 2013 and June 28, 2013, (Compl. ¶¶ 68–69), marking the close between May 3, 2013 and July 10, 2013, (*id.* ¶ 72), painting the tape on May 3, 2013, (*id.* ¶ 74), manipulative limit orders on July 9, 2013, (*id.* ¶ 75), fraudulent and misleading statements to brokerage firms between November 8, 2013 and January 27, 2014, (*id.* ¶¶ 78–84), and failure to disclose beneficial ownership of more than five percent of Plandai's shares and operation as an unregistered investment company at various times within the Relevant Period, (*id.* ¶¶ 85–90).

Defendants argue that any claims supported in part by conduct that occurred prior to June 18, 2013 must nonetheless be dismissed because the Second Circuit does not apply the continuing violations doctrine in securities cases.  (Defs.' Mem. 27.)  "The continuing violations doctrine operates to delay the triggering of a statute of limitations where a continuing violation is occasioned by continual unlawful acts, not continual ill effects from a single violation."  *In re Converse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (citation and quotation marks omitted).  Courts within the Second Circuit have reached "diametrically opposite conclusions" regarding whether the continuing violations doctrine applies in securities fraud cases.  *Freihofer v. Vt. Country Foods, Inc.*, No. 17-CV-149, 2019 WL 2995949, at *3 (D. Vt. July 9, 2019) (collecting cases); *compare In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012) (holding that "continuing misrepresentations mean that [the] [p]laintiffs' claims are not untimely, given the rule, adopted by the majority of courts in this Circuit, that the statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter" and collecting cases (citation and quotation marks omitted)), *with Converse Tech.*, 543

F. Supp. 2d at 155 ("The weight of authority in this circuit is skeptical of the application of the continuing violations doctrine in securities fraud cases." (collecting cases)).

In light of the fact that all of the SEC's claims survive based on timely-pled allegations alone, the Court declines to determine at this stage whether the potential inapplicability of the continuing violation doctrine bars consideration of, and damages for, conduct that occurred prior to June 18, 2013.  At the summary judgment stage, with the benefit of a developed factual record, Defendants may again raise the argument that some or all of the SEC's claims are time-barred.  *See Comverse Tech.*, 543 F. Supp. 2d at 155 (finding it "prudent to defer consideration of [the statute of limitations] issue until the factual record . . . is more fully developed" in light of the fact that it implicates "an uncertain area of the law," and because "it is difficult to determine [at the motion to dismiss stage] whether the factual predicate required for application of the continuing violations doctrine . . . has been met").[6]

---

[6] Defendants also argue that the Court lacks jurisdiction over this Action because the SEC failed to bring suit within 180 days of providing Defendants with a written *Wells* notification, as required by Section 929U of the Dodd-Frank Act.  (Defs.' Mem. 27–28 (citing 15 U.S.C. § 78d-5(a)(1)).)  Section 929U provides:

> Not later than 180 days after the date on which Commission staff provide a written Wells notification to any person, the Commission staff shall either file an action against such person or provide notice to the Director of the Division of Enforcement of its intent to not file an action.

15 U.S.C. § 78d-5(a)(1).  The statute includes a procedure for extending that deadline for "certain complex actions."  *See* 15 U.S.C. § 78d-5(a)(2).  The only courts to have considered Defendants' argument have rejected it, holding that the rule is an internal directive and not a jurisdictional bar.  *See Montford & Co. v. S.E.C.*, 793 F.3d 76, 83 (D.C. Cir. 2015) (holding "that the 180-day time period is not jurisdictional"); *S.E.C. v. NIR Grp., LLC*, No. 11-CV-4723, 2013 WL 5288962, at *5 (E.D.N.Y. Mar. 24, 2013) ("Every relevant authority supports the conclusion that expiration of the 180-day deadline imposed by section 929U does not create a jurisdictional bar to SEC enforcement actions."); *S.E.C. v. Levin*, No. 12-CV-21917, 2013 WL 594736, at *13 (S.D. Fla. Feb. 14, 2013) (holding that Section 929U "imposes only an internal deadline on the SEC, not a private right to be free from agency action occurring beyond the internal deadline").

### 5.  Disgorgement

Defendants argue that the SEC failed to properly plead a claim for disgorgement because disgorgement is an equitable remedy, not a separate cause of action.  (Def.'s Mem. 22–23.) Defendants are correct that "[d]isgorgement is merely an equitable remedy rather than a cause of action." *Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship*, 681 F. Supp. 2d 501, 512 n.60 (S.D.N.Y. 2010) (citing *Cavanagh*, 445 F.3d at 117), *aff'd*, 481 F. App'x 686 (2d Cir. 2012); *see also S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) ("Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct."); *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011) (comparing disgorgement to other "equitable remedies," and stating that "disgorgement is a distinctly public-regarding remedy").

However, to the extent the SEC seeks disgorgement as an equitable remedy, it has adequately pled facts supporting entitlement to the remedy.  "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (citation and quotation marks omitted), *as amended* (Nov. 26, 2013). Because the SEC has sufficiently pled securities fraud claims, it may seek disgorgement of any "illegally derived" proceeds it ultimately is able to prove, *see id.*, subject to the statute of limitations, *see Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1639 (2017) ("Disgorgement in the securities-enforcement context is a 'penalty' within the meaning of § 2462, and so disgorgement actions

---

Defendants' argument that the Court lacks jurisdiction over this Action is therefore without merit.

must be commenced within five years of the date the claim accrues.").  The SEC's cause of action for disgorgement thus survives as an equitable remedy.

### 6.  Liability Against Each Defendant

Defendants argue that the SEC failed to state claims against Berkshire and Eat at Joe's because the Complaint contained "*no* direct allegations of wrongdoing" by Berkshire and Eat at Joe's themselves "other than that Fiore is alleged to have acted through Berkshire and [Eat at Joe's]."  (Def.'s Mem. 18.)  In fact, however, the Complaint details numerous instances of trade matching between Berkshire, Eat at Joe's, and Fiore, (*see* Compl. ¶ 68), many instances of both Fiore and Berkshire marking the close, (*see id.* ¶ 72), and several instances of Berkshire and Fiore painting the tape, (*see id.* ¶ 75).  The SEC also alleges that Fiore "owned and controlled" Berkshire, and that he "effectively controlled Eat at Joe's," and that he conducted the alleged transactions through brokerage accounts held in their names.  (*Id.* ¶¶ 13–15.)  These allegations are sufficient to state claims against Eat at Joe's and Berkshire, based both on the direct allegations of misconduct against them, and the allegations that Fiore, the owner of Berkshire and the Chairman, majority shareholder, CEO, and CFO of Eat at Joe's, carried out the scheme via his complete control of these two entities.  *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 (S.D.N.Y. 2017) (denying motion to dismiss scheme liability claim by corporate defendant where a high-level officer committed deceptive acts through the company and the company benefitted from the misconduct); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008) (holding the plaintiffs stated a 10(b) claim against a defendant who "made no public statements himself," but whose "behavior [wa]s at the heart of [the defendant corporation's] false and misleading conduct"); *cf. In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for

how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." (collecting cases)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-CV-2923, 1994 WL 88129, at *15 (S.D.N.Y. Mar. 15, 1994) (dismissing claim where the plaintiff made generalized allegations against four defendants as a group, and noting that "pleading requires [the] plaintiffs to identify the specific defendant charged with committing a particular predicate act, rather than collectivizing a group of defendants as [the] plaintiffs have done here").

      7.  Section 20(b)

      Section 20(b) of the Exchange Act makes it "unlawful for any person, directly, or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."  15 U.S.C. § 78t(b).  The SEC alleges that Fiore and Berkshire violated § 20(b) by using third-party promoters to promote Plandai stock without disclosing their beneficial ownership and intent to sell.  (Compl. ¶ 117.)  Defendants argue that the claim fails because the SEC "has not alleged an independent unlawful act by any defendant," because Fiore and Berkshire had no duty to disclose their interest.  (Defs.' Mem. 18.)  Because the Court has already rejected that argument, and Defendants make no other argument with respect to this claim, Defendants' Motion To Dismiss the SEC's § 20(b) claim is denied.  *See Strebinger*, 114 F. Supp. 3d at 1334 (holding the SEC stated claim under 20(b) where the defendant "contributed to the false or otherwise misleading information contained" in reports issued by third parties).

## III. Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is denied. The Court will

hold a conference on November 6, 2019 at 11:30 a.m. to discuss the status of the case. The Clerk

of the Court is respectfully requested to terminate the pending Motion. (Dkt. No. 26.)

SO ORDERED.

Dated: September **25**, 2019
      White Plains, New York

KENNETH M. KARAS
United States District Judge

40